# EXHIBIT A

CREDIT AGREEMENT

Dated as of October 3, 2003

among

BLACK CROW MEDIA GROUP, LLC,
BLACK CROW MEDIA, L.L.C.,
STG MEDIA, L.L.C.,
RTG MEDIA, L.L.C.,
THOMAS MEDIA OPERATIONS, L.L.C.,
BLACK CROW RADIO, L.L.C.,
BCA RADIO, L.L.C.,
RTG RADIO, L.L.C.,
THOMAS RADIO, L.L.C.
and
RAINBOW MEDIA, INC.,

as Borrowers,

THE OTHER CREDIT PARTIES SIGNATORY HERETO,

as Credit Parties,

THE LENDERS SIGNATORY HERETO

FROM TIME TO TIME,

as Lenders,

and

GENERAL ELECTRIC CAPITAL CORPORATION,

as Agent and Lender

# TABLE OF CONTENTS

Page

1. AMOUNT AND TERMS OF CREDIT ....................................................................2
   1.1  Credit Facilities................................................................................................2
   1.2  [Intentionally Reserved]..................................................................................6
   1.3  Prepayments.....................................................................................................6
   1.4  Use of Proceeds................................................................................................8
   1.5  Interest and Applicable Margins......................................................................8
   1.6  [Intentionally Reserved.].................................................................................11
   1.7  [Intentionally Reserved.].................................................................................11
   1.8  Cash Management Systems ..............................................................................12
   1.9  Fees...................................................................................................................12
   1.10 Receipt of Payments ........................................................................................12
   1.11 Application and Allocation of Payments..........................................................12
   1.12 Loan Account and Accounting .........................................................................13
   1.13 Indemnity..........................................................................................................14
   1.14 Access ...............................................................................................................15
   1.15 Taxes.................................................................................................................15
   1.16 Capital Adequacy; Increased Costs; Illegality.................................................16
   1.17 Single Loan ......................................................................................................18

2. CONDITIONS PRECEDENT.............................................................................18
   2.1  Conditions to the Initial Loans........................................................................18
   2.2  Further Conditions to Each Loan.....................................................................20

3. REPRESENTATIONS AND WARRANTIES .....................................................20
   3.1  Corporate Existence; Compliance with Law ...................................................20
   3.2  Executive Offices, Collateral Locations, FEIN ...............................................21
   3.3  Corporate Power, Authorization, Enforceable Obligations..............................21
   3.4  Financial Statements and Projections ..............................................................21
   3.5  Material Adverse Effect....................................................................................22
   3.6  Ownership of Property; Liens ..........................................................................22
   3.7  Labor Matters....................................................................................................23
   3.8  Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ...........23
   3.9  Government Regulation .....................................................................................24
   3.10 Margin Regulations...........................................................................................24
   3.11 Taxes.................................................................................................................24
   3.12 ERISA...............................................................................................................25
   3.13 No Litigation.....................................................................................................25
   3.14 Brokers..............................................................................................................26
   3.15 Intellectual Property .........................................................................................26
   3.16 Full Disclosure .................................................................................................26
   3.17 Environmental Matters......................................................................................26
   3.18 Insurance...........................................................................................................27
   3.19 Deposit and Disbursement Accounts ................................................................27

i

|  | 3.20 | Government Contracts | 27 |
|--|------|---------------------|----|
|  | 3.21 | [Intentionally Reserved.] | 27 |
|  | 3.22 | Bonding; Licenses | 27 |
|  | 3.23 | Solvency | 27 |
|  | 3.24 | [Intentionally Reserved.] | 28 |
|  | 3.25 | Status of License Subs | 28 |
|  | 3.26 | Subordinated Debt | 28 |
|  | 3.27 | FCC Matters/Broadcasting Business. | 28 |
|  | 3.28 | [Intentionally Reserved.] | 30 |
|  | 3.29 | OFAC | 30 |
|  | 3.30 | Patriot Act | 30 |
| 4. | | FINANCIAL STATEMENTS AND INFORMATION | 30 |
|  | 4.1 | Reports and Notices. | 30 |
|  | 4.2 | Communication with Accountants | 31 |
| 5. | | AFFIRMATIVE COVENANTS | 31 |
|  | 5.1 | Maintenance of Existence and Conduct of Business | 31 |
|  | 5.2 | Payment of Charges. | 31 |
|  | 5.3 | Books and Records | 32 |
|  | 5.4 | Insurance; Damage to or Destruction of Collateral. | 32 |
|  | 5.5 | Compliance with Laws | 33 |
|  | 5.6 | Supplemental Disclosure | 33 |
|  | 5.7 | Intellectual Property | 34 |
|  | 5.8 | Environmental Matters | 34 |
|  | 5.9 | Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases. | 35 |
|  | 5.10 | [Intentionally Reserved.] | 35 |
|  | 5.11 | Further Assurances. | 35 |
|  | 5.12 | FCC Reports and Communications | 35 |
| 6. | | NEGATIVE COVENANTS | 36 |
|  | 6.1 | Mergers, Subsidiaries, Etc | 36 |
|  | 6.2 | Investments; Loans and Advances | 36 |
|  | 6.3 | Indebtedness. | 37 |
|  | 6.4 | Employee Loans and Affiliate Transactions. | 37 |
|  | 6.5 | Capital Structure and Business | 38 |
|  | 6.6 | Guaranteed Indebtedness | 38 |
|  | 6.7 | Liens | 38 |
|  | 6.8 | Sale of Stock and Assets | 39 |
|  | 6.9 | ERISA | 39 |
|  | 6.10 | Financial Covenants | 39 |
|  | 6.11 | Hazardous Materials | 39 |
|  | 6.12 | Sale-Leasebacks | 39 |
|  | 6.13 | Restricted Payments | 39 |
|  | 6.14 | Change of Corporate Name, State of Incorporation or Location; Change of Fiscal Year | 39 |

| 6.15 | No Impairment of Intercompany Transfers | 40 |
| 6.16 | Real Estate Purchases | 40 |
| 6.17 | Changes Relating to Subordinated Debt; Material Contracts. | 40 |
| 6.18 | [Intentionally Reserved.] | 41 |
| 6.19 | License Subs | 41 |
| 6.20 | Limitation on Sale or Discount of Receivables | 41 |
| 6.21 | Marketing Agreements | 42 |

| 7. | **TERM** | 42 |
| 7.1 | Termination | 42 |
| 7.2 | Survival of Obligations Upon Termination of Financing Arrangements | 42 |

| 8. | **EVENTS OF DEFAULT; RIGHTS AND REMEDIES** | 42 |
| 8.1 | Events of Default | 42 |
| 8.2 | Remedies. | 45 |
| 8.3 | Waivers by Credit Parties | 46 |
| 8.4 | FCC Approvals | 46 |
| 8.5 | Consent to Receiver | 47 |

| 9. | **ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF AGENT** | 48 |
| 9.1 | Assignment and Participations | 48 |
| 9.2 | Appointment of Agent | 50 |
| 9.3 | Agent's Reliance, Etc. | 51 |
| 9.4 | GE Capital and Affiliates | 52 |
| 9.5 | Lender Credit Decision | 52 |
| 9.6 | Indemnification | 52 |
| 9.7 | Successor Agent | 52 |
| 9.8 | Setoff and Sharing of Payments | 53 |
| 9.9 | Advances; Payments; Non-Funding Lenders; Information; Actions in Concert. | 54 |

| 10. | **SUCCESSORS AND ASSIGNS** | 56 |
| 10.1 | Successors and Assigns | 56 |

| 11. | **MISCELLANEOUS** | 56 |
| 11.1 | Complete Agreement; Modification of Agreement | 56 |
| 11.2 | Amendments and Waivers. | 56 |
| 11.3 | Fees and Expenses | 58 |
| 11.4 | No Waiver | 59 |
| 11.5 | Remedies | 60 |
| 11.6 | Severability | 60 |
| 11.7 | Conflict of Terms | 60 |
| 11.8 | Confidentiality | 60 |
| 11.9 | GOVERNING LAW | 61 |
| 11.10 | Notices | 61 |
| 11.11 | Section Titles | 62 |
| 11.12 | Counterparts | 62 |

11.13   WAIVER OF JURY TRIAL.................................................................................62
11.14   Press Releases and Related Matters .............................................................62
11.15   Reinstatement................................................................................................63
11.16   Advice of Counsel..........................................................................................63
11.17   No Strict Construction ...................................................................................63

12.    CROSS-GUARANTY..........................................................................................63
12.1    Cross-Guaranty ..............................................................................................63
12.2    Waivers by Borrowers ...................................................................................64
12.3    Benefit of Guaranty.......................................................................................64
12.4    Waiver of Subrogation, Etc...........................................................................64
12.5    Election of Remedies .....................................................................................64
12.6    Limitation.......................................................................................................65
12.7    Contribution with Respect to Guaranty Obligations....................................65
12.8    Liability Cumulative ......................................................................................66

## INDEX OF APPENDICES

| | | |
|---|---|---|
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.2) | - | [Intentionally Reserved] |
| Annex C (Section 1.8) | - | Cash Management System |
| Annex D (Section 2.1(a)) | - | Closing Checklist |
| Annex E (Section 4.1(a)) | - | Financial Statements and Projections -- Reporting |
| Annex F (Section 4.1(b)) | - | Collateral Reports |
| Annex G (Section 6.10) | - | Financial Covenants |
| Annex H (Section 9.9(a)) | - | Lenders' Wire Transfer Information |
| Annex I (Section 11.10) | - | Notice Addresses |
| Annex J (from Annex A - Commitments definition) | | Commitments as of Closing Date |

| | | |
|---|---|---|
| Exhibit 1.1(a)(i) | - | Form of Notice of Revolving Credit Advance |
| Exhibit 1.1(a)(ii) | - | Form of Revolving Note |
| Exhibit 1.1(b)(i) | - | Form of Term A Note |
| Exhibit 1.1(b)(ii) | - | Form of Term B Note |
| Exhibit 1.5(e) | - | Form of Notice of Conversion/Continuation |
| Exhibit 9.1(a) | - | Form of Assignment Agreement |
| Exhibit Annex E | - | Form of Compliance Certificate |

| | | |
|---|---|---|
| Schedule 1.1 | - | Agent's Representatives |
| Disclosure Schedule 1.4 | - | Sources and Uses; Funds Flow Memorandum |
| Disclosure Schedule 3.1 | - | Type of Entity; State of Organization |
| Disclosure Schedule 3.2 | - | Executive Offices, Collateral Locations, FEIN |
| Disclosure Schedule 3.4(a) | - | Financial Statements |
| Disclosure Schedule 3.4(b) | - | Pro Forma |
| Disclosure Schedule 3.4(c) | - | Projections |
| Disclosure Schedule 3.6 | - | Real Estate and Leases |
| Disclosure Schedule 3.7 | - | Labor Matters |
| Disclosure Schedule 3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Disclosure Schedule 3.11 | - | Tax Matters |
| Disclosure Schedule 3.12 | - | ERISA Plans |
| Disclosure Schedule 3.13 | - | Litigation |
| Disclosure Schedule 3.14 | - | Brokers |
| Disclosure Schedule 3.15 | - | Intellectual Property |
| Disclosure Schedule 3.17 | - | Hazardous Materials |
| Disclosure Schedule 3.18 | - | Insurance |
| Disclosure Schedule 3.19 | - | Deposit and Disbursement Accounts |
| Disclosure Schedule 3.20 | - | Government Contracts |
| Disclosure Schedule 3.22 | - | Bonds; Patent, Trademark Licenses |
| Disclosure Schedule 3.27(b) | - | FCC Licenses and Related Matters |
| Disclosure Schedule 5.1 | - | Trade Names |

Disclosure Schedule 6.3      -      Indebtedness
Disclosure Schedule 6.4(a)   -      Transactions with Affiliates
Disclosure Schedule 6.7      -      Existing Liens

This CREDIT AGREEMENT (this "Agreement"), dated as of October 3, 2003 among BLACK CROW MEDIA GROUP, LLC, a Delaware limited liability company ("Holdings"), BLACK CROW MEDIA, L.L.C., a Florida limited liability company ("Black Crow Media"), STG MEDIA, L.L.C., a Florida limited liability company ("STG Media"), RTG MEDIA, L.L.C., a Florida limited liability company ("RTG Media"), THOMAS MEDIA OPERATIONS, L.L.C., a Florida limited liability company ("Thomas Media"), BLACK CROW RADIO, L.L.C., a Florida limited liability company ("Black Crow Radio"), BCA RADIO, L.L.C., a Florida limited liability company ("BCA Radio"), RTG RADIO, L.L.C., a Florida limited liability company ("RTG Radio"), THOMAS RADIO, L.L.C., a Florida limited liability company ("Thomas Radio"), RAINBOW MEDIA, INC., a Tennessee corporation ("Rainbow") (Holdings, Black Crow Media, STG Media, RTG Media, Thomas Media, Black Crow Radio, BCA Radio, RTG Radio, Thomas Radio and Rainbow is each sometimes individually referred to herein as a "Borrower" and, collectively, as the "Borrowers"); the other Credit Parties signatory hereto from time to time; GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (in its individual capacity, "GE Capital"), for itself, as Lender, and as Agent for Lenders ("Agent"); and the other Lenders signatory hereto from time to time.

RECITALS

WHEREAS, Borrowers have requested that Lenders extend revolving and term credit facilities to Borrowers of up to Forty-Eight Million Dollars ($48,000,000) in the aggregate for the purpose of funding a portion of the refinancing of certain indebtedness of Borrowers and to provide (a) working capital financing for Borrowers, (b) funds for other general corporate purposes of Borrowers, and (c) funds for other purposes permitted hereunder; and for these purposes, Lenders are willing to make certain loans and other extensions of credit to Borrowers of up to such amount upon the terms and conditions set forth herein; and

WHEREAS, Borrowers have agreed to secure all of their obligations under the Loan Documents by granting to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of their existing and after-acquired personal and real property (including, without limitation, the Stock of their Subsidiaries); and

WHEREAS, each of the Stockholders of Holdings is willing to pledge to Agent, for the benefit of Lenders, all of their respective existing and future interests in Holdings; and

WHEREAS, each of (i) Steven J. Shelton, a minority interest holder in STG Media, (ii) Bob Ganzak, a minority interest holder in RTG Media, and (iii) Billy W. Thomas, Sr. and Billy W. Thomas, Jr., minority interest holders in Thomas Media is, in each case, willing to pledge to Agent, for the benefit of Lenders, all of their respective existing and future interests in STG Media, RTG Media and Thomas Media, as the case may be; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Disclosure Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

1. **AMOUNT AND TERMS OF CREDIT**

    1.1 <u>Credit Facilities.</u>

    (a) <u>Revolving Credit Facility.</u>

    (i) Subject to the terms and conditions hereof, each Revolving Lender agrees to make available to Borrowers from time to time until the Commitment Termination Date its Pro Rata Share of advances (each, a "<u>Revolving Credit Advance</u>"). The Pro Rata Share of the Revolving Loan of any Revolving Lender shall not at any time exceed its separate Revolving Loan Commitment. The obligations of each Revolving Lender hereunder shall be several and not joint. Until the Commitment Termination Date, Borrowers may borrow, repay and reborrow under this <u>Section 1.1(a)</u>; provided, that the amount of any Revolving Credit Advance to be made at any time shall not exceed Borrowing Availability at such time. Each Revolving Credit Advance shall be made on notice by Borrower Representative on behalf of the applicable Borrower to one of the representatives of Agent identified in <u>Schedule 1.1</u> at the address specified therein. Any such notice must be given no later than (1) noon (New York time) on the Business Day of the proposed Revolving Credit Advance, in the case of an Index Rate Loan, or (2) noon (New York time) on the date which is three (3) Business Days prior to the proposed Revolving Credit Advance, in the case of a LIBOR Loan. Each such notice (a "<u>Notice of Revolving Credit Advance</u>") must be given in writing (by telecopy or overnight courier) substantially in the form of <u>Exhibit 1.1(a)(i)</u>, and shall include (A) a written calculation, in detail reasonably satisfactory to Agent, of the Financial Covenants (after giving effect to the requested Revolving Credit Advance), (B) the information required in such Exhibit, and (C) such other information as may be reasonably required by Agent. If any Borrower desires to have the Revolving Credit Advances bear interest by reference to a LIBOR Rate, Borrower Representative must comply with <u>Section 1.5(e)</u>.

    (ii) Except as provided in <u>Section 1.12</u>, Borrowers shall jointly and severally execute and deliver to each Revolving Lender a note to evidence the Revolving Loan Commitment of that Revolving Lender. Each note shall be in the principal amount of the Revolving Loan Commitment of the applicable Revolving Lender, dated the Closing Date and substantially in the form of <u>Exhibit 1.1(a)(ii)</u> (each, a "<u>Revolving Note</u>" and, collectively, the "<u>Revolving Notes</u>"). Each Revolving Note shall represent the joint and several obligation of the Borrowers to pay the amount of the applicable Revolving Lender's Revolving Loan Commitment or, if less, such Revolving Lender's Pro Rata Share of the aggregate unpaid principal amount of all Revolving Credit Advances to Borrowers, together with interest thereon as prescribed in <u>Section 1.5</u>. The entire unpaid balance of the aggregate Revolving Loan and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

(b)     Term Loans.

(i)     Term Loan A.

(A)     Subject to the terms and conditions hereof, each Term A Lender agrees to make a term loan (collectively, "Term Loan A") on the Closing Date to Borrowers in the amount of the applicable Term A Lender's Term Loan A Commitment. The obligations of each Term A Lender hereunder shall be several and not joint. Each such Term Loan A shall be evidenced by a promissory note substantially in the form of Exhibit 1.1(b)(i) (each, a "Term A Note" and, collectively, the "Term A Notes"), and, except as provided in Section 1.12, all of the Borrowers shall jointly and severally execute and deliver a Term A Note to the applicable Term A Lender. Each Term A Note shall represent the joint and several obligation of Borrowers to pay the applicable Term A Lender's Term Loan A Commitment, together with interest thereon as prescribed in Section 1.5.

(B)     Borrowers shall repay Term Loan A in eighteen (18) consecutive quarterly principal installments on the last day of March, June, September and December of each year, commencing March 31, 2004, as follows:

| Payment Dates | Installment Amounts |
|---|---|
| March 31, 2004, June 30, 2004, September 30, 2004 and December 31, 2004 | $406,250 |
| March 31, 2005, June 30, 2005, September 30, 2005 and December 31, 2005 | $609,375 |
| March 31, 2006, June 30, 2006, September 30, 2006 and December 31, 2006 | $812,500 |
| March 31, 2007, June 30, 2007, September 30, 2007 and December 31, 2007 | $1,218,750 |
| March 31, 2008 and June 30, 2008 | $1,218,750 |
| Commitment Termination Date | Remaining Outstanding Balance |

The final installment due on the Commitment Termination Date shall be in the amount of the remaining principal balance of Term Loan A, together with all accrued and unpaid interest and charges thereon.

(C)     Notwithstanding Section 1.1(b)(i)(B), the aggregate outstanding principal balance of Term Loan A shall be due and payable in full in immediately available funds on the Commitment Termination Date, if not sooner paid in full. No payment with respect to Term Loan A may be reborrowed.

(D)     Each payment of principal with respect to Term Loan A shall be paid to Agent for the ratable benefit of each Term A Lender making a

3

Term Loan A, ratably in proportion to each such Term A Lender's respective Term Loan A Commitment.

       (ii)    <u>Term Loan B</u>.

       (A)    Subject to the terms and conditions hereof, each Term B Lender agrees to make a term loan (collectively, "<u>Term Loan B</u>") on the Closing Date to Borrowers in the amount of the applicable Term B Lender's Term Loan B Commitment. The obligations of each Term B Lender hereunder shall be several and not joint. Each such Term Loan B shall be evidenced by a promissory note substantially in the form of <u>Exhibit 1.1(b)(ii)</u> (each, a "<u>Term B Note</u>" and, collectively, the "<u>Term B Notes</u>"), and, except as provided in <u>Section 1.12</u>, all of the Borrowers shall jointly and severally execute and deliver a Term B Note to the applicable Term B Lender. Each Term B Note shall represent the joint and several obligation of Borrowers to pay the applicable Term B Lender's Term Loan B Commitment, together with interest thereon as prescribed in <u>Section 1.5</u>.

       (B)    Borrowers shall repay Term Loan B in twenty-two (22) consecutive quarterly principal installments on the last day of March, June, September and December of each year, commencing December 31, 2003, as follows:

| Payment Dates | Installment Amounts |
|---|---|
| December 31, 2003 | $18,750 |
| March 31, 2004, June 30, 2004, September 30, 2004 and December 31, 2004 | $18,750 |
| March 31, 2005, June 30, 2005, September 30, 2005 and December 31, 2005 | $18,750 |
| March 31, 2006, June 30, 2006, September 30, 2006 and December 31, 2006 | $18,750 |
| March 31, 2007, June 30, 2007, September 30, 2007 and December 31, 2007 | $18,750 |
| March 31, 2008, June 30, 2008, September 30, 2008 and December 31, 2008 | $18,750 |
| Term Loan B Commitment Termination Date | Remaining Outstanding Balance |

       The final installment due on the Term Loan B Commitment Termination Date shall be in the amount of the remaining principal balance of Term Loan B, together with all accrued and unpaid interest and charges thereon.

       (C)    Notwithstanding <u>Section 1.1(b)(ii)(B)</u>, the aggregate outstanding principal balance of Term Loan B shall be due and payable in full in

immediately available funds on the Term Loan B Commitment Termination Date, if not sooner repaid in full. No payment with respect to Term Loan B may be reborrowed.

(D)     Each payment of principal with respect to Term Loan B shall be paid to Agent for the ratable benefit of each Term B Lender making a Term Loan B, ratably in proportion to each such Term B Lender's respective Term Loan B Commitment.

(c)     [Intentionally Reserved].

(d)     <u>Reliance on Notices; Appointment of Borrower Representative.</u>

(i)     Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Credit Advance, Notice of Conversion/Continuation or similar notice reasonably believed by Agent to be genuine. Agent may assume that each Person executing and delivering any notice in accordance herewith was duly authorized, unless the responsible individual acting thereon for Agent has actual knowledge to the contrary.

(ii)     Borrowers maintain an integrated cash management system reflecting their interdependence on one another and the mutual benefits shared among them as a result of their respective operations. In order to efficiently fund and operate their respective businesses and minimize the number of borrowings which they will make under this Agreement and thereby reduce the administrative costs and record keeping required in connection therewith, including the necessity to enter into and maintain separately identified and monitored borrowing facilities, Borrowers have requested, and Agent and Lenders have agreed that, subject to <u>Section 1.1</u>, all Loans will be advanced to and for the account of Borrowers on a joint and several basis in accordance with the other provisions hereof.

(iii)     Each Credit Party hereby designates, appoints, authorizes and empowers Borrower Representative as its agent to act as specified in this Agreement and each of the other Loan Documents and Borrower Representative hereby acknowledges such designation, authorization and empowerment, and accepts such appointment. Each Credit Party hereby irrevocably authorizes and directs Borrower Representative to take such action on its behalf under the provisions of this Agreement and the other Loan Documents, and any other instruments, documents and agreements referred to herein or therein, and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Borrower Representative by the respective terms and provisions hereof and thereof, and such other powers as are reasonably incidental thereto, including, without limitation, to take the following actions for and on such Credit Party's behalf:

(A)     to submit on behalf of each Credit Party, Notices of Revolving Credit Advances and/or Notices of Conversion/Continuation to Agent or Lenders in accordance with the provisions of this Agreement;

(B)     to receive on behalf of each Credit Party the proceeds of Loans in accordance with the provisions of this Agreement, such proceeds to be

disbursed to or for the account of Borrowers as soon as practicable after its receipt thereof; and

(C)   to submit on behalf of each Credit Party, Compliance Certificates and all other certificates, notices and other communications given or required to be given hereunder.

Borrower Representative is further authorized and directed by each Borrower to take all such actions on behalf of such Borrower necessary to exercise the specific power granted in clauses (A) through (C) above and to perform such other duties hereunder and under the other Loan Documents, and deliver such documents as delegated to or required of Borrower Representative by the terms hereof or thereof.

(iv)   The administration by Agent and Lenders of the credit facilities under this Agreement as a co-borrowing facility with funds being administered in the manner set forth herein is solely as an accommodation to Borrowers and at their request and neither the Agent nor any Lender shall incur any liability to any Credit Party or any other Person as a result.

1.2   [Intentionally Reserved]

1.3   Prepayments.

(a)   Voluntary Prepayments; Reductions in Revolving Loan Commitments.  In addition to Borrowers' right to borrow, repay and reborrow Revolving Credit Advances under Section 1.1(a)(i), Borrowers may at any time on at least five (5) days' prior written notice by Borrower Representative to Agent (i) voluntarily prepay all or part of either Term Loan and/or (ii) permanently reduce (but not terminate) the Revolving Loan Commitment; provided, that (A) any such prepayments or reductions shall be in a minimum amount of $1,000,000 and integral multiples of $250,000 in excess of such amount, (B) after giving effect to such reductions, Borrowers shall comply with Section 1.3(b)(i), and (C) no prepayment of the Term Loan B may be made prior to the payment in full in cash of the Term Loan A, the Revolving Loan and all other Obligations hereunder and the termination of the Commitments hereunder.  In addition, Borrowers may at any time on at least ten (10) days' prior written notice by Borrower Representative to Agent terminate the Revolving Loan Commitment; provided that upon such termination, all Revolving Loans and other Obligations in connection with the Revolving Loan Commitment shall be immediately due and payable in full.  Any voluntary prepayment and any reduction or termination of the Revolving Loan Commitment must be accompanied by payment of LIBOR funding breakage costs in accordance with Section 1.13(b).  Upon any such reduction or termination of the Revolving Loan Commitment, each Borrower's right to request Revolving Credit Advances shall simultaneously be permanently reduced or terminated.  Each notice of partial prepayment shall designate the Loans or other Obligations to which such prepayment is to be applied; provided, that any partial prepayments of either Term Loan made by or on behalf of Borrowers shall be applied to prepay the scheduled installments of such Term Loan in inverse order of maturity.

(b)    <u>Mandatory Prepayments</u>.

(i)    If at any time the aggregate outstanding balances of the Revolving Loan exceeds the Borrowing Availability, Borrowers shall immediately repay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess.

(ii)    Immediately upon receipt by any Credit Party of any proceeds of any asset disposition (including, without limitation, proceeds of any sale of Stock of any Subsidiary of any Credit Party), Borrowers shall prepay the Loans in an amount equal to all such adjustment payments or proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrowers in connection therewith (in each case, paid to non-Affiliates), (B) sale, use and transfer taxes, (C) amounts payable to holders of senior Liens on such asset (to the extent such Liens constitute Permitted Encumbrances hereunder), if any, and (D) an appropriate reserve for income taxes in accordance with GAAP in connection therewith. Any such prepayment shall be applied in accordance with <u>Section 1.3(c)</u>. The following shall not be subject to mandatory prepayment under this <u>clause (ii)</u>: (1) asset disposition proceeds of less than $250,000 in the aggregate in any Fiscal Year, and (2) asset disposition proceeds that are reinvested in Radio Stations, Licenses, Equipment, Fixtures or Real Estate prior to the earlier of (A) the occurrence of an Event of Default, or (B) the two hundred seventieth (270th) day following receipt thereof (the earlier of such dates being the "<u>Required Prepayment Date</u>"); provided, that Borrower notifies Agent of its intent to reinvest at the time such proceeds are received and when such reinvestment occurs; and provided, further, that any such proceeds shall be held in a cash collateral account controlled by Agent until applied to the Loans or as otherwise set forth herein (such proceeds, while held in such collateral account controlled by Agent prior to the Required Prepayment Date, collectively, the "<u>Net Sale Proceeds</u>").

(iii)    If Holdings or any Borrower issues Stock, no later than the Business Day following the date of receipt of the proceeds thereof, all Borrowers (in the case of an issuance by Holdings) or the issuing Borrower shall prepay the Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs paid to non-Affiliates in connection therewith. Any such prepayment shall be applied in accordance with <u>Section 1.3(c)</u>.

(iv)    Commencing on May 15, 2005 for the Fiscal Year ending December 31, 2004 and until the Termination Date, Borrowers shall prepay the Obligations on the date that is ten (10) Business Days after the earlier of (A) the date on which Borrowers' annual audited Financial Statements for the immediately preceding Fiscal Year are delivered pursuant to <u>Annex E</u> or (B) the date on which such annual audited Financial Statements were required to be delivered (I) pursuant to <u>Annex E</u>, or (II) in the event Agent and Requisite Lenders have agreed in writing to an extension of the time frames set forth in <u>Annex E</u>, such extended date, in an amount equal to fifty percent (50%) of Excess Cash Flow for the immediately preceding Fiscal Year, if any. Any prepayments from Excess Cash Flow shall be applied in accordance with <u>Section 1.3(c)</u>. Each such prepayment shall be accompanied by a certificate signed by Borrower Representative's chief financial officer certifying on behalf of the Credit Parties the manner in which Excess Cash Flow, the resulting prepayment, and the method of

allocation to each Borrower's Obligations were calculated, which certificate shall be in form and substance reasonably satisfactory to Agent.

(c)     *Application of Certain Mandatory Prepayments*.  Any prepayments made by any Borrower pursuant to Sections 1.3(b)(ii), (b)(iii), or (b)(iv) above shall be applied as follows: first, to Fees and reimbursable expenses of Agent then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on Term Loan A; third, to prepay the scheduled principal installments of Term Loan A in inverse order of maturity, until Term Loan A has been prepaid in full; fourth, to interest then due and payable on Revolving Credit Advances made to Borrowers; fifth, to the principal balance of Revolving Credit Advances outstanding to Borrowers until the same has been paid in full; sixth, to interest then due and payable on Term Loan B; and seventh, to prepay scheduled principal installments of Term Loan B in inverse order of maturity, until Term Loan B has been prepaid in full.  The Revolving Loan Commitment shall not be permanently reduced by the amount of any such prepayments.

(d)     *Application of Prepayments from Insurance and Condemnation Proceeds*. Any prepayments from insurance or condemnation proceeds required in accordance with Section 5.4(c) and the Mortgage(s), respectively, shall be applied as follows: insurance proceeds from casualties or losses to cash shall be applied to the Revolving Credit Advances of Borrowers; insurance or condemnation proceeds from casualties or losses to Equipment, Fixtures and Real Estate shall be applied to scheduled installments of Term Loan A in inverse order of maturity, and thereafter subject to the prior repayment in full in cash of the Term Loan A, scheduled installments of Term Loan B in inverse order of maturity.  The Revolving Loan Commitment shall not be permanently reduced by the amount of any such prepayments.  If the precise amount of insurance or condemnation proceeds allocable to cash as compared to Equipment, Fixtures and Real Estate are not otherwise determined, the allocation and application of those proceeds shall be determined by Agent, subject to the approval of Requisite Lenders.

(e)     *No Implied Consent*.  Nothing in this Section 1.3 shall be construed to constitute Agent's or any Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

1.4     *Use of Proceeds*.  Borrowers shall utilize the proceeds of the Loans solely for the Refinancing (and to pay any related transaction expenses), and for the financing of Borrowers' ordinary working capital and general corporate needs.  Disclosure Schedule (1.4) contains a description of Borrowers' sources and uses of funds as of the Closing Date, including Loans to be made or incurred on that date, and a funds flow memorandum detailing how funds from each source are to be transferred to particular uses.

1.5     *Interest and Applicable Margins.*

(a)     Borrowers shall pay interest to Agent, for the ratable benefit of Lenders in accordance with the various Loans being made by each Lender, in arrears on each applicable Interest Payment Date, at the following rates: (i) with respect to the Revolving Credit Advances, the Index Rate plus the Applicable Revolver Index Margin per annum or, at the election of Borrower Representative, the applicable LIBOR Rate plus the Applicable Revolver LIBOR

Margin per annum; (ii) with respect to Term Loan A, the Index Rate plus the Applicable Term Loan A Index Margin per annum or, at the election of Borrower Representative, the applicable LIBOR Rate plus the Applicable Term Loan A LIBOR Margin per annum; and (iii) with respect to Term Loan B, the Index Rate plus the Applicable Term Loan B Index Margin per annum or, at the election of Borrower Representative, the applicable LIBOR Rate plus the Applicable Term Loan B LIBOR Margin per annum.

As of the Closing Date, the Applicable Margins are as follows:

| | |
|---|---|
| Applicable Revolver Index Margin | 2.75% |
| Applicable Revolver LIBOR Margin | 4.25% |
| Applicable Term A Loan Index Margin | 2.75% |
| Applicable Term A Loan LIBOR Margin | 4.25% |
| Applicable Term B Loan Index Margin | 6.50% |
| Applicable Term B Loan LIBOR Margin | 8.00% |

On and after April 1, 2004, the Applicable Margins may be adjusted by reference to the following grid:

| Borrowers' Total Debt to EBITDA | Applicable Revolver Index Margin | Applicable Revolver LIBOR Margin | Applicable Term Loan A Index Margin | Applicable Term Loan A LIBOR Margin | Applicable Term Loan B Index Margin | Applicable Term Loan B LIBOR Margin |
|---|---|---|---|---|---|---|
| Greater than 6.0 to 1.0 | 2.75 | 4.25 | 2.75 | 4.25 | 6.50 | 8.00 |
| Less than or equal to 6.0 to 1.00 but greater than 5.5 to 1.00 | 2.50 | 4.00 | 2.50 | 4.00 | 6.50 | 8.00 |
| Less than or equal to 5.5 to 1.00 but greater than 5.0 to 1.00 | 2.25 | 3.75 | 2.25 | 3.75 | 6.50 | 8.00 |
| Less than or equal to 5.0 to 1.00 but greater than 4.5 to 1.00 | 2.00 | 3.50 | 2.00 | 3.50 | 6.50 | 8.00 |

| Borrowers' Total Debt to EBITDA | Applicable Revolver Index Margin | Applicable Revolver LIBOR Margin | Applicable Term Loan A Index Margin | Applicable Term Loan A LIBOR Margin | Applicable Term Loan B Index Margin | Applicable Term Loan B LIBOR Margin |
|---|---|---|---|---|---|---|
| Less than or equal to 4.5 to 1.00 | 1.75 | 3.25 | 1.75 | 3.25 | 6.50 | 8.00 |

Adjustments in the Applicable Margins commencing with the Fiscal Quarter ending March 31, 2004 shall be implemented quarterly on a prospective basis, for each calendar month commencing at least five (5) days after the date of delivery to Lenders of the quarterly unaudited or annual audited (as applicable) Financial Statements evidencing the need for an adjustment. Concurrently with the delivery of those Financial Statements, Borrower Representative shall deliver to Agent and Lenders a certificate, signed by its chief financial officer, setting forth in reasonable detail the basis for the continuance of, or any change in, the Applicable Margins. Failure to timely deliver such Financial Statements shall, in addition to any other remedy provided for in this Agreement, result in an increase in the Applicable Margins to the highest level set forth in the foregoing grid, until the first day of the first calendar month following the delivery of those Financial Statements demonstrating that such an increase is not required. If a Default or Event of Default has occurred and is continuing at the time any reduction in the Applicable Margins is to be implemented, that reduction shall be deferred until the first day of the first calendar month following the date on which such Default or Event of Default is waived or cured.

(b)     If any payment on any Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day (except as set forth in the definition of LIBOR Period) and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of Fees calculated on a per annum basis and interest accrued with reference to the LIBOR Rate shall be made by Agent on the basis of a 360-day year, and interest accrued with reference to the Index Rate shall be made by Agent on the basis of a 365/366 day year, in each case, for the actual number of days occurring in the period for which such interest and Fees are payable. The Index Rate is a floating rate determined for each day. Each determination by Agent of an interest rate and Fees hereunder shall be presumptive evidence of the correctness of such rates and Fees.

(d)     So long as an Event of Default has occurred and is continuing under Section 8.1(a), (h) or (i) or so long as any other Event of Default has occurred and is continuing and at the election of Agent (or upon the written request of Requisite Lenders) confirmed by written notice from Agent to Borrower Representative, the interest rates applicable to the Loans shall be increased by two percentage points (2%) per annum above the rates of interest or the rate of such Fees otherwise applicable hereunder unless Agent or Requisite Lenders elect to impose a smaller increase (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the

initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

(e)      Subject to the conditions precedent set forth in Section 2.2, Borrower Representative shall have the option to (i) request that any Revolving Credit Advance be made as a LIBOR Loan, (ii) convert at any time all or any part of outstanding Loans from Index Rate Loans to LIBOR Loans, (iii) convert any LIBOR Loan to an Index Rate Loan, subject to payment of LIBOR breakage costs in accordance with Section 1.13(b), if such conversion is made prior to the expiration of the LIBOR Period applicable thereto, or (iv) continue all or any portion of any Loan as a LIBOR Loan upon the expiration of the applicable LIBOR Period and the succeeding LIBOR Period of that continued Loan shall commence on the first day after the last day of the LIBOR Period of the Loan to be continued.  Any Loan or group of Loans having the same proposed LIBOR Period to be made or continued as, or converted into, a LIBOR Loan must be in a minimum amount of $500,000 and integral multiples of $100,000 in excess of such amount.  Any such election must be made by noon (New York time) on the third Business Day prior to (1) the date of any proposed Advance which is to bear interest at the LIBOR Rate, (2) the end of each LIBOR Period with respect to any LIBOR Loans to be continued as such, or (3) the date on which Borrower Representative wishes to convert any Index Rate Loan to a LIBOR Loan for a LIBOR Period designated by Borrower Representative in such election.  If no election is received with respect to a LIBOR Loan by noon (New York time) on the third (3rd) Business Day prior to the end of the LIBOR Period with respect thereto (or if a Default or an Event of Default has occurred and is continuing or if the additional conditions precedent set forth in Section 2.2 shall not have been satisfied), that LIBOR Loan shall be converted to an Index Rate Loan at the end of its LIBOR Period.  Borrower Representative must make such election by notice to Agent in writing, by telecopy or overnight courier.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "Notice of Conversion/Continuation") in the form of Exhibit 1.5(e).

(f)      Notwithstanding anything to the contrary set forth in this Section 1.5, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.  In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

1.6      [Intentionally Reserved.]

1.7      [Intentionally Reserved.]

1.8    Cash Management Systems.  On or prior to the Closing Date, the Credit Parties shall have established and will continue to maintain until the Termination Date, the cash management systems described in Annex C (the "Cash Management Systems").

1.9    Fees.

(a)    In consideration for documenting, extending and closing the Loans and committing the funds with respect thereto, Borrowers agree to pay to Agent, for the ratable benefit of Lenders, a fully-earned when paid, non-refundable, closing fee in an amount equal to two and one-quarter percent (2.25%) of the Commitments less (A) an amount equal to the unused portion of the Underwriting Deposit, and (B) the Approval Fee.  In accordance with the terms of the Approval Letter, the Approval Fee shall in no event be returned to Borrowers.

(b)    As additional compensation for the Revolving Lenders, Borrowers shall pay to Agent, for the ratable benefit of such Lenders, in arrears, on the first Business Day of each month prior to the Commitment Termination Date and on the Commitment Termination Date, a Fee for Borrowers' non-use of available funds in an amount equal to one-half of one percent (0.50%) per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the difference between (x) the Commitments (as they may be reduced from time to time), and (y) the average for the period of the daily closing balances of the aggregate Revolving Loan outstanding during the period for which such Fee is due.

(c)    As additional consideration for Agent's on-going costs of administering the Loans, Borrowers agree to pay to Agent, for its own account, annually, on the Closing Date and continuing on each anniversary thereof during the term of this Agreement, a fully-earned when paid, non-refundable, administrative agency fee in an amount equal to $25,000.

(d)    [Intentionally Reserved.]

1.10    Receipt of Payments.  Borrowers shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest and Fees and determining Borrowing Availability as of any date, all payments shall be deemed received on the first Business Day following the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time.  Payments received after 2:00 p.m. New York time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

1.11    Application and Allocation of Payments.

(a)    So long as no Event of Default has occurred and is continuing, (i) following an Activation Event in accordance with Annex C, payments consisting of proceeds of Accounts received in the ordinary course of business shall be applied to the Revolving Loan; (ii) payments matching specific scheduled payments then due shall be applied to those scheduled payments; (iii) voluntary prepayments shall be applied in accordance with the provisions of Section 1.3(a); and (iv) mandatory prepayments shall be applied as set forth in Sections 1.3(c) and 1.3(d).  All payments and prepayments applied to a particular Loan shall be applied ratably to the portion thereof held by each Lender as determined by its Pro Rata Share.  As to any other

12

payment, and as to all payments made when an Event of Default has occurred and is continuing or following the Commitment Termination Date, each Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of such Borrower, and each Borrower hereby irrevocably agrees that Agent shall have the continuing exclusive right to apply any and all such payments against the Obligations of Borrowers as Agent may deem advisable notwithstanding any previous entry by Agent in the Loan Account or any other books and records. In the absence of a specific determination by Agent with respect thereto, payments shall be applied to amounts then due and payable in the following order: (1) to Fees and Agent's expenses reimbursable hereunder; (2) to interest on the Revolving Loan and Term Loan A, ratably in proportion to the interest accrued as to each such Loan; (3) to principal payments on the Revolving Loan and Term Loan A, ratably to the aggregate, combined principal balance of the other Loans; (4) to interest on Term Loan B; (5) to principal payments on Term Loan B; and (6) to all other Obligations, including expenses of Lenders to the extent reimbursable under <u>Section 11.3</u>.

(b)     Agent is authorized to, and at its sole election may, charge to the Revolving Loan balance on behalf of each Borrower and cause to be paid all Fees, expenses, Charges, costs (including insurance premiums in accordance with <u>Section 5.4(a)</u>) and interest and principal, other than principal of the Revolving Loan, owing by Borrowers under this Agreement or any of the other Loan Documents if and to the extent Borrowers fail to pay promptly any such amounts as and when due, even if the amount of such charges would exceed Borrowing Availability at such time. At Agent's option and to the extent permitted by law, any charges so made shall constitute part of the Revolving Loan hereunder.

1.12    <u>Loan Account and Accounting</u>.  Agent shall maintain a loan account (the "<u>Loan Account</u>") on its books to record: all Advances and the Term Loans, all payments made by Borrowers, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Agent's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Agent and Lenders by each Borrower; <u>provided</u>, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay the Obligations. Agent shall render to Borrower Representative a monthly accounting of transactions with respect to the Loans setting forth the balance of the Loan Account as to each Borrower for the immediately preceding month. Unless Borrower Representative notifies Agent in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall be presumptive evidence of all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by Borrowers. Notwithstanding any provision herein contained to the contrary, any Lender may elect (which election may be revoked) to dispense with the issuance of Notes to that Lender and may rely on the Loan Account as evidence of the amount of Obligations from time to time owing to it.

1.13    Indemnity.

(a)     Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense has been determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from that Indemnified Person's gross negligence or willful misconduct.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(b)     To induce Lenders to provide the LIBOR Rate option on the terms provided herein, if (i) any LIBOR Loans are repaid in whole or in part prior to the last day of any applicable LIBOR Period (whether that repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, by operation of law or otherwise); (ii) any Borrower shall default in payment when due of the principal amount of or interest on any LIBOR Loan; (iii) any Borrower shall refuse to accept any borrowing of, or shall request a termination of, any borrowing of, conversion into or continuation of, LIBOR Loans after Borrower Representative has given notice requesting the same in accordance herewith; or (iv) any Borrower shall fail to make any prepayment of a LIBOR Loan after Borrower Representative has given a notice thereof in accordance herewith, then Borrowers shall jointly and severally indemnify and hold harmless each Lender from and against all losses, costs and expenses resulting from or arising from any of the foregoing.  Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained.  For the purpose of calculating amounts payable to a Lender under this subsection, each Lender shall be deemed to have actually funded its relevant LIBOR Loan through the purchase of a deposit bearing interest at the LIBOR Rate in an amount equal to the amount of that LIBOR Loan and having a maturity comparable to the relevant LIBOR Period; provided, that each Lender may fund each of its LIBOR Loans in any manner it sees fit, and the foregoing assumption shall be

14

utilized only for the calculation of amounts payable under this subsection. This covenant shall survive the termination of this Agreement and the payment of the Notes and all other amounts payable hereunder. As promptly as practicable under the circumstances, each Lender shall provide Borrower Representative with its written calculation of all amounts payable pursuant to this Section 1.13(b), and such calculation shall be binding on the parties hereto unless Borrower Representative shall object in writing within ten (10) Business Days of receipt thereof, specifying the basis for such objection in detail.

1.14    Access. Each Credit Party that is a party hereto shall, during normal business hours, from time to time upon at least five (5) Business Days' prior notice and not more frequently than once each Fiscal Quarter: (a) provide Agent and any of its officers, employees and agents access to its properties, facilities, advisors, officers and employees of each Credit Party and to the Collateral; (b) permit Agent, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's books and records; and (c) permit Agent, and its officers, employees and agents, to inspect, review, evaluate and make test verifications and counts of the Accounts and other Collateral of any Credit Party, all at Lender's cost and expense. If an Event of Default has occurred and is continuing, each such Credit Party shall provide such access, at Credit Parties' cost and expense, to Agent and to each Lender at all times and without advance notice; provided, however, that Agent shall use its reasonable efforts to provide one (1) Business Day's prior written notice of such visits, other than with respect to visits to Borrowers' chief executive offices; provided, further, however, that Agent's failure to give any such notice shall not effect its rights hereunder. Furthermore, (A) immediately, so long as any Event of Default has occurred and is continuing under Section 8.1(a), 8.1(h) or 8.1(i), and (B) if any other Event of Default has occurred and is continuing, on or after the forty-fifth (45th) day following the occurrence thereof, Borrowers shall provide Agent and each Lender with access to their suppliers and customers. Each Credit Party shall make available to Agent and its counsel reasonably promptly originals or copies of all books and records that Agent may reasonably request. Each Credit Party shall deliver any document or instrument necessary for Agent, as it may from time to time reasonably request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Credit Party. Agent will give Lenders at least five (5) days' prior written notice of regularly scheduled audits. Representatives of other Lenders may accompany Agent's representatives on regularly scheduled audits at no charge to Borrowers.

1.15    Taxes.

(a)    Any and all payments by each Borrower hereunder (including any payments made pursuant to Section 12) or under the Notes shall be made, in accordance with this Section 1.15, free and clear of and without deduction for any and all present and future Taxes. If any Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder (including any sum payable pursuant to Section 12) or under the Notes, (i) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.15) Agent or Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) such Borrower shall make such deductions, and (iii) such Borrower shall pay the full amount deducted to the relevant taxing or other authority in

accordance with applicable law. Within thirty (30) days after the date of any payment of Taxes, Borrower Representative shall furnish to Agent the original or a certified copy of a receipt evidencing payment thereof.

(b)　　Each Credit Party that is a signatory hereto shall jointly and severally indemnify and, within ten (10) days of demand therefore, pay Agent and each Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 1.15) paid by Agent or such Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

(c)　　Each Lender organized under the laws of a jurisdiction outside the United States (a "Foreign Lender") as to which payments to be made under this Agreement or under the Notes are exempt from United States withholding tax under an applicable statute or tax treaty shall provide to Borrower Representative and Agent a properly completed and executed IRS Form W-8ECI or Form W-8BEN or other applicable form, certificate or document prescribed by the IRS or the United States certifying as to such Foreign Lender's entitlement to such exemption (a "Certificate of Exemption"). Any foreign Person that seeks to become a Lender under this Agreement shall provide a Certificate of Exemption to Borrower Representative and Agent prior to becoming a Lender hereunder. No foreign Person may become a Lender hereunder if such Person fails to deliver a Certificate of Exemption in advance of becoming a Lender.

1.16　　Capital Adequacy; Increased Costs; Illegality.

(a)　　If any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender and thereby reducing the rate of return on such Lender's capital as a consequence of its obligations hereunder, then Borrowers shall from time to time upon demand by such Lender (with a copy of such demand to Agent) pay to Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by such Lender to Borrower Representative and to Agent shall be presumptive evidence of the matters set forth therein.

(b)　　If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to any Lender of agreeing to make or making, funding or maintaining any Loan, then Borrowers shall from time to time, upon demand by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost. A certificate as to the amount of such increased cost, submitted

to Borrower Representative and to Agent by such Lender, shall be presumptive evidence of the matters set forth therein. Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances referred to above which would result in any such increased cost, the affected Lender shall, to the extent not inconsistent with such Lender's internal policies of general application, use reasonable commercial efforts to minimize costs and expenses incurred by it and payable to it by Borrowers pursuant to this Section 1.16(b).

(c)     Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any LIBOR Loan, then, unless that Lender is able to make or to continue to fund or to maintain such LIBOR Loan at another branch or office of that Lender without, in that Lender's reasonable opinion, materially adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower Representative through Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain LIBOR Loans shall terminate and (ii) each Borrower shall forthwith prepay in full all outstanding LIBOR Loans owing by such Borrower to such Lender, together with interest accrued thereon, unless Borrower Representative on behalf of such Borrower, within five (5) Business Days after the delivery of such notice and demand, converts all LIBOR Loans into Index Rate Loans.

(d)     Within thirty (30) days after receipt by Borrower Representative of written notice and demand from any Lender (an "Affected Lender") for payment of additional amounts or increased costs as provided in Sections 1.15(a), 1.16(a) or 1.16(b), Borrower Representative may, at its option, notify Agent and such Affected Lender of its intention to replace the Affected Lender. So long as no Default or Event of Default has occurred and is continuing, Borrower Representative, with the consent of Agent, may obtain, at Borrowers' expense, a replacement Lender ("Replacement Lender") for the Affected Lender, which Replacement Lender must be reasonably satisfactory to Agent. If Borrowers obtain a Replacement Lender within ninety (90) days following notice of their intention to do so, the Affected Lender must sell and assign its Loans and Commitments to such Replacement Lender for an amount equal to the principal balance of all Loans held by the Affected Lender and all accrued interest and Fees with respect thereto through the date of such sale and such assignment shall not require the payment of an assignment fee to Agent; provided, that Borrowers shall have reimbursed such Affected Lender for the additional amounts or increased costs that it is entitled to receive under this Agreement through the date of such sale and assignment. Notwithstanding the foregoing, Borrowers shall not have the right to obtain a Replacement Lender if the Affected Lender rescinds its demand for increased costs or additional amounts within 15 days following its receipt of Borrowers' notice of intention to replace such Affected Lender. Furthermore, if Borrowers give a notice of intention to replace and do not so replace such Affected Lender within ninety (90) days thereafter, Borrowers' rights under this Section 1.16(d) shall terminate with respect to such Affected Lender and Borrowers shall promptly pay all increased costs or additional amounts demanded by such Affected Lender pursuant to Sections 1.15(a), 1.16(a) and 1.16(b).

1.17    Single Loan.  All Loans to each Borrower and all of the other Obligations of each Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of that Borrower secured, until the Termination Date, by all of the Collateral.

## 2.    CONDITIONS PRECEDENT

2.1    Conditions to the Initial Loans.  No Lender shall be obligated to make any Loan on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner reasonably satisfactory to Agent, or waived in writing by Agent.

(a)    Credit Agreement; Loan Documents.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrowers, each other Credit Party, Agent and Lenders; and Agent shall have received such documents, instruments, agreements and legal opinions as Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as Annex D, each in form and substance reasonably satisfactory to Agent.

(b)    Repayment of Prior Lender Obligations; Satisfaction of Outstanding L/Cs.  (i) Agent shall have received a fully executed original of a pay-off letter reasonably satisfactory to Agent confirming that all of the Prior Lender Obligations will be repaid in full from the proceeds of the Term Loans and the initial Revolving Credit Advance and all Liens upon any of the property of Borrowers or any of their Subsidiaries in favor of Prior Lender shall be terminated by Prior Lender immediately upon such payment; and (ii) all letters of credit issued or guaranteed by Prior Lender shall have been cash collateralized, as mutually agreed upon by Agent, Borrowers and Prior Lender.

(c)    Approvals.  Agent shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the Related Transactions, or (ii) an officer's certificate in form and substance reasonably satisfactory to Agent affirming that no such consents or approvals are required.

(d)    Payment of Fees.  Borrowers shall have paid the Fees required to be paid on the Closing Date in the respective amounts specified in Section 1.9, and shall have reimbursed Agent for all fees, costs and expenses of closing presented as of the Closing Date.

(e)    Capital Structure; Other Indebtedness.  The capital structure, corporate structure, governing documents, material contracts and consequences of the transactions hereunder and the solvency of each Credit Party and the terms and conditions of all Indebtedness of each Credit Party shall be acceptable to Agent in its sole discretion.

(f)    Due Diligence.  Agent shall have completed its business and legal due diligence, including a roll forward of its previous Collateral audit, with results reasonably satisfactory to Agent.

(g)  Marcus Taylor Settlement.  Agent shall have received (A) a fully executed copy of the Marcus Taylor Settlement Agreement, which (i) shall be in form and substance satisfactory to Agent, in its reasonable discretion, and (ii) shall be in substantially the same form previously delivered to Agent, and (B) evidence that the litigation which is the subject of the Marcus Taylor Settlement Agreement has been dismissed with prejudice and the promissory note related thereto has been satisfied and/or canceled.

(h)  Consummation of Holdings Investment.  Agent shall have received fully executed copies of the Holdings Investment Documents, each of which shall be in full force and effect and in form and substance reasonably satisfactory to Agent. The Holdings Investment shall have been simultaneously consummated in accordance with the terms of the Holdings Investment Documents in an amount not less than $35,000,000. The Spectrum Notes evidencing the Holdings Investment shall be legended as required by the Spectrum Subordination Agreement.

(i)  Spectrum Subordination Agreement.  Agent shall have received a fully executed original of the Spectrum Subordination Agreement, which Spectrum Subordination Agreement shall be in full force and effect and in form and substance satisfactory to Agent.

(j)  [Intentionally Reserved.]

(k)  Black Crow Outdoor.  Agent shall have received evidence satisfactory to Agent in its reasonable discretion that (i) the Stock of Black Crow Outdoor, L.L.C. and BCPC Radio, L.L.C. shall have been transferred to an entity other than Holdings, any other Borrower or any other Credit Party, and (ii) prior to such transfer, Black Crow Outdoor, L.L.C. and BCPC Radio, L.L.C. shall not have engaged in any business or held any assets (other than, in the case of Black Crow Outdoor, L.L.C., the Stock of its Subsidiary).

(l)  Appraisals.  Agent shall have received fair market value appraisals of each Radio Station from professional appraisers acceptable to Agent reflecting a value for all such assets in a minimum amount of $80,000,000 in the aggregate, which appraisals reflect values and are otherwise in form and substance acceptable to Agent.

(m)  Financial Covenants.  Agent shall have received evidence satisfactory to Agent in its reasonable discretion that, as of the Closing Date and after giving effect to the Related Transactions and the Loans to be made on the Closing Date, the Borrowers and their Subsidiaries have on a consolidated basis, for the trailing twelve month period ending on August 31, 2003: (i) a Fixed Charge Coverage Ratio of not less than 1.0 to 1.0, (ii) a Senior Secured Leverage Ratio of not more than 6.25 to 1.0, (iii) an Interest Coverage Ratio of not less than 1.5 to 1.0, (iv) a Total Secured Leverage Ratio of not more than 7.35 to 1.0, and (v) a Total Leverage Ratio of not more than 7.85 to 1.0.

(n)  Merger.  The merger of Black Crow Media Group, L.L.C., a Florida limited liability company, with and into Holdings (A) shall have been fully consummated pursuant to documents, agreements and instruments satisfactory to Agent in its reasonable discretion, and (B) shall have been consummated in accordance with the operating agreement of each such entity and applicable law.

19

2.2 <u>Further Conditions to Each Loan</u>. Except as otherwise expressly provided herein, no Lender shall be obligated to fund any Advance, convert or continue any Loan as a LIBOR Loan or incur any Letter of Credit Obligation, if, as of the date thereof:

(a) any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect as of such date as determined by Agent or Requisite Lenders, except to the extent that such representation or warranty expressly relates to an earlier date and except for changes therein expressly permitted or expressly contemplated by this Agreement and Agent or Requisite Revolving Lenders have determined not to make such Advance or convert or continue any Loan as LIBOR Loan as a result of the fact that such warranty or representation is untrue or incorrect;

(b) any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance, and Agent or Requisite Revolving Lenders shall have determined not to make any Advance or convert or continue any Loan as a LIBOR Loan as a result of that Default or Event of Default; or

(c) after giving effect to any Advance, the outstanding principal amount of the aggregate Revolving Loan would exceed the Borrowing Availability.

The request and acceptance by any Borrower of the proceeds of any Advance or the conversion or continuation of any Loan into, or as, a LIBOR Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrowers that the conditions in this <u>Section 2.2</u> have been satisfied and (ii) a reaffirmation by Borrowers of the cross-guaranty provisions set forth in <u>Section 12</u> and of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

**3.      REPRESENTATIONS AND WARRANTIES**

To induce Lenders to make the Loans, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Agent and each Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1 <u>Corporate Existence; Compliance with Law</u>. Each Credit Party (a) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization set forth in <u>Disclosure Schedule (3.1)</u>; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses or liabilities which would reasonably be expected to have a Material Adverse Effect; (c) has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (d) subject to specific representations regarding Environmental Laws, the Communications Laws (and the regulations promulgated thereunder) and FCC Licenses, has all material licenses, permits, consents or approvals from or by, and has made all material filings with, and has given

all notices to, all Governmental Authorities having jurisdiction. to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and bylaws or partnership or operating agreement, as applicable; and (f) subject to specific representations set forth herein regarding ERISA, Environmental Laws, Communications Laws, tax and other laws. is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate. would not reasonably be expected to have a Material Adverse Effect.

3.2     Executive Offices. Collateral Locations. FEIN.   As of the Closing Date, each Credit Party's name as it appears in official filings in its state of incorporation or organization, state of incorporation or organization, organization type, organization number, if any, issued by its state incorporation or organization, and the current location of each Credit Party's chief executive office and the warehouses and premises at which any Collateral is located are set forth in Disclosure Schedule (3.2), none of such locations has changed within the four (4) months preceding the Closing Date and each Credit Party has only one state of incorporation or organization.  In addition, Disclosure Schedule (3.2) lists the federal employer identification number of each Credit Party.

3.3     Corporate Power. Authorization, Enforceable Obligations.   The execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's power; (b) have been duly authorized by all necessary corporate, limited liability company or limited partnership action; (c) do not contravene any provision of such Person's charter, bylaws or partnership or operating agreement, as applicable; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Person is a party or by which such Person or any of its property is bound; (f) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Agent, on behalf of itself and Lenders, pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in Section 2.1(c), all of which will have been duly obtained, made or complied with prior to the Closing Date.  Each of the Loan Documents shall be duly executed and delivered by each Credit Party that is a party thereto and each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms, subject to equitable remedies.

3.4     Financial Statements and Projections.   Except for the Projections, all Financial Statements concerning Holdings and its Subsidiaries that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

(a)     Financial Statements.  The following Financial Statements attached hereto as Disclosure Schedule (3.4(a)) have been delivered on the date hereof:

(i)     The audited balance sheets at December 31, 2001 and 2002 and the related statements of income and cash flows of Holdings and its Subsidiaries for the Fiscal Years then ended, certified by BDO Seidman LLP.

(ii)     The unaudited balance sheet(s) at August 31, 2003 and the related consolidated and consolidating statement(s) of income and cash flows of Holdings and its Subsidiaries for the eight (8) Fiscal Months then ended.

(b)     Pro Forma.  The Pro Forma delivered on the date hereof and attached hereto as Disclosure Schedule (3.4(b)) was prepared by Borrowers giving pro forma effect to the Related Transactions, was based on the unaudited consolidated balance sheets of Holdings and its Subsidiaries dated August 31, 2003, and was prepared in accordance with GAAP, with Permitted Addbacks and only such other adjustments thereto as would be required in accordance with GAAP.

(c)     Projections.  The Projections delivered on the date hereof and attached hereto as Disclosure Schedule (3.4(c)) have been prepared by Borrowers in light of the past operations of their businesses and reflect projections for the five (5) year period beginning on January 1, 2003 on a quarter-by-quarter basis for the first two (2) years and on a year-by-year basis thereafter.  The Projections are based upon the same accounting principles as those used in the preparation of the financial statements described above and the estimates and assumptions stated therein, all of which Borrowers believe to be reasonable and fair in light of current conditions and current facts known to Borrowers and, as of the Closing Date, reflect Borrowers' good faith and reasonable estimates of the future financial performance of Borrowers for the period set forth therein.  The Projections are not a guaranty of future performance, and actual results may differ from the Projections.

3.5     Material Adverse Effect.  Between December 31, 2002 and the Closing Date: (a) no Credit Party has incurred any obligations, noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are not reflected in the Pro Forma and that, alone or in the aggregate, would reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has had or could reasonably be expected to have a Material Adverse Effect, and (c) no Credit Party is in default and to the best of Borrowers' knowledge no third party is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate would reasonably be expected to have a Material Adverse Effect.  Since December 31, 2002 no event has occurred, that alone or together with other events, would reasonably be expected to have a Material Adverse Effect.

3.6     Ownership of Property; Liens.  As of the Closing Date, the real estate listed in Disclosure Schedule (3.6) constitutes all of the real property owned, leased, subleased, or used by any Credit Party (collectively, the "Real Estate").  Each Credit Party owns good and marketable fee simple title to all of its owned Real Estate, and valid leasehold interests in all of its leased Real Estate, all as described on Disclosure Schedule (3.6), and copies of all such leases or a summary of terms thereof reasonably satisfactory to Agent have been delivered to Agent.  Disclosure Schedule (3.6) further describes any Real Estate with respect to which any Credit

Party is a lessor, sublessor or assignor as of the Closing Date. Each Credit Party also has good and marketable title to, or valid leasehold interests in, all of its personal property and assets. As of the Closing Date, none of the properties and assets of any Credit Party are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions known to any Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Permitted Encumbrances. Each Credit Party has received all deeds, assignments, waivers, consents, nondisturbance and attornment or similar agreements, bills of sale and other documents, and has duly effected all recordings, filings and other actions necessary to establish, protect and perfect such Credit Party's right, title and interest in and to all such Real Estate and other properties and assets. Disclosure Schedule (3.6) also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, no portion of any Credit Party's Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used by Borrowers have been lawfully issued and are in full force and effect.

3.7     Labor Matters. Except as set forth on Disclosure Schedule 3.7, as of the Closing Date (a) no strikes or other material labor disputes against any Credit Party are pending or, to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of each Credit Party comply in all material respects with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters; (c) all payments due from any Credit Party for employee health and welfare insurance have been paid or accrued as a liability on the books of such Credit Party; (d) no Credit Party is a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement with any employee with an annual salary in excess of $100,000, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (and true and complete copies of any agreements described on Disclosure Schedule (3.7) have been delivered to Agent); (e) there is no organizing activity involving any Credit Party pending or, to any Credit Party's knowledge, threatened by any labor union or group of employees; (f) there are no representation proceedings pending or, to any Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of employees of any Credit Party has made a pending demand for recognition; and (g) there are no material complaints or charges against any Credit Party pending or, to the knowledge of any Credit Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Credit Party of any individual.

3.8     Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. Except as set forth in Disclosure Schedule (3.8), as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person. All of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule (3.8). Except as set forth in Disclosure Schedule (3.8), there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any

Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in Section 6.3 (including Disclosure Schedule (6.3)).

3.9    Government Regulation. No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940. No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder. The making of the Loans by Lenders to Borrowers, the application of the proceeds thereof and repayment thereof and the consummation of the Related Transactions will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.10    Margin Regulations. No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "Margin Stock"). No Credit Party owns any Margin Stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board. No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

3.11    Taxes. All Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority, and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof excluding Charges or other amounts being contested in accordance with Section 5.2(b). Proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in full and complete compliance with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities. Disclosure Schedule (3.11) sets forth as of the Closing Date those taxable years for which any Credit Party's tax returns are currently being audited by the IRS or any other applicable Governmental Authority, and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding. Except as described in Disclosure Schedule (3.11), as of the Closing Date, no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges. Except as described in Disclosure Schedule (3.11), none of the Credit Parties and their respective predecessor Affiliates are liable for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section

481(a), by reason of a change in accounting method or otherwise, which would reasonably be expected to have a Material Adverse Effect.

3.12    ERISA.

(a)    Disclosure Schedule (3.12) lists, as of the Closing Date, (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, and all Retiree Welfare Plans. Copies of all such listed Plans, together with a copy of the latest form IRS/DOL 5500-series, as applicable, for each such Plan, have been delivered to Agent. Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, and nothing has occurred that would cause the loss of such qualification or tax-exempt status. Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the IRC and its terms, including the timely filing of all reports required under the IRC or ERISA. Neither any Credit Party nor ERISA Affiliate has failed to make any material contribution or pay any material amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan. No "prohibited transaction," as defined in Section 406 of ERISA and Section 4975 of the IRC, has occurred with respect to any Plan, that would subject any Credit Party to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC.

(b)    Except as set forth in Disclosure Schedule (3.12): (i) no Title IV Plan has any material Unfunded Pension Liability; (ii) no ERISA Event has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Credit Party, threatened material claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) no Credit Party or ERISA Affiliate has incurred or reasonably expects to incur any material liability as a result of a complete or partial withdrawal from a Multiemployer Plan; and (v) within the last five years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Title IV Plan of any Credit Party or any ERISA Affiliate (determined at any time within the last five years) with material Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate (determined at such time).

3.13    No Litigation. No action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any Credit Party, threatened against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "Litigation"), (a) that challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that has a reasonable risk of being determined adversely to any Credit Party and that, if so determined, could reasonably be expected to have a Material Adverse Effect. Except as set forth on Disclosure Schedule (3.13), as of the Closing Date there is no Litigation pending or, to any Credit Party's knowledge, threatened, that seeks damages in excess of $250,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

3.14    Brokers.  Except as set forth on Disclosure Schedule 3.14, no investment banker, broker or finder brought about the obtaining, making or closing of the Loans or the Related Transactions, and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

3.15    Intellectual Property.  As of the Closing Date, each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it, and each Patent, Trademark, Copyright and License is listed, together with application or registration numbers, as applicable, in Disclosure Schedule (3.15).  Each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.  Except as set forth in Disclosure Schedule (3.15), no Credit Party is aware of any material infringement claim by any other Person with respect to any Intellectual Property.

3.16    Full Disclosure.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports from time to time prepared by any Credit Party and delivered hereunder or any written statement prepared by any Credit Party and furnished by or on behalf of any Credit Party to Agent or any Lender pursuant to the terms of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  Projections from time to time delivered hereunder are or will be based upon the estimates and assumptions stated therein, all of which Borrowers believed at the time of delivery to be reasonable and fair in light of current conditions and current facts known to Borrowers as of such delivery date, and reflect Borrowers' good faith and reasonable estimates of the future financial performance of Borrowers and of the other information projected therein for the period set forth therein.  Such Projections are not a guaranty of future performance and actual results may differ meaningfully from those set forth in such Projections.  To each Credit Party's knowledge, the Liens granted to Agent, on behalf of itself and Lenders, pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Encumbrances.

3.17    Environmental Matters.

(a)    Except as set forth in Disclosure Schedule (3.17), as of the Closing Date: (i) the Real Estate is free of contamination from any Hazardous Material except for such contamination that would not adversely impact the current uses or marketability of such Real Estate and that would not result in Environmental Liabilities that could reasonably be expected to exceed $100,000; (ii) no Credit Party has caused or suffered to occur any material Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate; (iii) the Credit Parties are and have been in compliance with all Environmental Laws, except for such noncompliance that would not result in Environmental Liabilities which could reasonably be expected to exceed $100,000; (iv) the Credit Parties have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, except where the failure to so obtain or comply with such Environmental Permits would not result in Environmental Liabilities that could reasonably be expected to exceed $100,000, and all such Environmental Permits are

26

valid, uncontested and in good standing; (v) no Credit Party is involved in operations or knows of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of such Credit Party which could reasonably be expected to exceed $100,000; (vi) there is no Litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Material that seeks damages, penalties, fines, costs or expenses in excess of $100,000 or injunctive relief against, or that alleges criminal misconduct by, any Credit Party; (vii) no notice has been received by any Credit Party identifying it as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any Credit Party being identified as a "potentially responsible party" under CERCLA or analogous state statutes; and (viii) the Credit Parties have provided to Agent copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities, in each case relating to any Credit Party.

(b)     Each Credit Party hereby acknowledges and agrees that Agent (i) is not now, and has not ever been, in control of any of the Real Estate or any Credit Party's affairs, and (ii) does not have the capacity through the provisions of the Loan Documents or otherwise to influence any Credit Party's conduct with respect to the ownership, operation or management of any of its Real Estate or compliance with Environmental Laws or Environmental Permits.

3.18     Insurance.  Disclosure Schedule (3.18) lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the terms of each such policy.

3.19     Deposit and Disbursement Accounts.  Disclosure Schedule (3.19) lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Closing Date, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.20     Government Contracts.  Except as set forth in Disclosure Schedule (3.20), as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727) or any similar state or local law.

3.21     [Intentionally Reserved.]

3.22     Bonding; Licenses.  Except as set forth on Disclosure Schedule 3.22, as of the Closing Date, no Credit Party is a party to or bound by any surety bond agreement or bonding requirement with respect to products or services sold by it or any trademark or patent license agreement with respect to products sold by it.

3.23     Solvency.  Both before and after giving effect to (a) the Loans to be made or incurred on the Closing Date or such other date as Loans requested hereunder are made or incurred; (b) the disbursement of the proceeds of such Loans pursuant to the instructions of

Borrower Representative; (c) the Permitted Equity Repurchase, the Refinancing, the Linn Payment and the consummation of the other Related Transactions; and (d) the payment and accrual of all transaction costs in connection with the foregoing, each Credit Party is and will be Solvent.

3.24    [Intentionally Reserved.]

3.25    Status of License Subs. Prior to the Closing Date, no License Sub (including, specifically, but without limitation, Rainbow) will have engaged in any business or incurred any Indebtedness or any other liabilities (except in connection with its corporate formation and this Agreement and the ownership of FCC Licenses).

3.26    Subordinated Debt. As of the Closing Date, Borrowers have delivered to Agent complete and correct copies of the Seller Notes, the Spectrum Notes and the Holdings Investment Documents (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

3.27    FCC Matters/Broadcasting Business.

(a)    Each Credit Party has all Main Station Licenses necessary to conduct the operations of the Radio Stations in conformity with the Communications Laws and other applicable law. The FCC Licenses are all of the licenses, permits and other authorizations issued by the FCC that are used or necessary to operate the Radio Stations as currently operated by the respective Credit Parties. The Main Station Licenses are not subject to any material restriction or condition not appearing on the face of such Main Station License that would reasonably be expected to limit or restrict the operation of the Radio Stations, except for Communications Laws and matters affecting the radio broadcasting industry generally;

(b)    Set forth in Disclosure Schedule (3.27(b)) is a true and correct description of all FCC Licenses issued in the name of or assigned to any Credit Party as of the Closing Date (including the expiration date of each such FCC License). All of the Main Station Licenses are in full force and effect and have been duly and validly issued in the name of, or validly assigned to, the respective Credit Party and, in the case of each FCC License is held by a License Sub which is a wholly-owned Subsidiary of the Borrower directly operating the Radio Station with respect to which such FCC License was issued; provided, however, that (i) Disclosure Schedule 3.27(b)(i) identifies certain discrepancies between the tower coordinates specified on certain Main Station Licenses and the tower registration on file with the FCC and (ii) as described in Disclosure Schedule 3.27(b)(ii), due to the loss of its former nighttime tower site, Station WLOR(AM) currently conducts its nighttime operations at the licensed tower site for its daytime operations pursuant to a special temporary authorization ("STA") and holds a construction permit to relocate both its daytime and nighttime facilities to a new tower site;

(c)    Each Credit Party has taken all material actions and performed all of their material obligations necessary to maintain all Main Station Licenses without adverse modification or impairment, and complete and correct copies of all Main Station Licenses of each such Credit Party have been delivered to Agent;

(d)     To Credit Parties' knowledge, no event has occurred which (A) results in, or after notice or lapse of time or both would result in, revocation, suspension, adverse modification, non-renewal, short-term renewal, impairment or termination of or any notice of apparent liability or any order of forfeiture with respect to, any Main Station License, or (B) materially and adversely affects or in the future may (so far as any Credit Party can now reasonably foresee) materially adversely affect any of the rights of any Credit Party with respect thereto, other than those matters affecting the radio broadcasting industry generally;

(e)     None of the Main Station Licenses requires that any present Stockholder, director, officer or employee of any Credit Party remain a stockholder or employee of such Credit Party, or that any transfer of control of such Person must be approved by any Governmental Authority other than the FCC;

(f)     No Credit Party has any reason to believe that the Main Station Licenses listed and described in Disclosure Schedule (3.27(b)) will not be renewed for a full term in the ordinary course.  Each Credit Party (a) has duly filed all reports and other filings which are required to be filed under the Communications Laws, and (b) is in compliance in all material respects with the Communications Laws, except as set forth on Disclosure Schedule (3.27(b)). All information provided by or on behalf of any Credit Party in any material filing with the FCC was, at the time of filing, true, correct and complete in all material respects when made, and the FCC has been notified of any substantial or significant changes in such information as may be required by the Communications Laws;

(g)     No Credit Party is a party to or has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or material complaint issued or threatened in writing by or before any Governmental Authority, including the FCC, or of any other proceedings which could in any manner threaten or adversely affect the validity or continued effectiveness of the Main Station Licenses of any such Credit Party.  In addition, to Borrowers' knowledge, no such investigation, notice of apparent liability, violation, forfeiture or other order or material complaint issued by or before any Governmental Authority, including the FCC, or any other proceedings have occurred or been issued with respect to any Credit Party or any Main Station License since the applicable Credit Party acquired each Main Station License;

(h)     All information contained in any pending applications for modification, extension or renewal of Main Station Licenses associated with any of the Radio Stations filed with the FCC by any Credit Party is true, complete and accurate in all material respects.  Each Ownership Report filed by the any Credit Party with the FCC was true, correct and complete in all material respects as of the date of such report, and there has been no change in control of the ownership of any Credit Party or the Main Station Licenses of any Credit Party since the most recently filed Ownership Report for any of any Credit Party.  All FCC regulatory fees assessed with respect to the Main Station Licenses have been timely and accurately paid by Borrowers;

(i)     Set forth in Disclosure Schedule (3.6) is a list of the locations of all tower installations, transmitters and offices used in connection with the operation of the Radio Stations (identified with reference to the Radio Station to which each such location serves).  Each of the towers required to be registered by Borrowers with the FCC pursuant to the FCC's antenna

structure registration regulations has been duly and accurately registered, except as set forth in Disclosure Schedule (3.27(b));

(j)     No Credit Party is party to or bound by any Marketing Agreement; and

(k)     The Radio Stations' physical facilities, including their transmitting and studio equipment, are operated in all material respects in accordance with the terms of their respective Main Station Licenses and in accordance with the Communications Laws. The location, staffing and equipment of each Radio Station's main studio complies with the Communications Laws. The Radio Stations are in compliance in all material respects with the limitations on exposure of workers and the public to radio frequency radiation established by the Communications Laws.

3.28     [Intentionally Reserved.]

3.29     OFAC. No Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

3.30     Patriot Act. Each Credit Party is in compliance, in all material respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001). No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

## 4.     FINANCIAL STATEMENTS AND INFORMATION

4.1     Reports and Notices.

(a)     Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and Lenders, as required, the Financial Statements, notices, Projections and other information at the times, to the Persons and in the manner set forth in Annex E.

(b)     Each Credit Party executing this Agreement hereby agrees that, from and after the Closing Date and until the Termination Date, it shall deliver to Agent or to Agent and

Lenders, as required, the various Collateral Reports at the times, to the Persons and in the manner set forth in <u>Annex F</u>.

    4.2   <u>Communication with Accountants</u>. Each Credit Party executing this Agreement authorizes (a) Agent and (b) so long as an Event of Default has occurred and is continuing, each Lender, to communicate directly with its independent certified public accountants. including BDO Seidman, LLP, and authorizes those accountants and advisors to communicate to Agent and each Lender information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party.

## 5.    AFFIRMATIVE COVENANTS

    Each Credit Party executing this Credit Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

    5.1   <u>Maintenance of Existence and Conduct of Business</u>. Each Credit Party shall:  do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its material rights and franchises;  continue to conduct its business substantially as now conducted or as otherwise permitted hereunder;  at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with good engineering and maintenance practices; and transact business only in such corporate and trade names as are set forth in <u>Disclosure Schedule (5.1)</u>.

    5.2   <u>Payment of Charges</u>.

    (a)   Subject to <u>Section 5.2(b)</u>, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due or delinquent.

    (b)   Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in <u>Section 5.2(a)</u>; <u>provided,</u> that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Agent evidence reasonably acceptable to Agent of such compliance, payment or discharge, if such contest is

terminated or discontinued adversely to such Credit Party or the conditions set forth in this Section 5.2(b) are no longer met.

5.3    Books and Records.    Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as Disclosure Schedule (3.4(a)).

5.4    Insurance; Damage to or Destruction of Collateral.

(a)    The Credit Parties shall, at their sole cost and expense, maintain the policies of insurance described on Disclosure Schedule (3.18) as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Agent (which shall specifically include, without limitation, business interruption insurance).    Such policies of insurance (or the loss payable and additional insured endorsements delivered to Agent) shall contain provisions pursuant to which the insurer agrees to provide thirty (30) days prior written notice to Agent in the event of any non-renewal, cancellation or amendment of any such insurance policy.    If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above, or to pay all premiums relating thereto, Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Agent deems advisable.    Agent shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, Agent shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor.    All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrowers to Agent and shall be additional Obligations hereunder secured by the Collateral.

(b)    Agent reserves the right at any time upon any change in any Credit Party's risk profile (including any change in the laws affecting the potential liability of such Credit Party) to require additional forms and limits of insurance consistent with radio broadcasting industry standards, which, in Agent's reasonable opinion, are appropriate and necessary to protect both Agent's and Lenders' interests in all or any portion of the Collateral and to ensure that each Credit Party is protected by insurance in amounts and with coverage customary for a company in its industry of similar size, risk profile and claims experience.    If reasonably requested by Agent, each Credit Party shall deliver to Agent from time to time a report of a reputable insurance broker, reasonably satisfactory to Agent, with respect to its insurance policies.

(c)    Each Credit Party shall deliver to Agent, in form and substance reasonably satisfactory to Agent, endorsements to (i) all "All Risk" insurance naming Agent, on behalf of itself and Lenders, as loss payee, and (ii) all general liability and other liability policies naming Agent, on behalf of itself and Lenders, as additional insured.    Each Credit Party irrevocably makes, constitutes and appoints Agent (and all officers, employees or agents designated by Agent), so long as any Event of Default has occurred and is continuing or the anticipated insurance proceeds exceed $500,000, as such Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such "All Risk"

32

policies of insurance, endorsing the name of such Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance. Agent shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney. Borrower Representative shall promptly notify Agent of any loss, damage, or destruction to the Collateral in the amount of $500,000 or more, whether or not covered by insurance. Agent shall permit (in accordance with the remaining provisions hereof) the applicable Credit Party to replace, restore, repair or rebuild the property subject to any such casualty (i) if (A) such casualty is related to a tower, and (B) the insurance proceeds arising from such casualty do not exceed $2,000,000, or (ii) if the insurance proceeds arising from such casualty do not exceed $500,000; provided, that if such Credit Party shall not have completed or entered into binding agreements to complete such replacement, restoration, repair or rebuilding within 180 days of such casualty, Agent may apply such insurance proceeds to the Obligations in accordance with Section 1.3(d); provided, further, that in the case of insurance proceeds pertaining to any Credit Party that is not a Borrower, such insurance proceeds shall be applied ratably to all of the Loans. All insurance proceeds that are to be made available to any Borrower to replace, repair, restore or rebuild the Collateral in accordance with the terms hereof shall either, at the option of Borrower Representative, (i) be applied by Agent to reduce the outstanding principal balance of the Revolving Loan of such Borrower (which application shall not result in a permanent reduction of the Revolving Loan Commitment) and upon such application, Agent shall establish a reserve in an amount equal to the amount of such proceeds so applied, or (ii) be maintained in a separate cash collateral account, (A) which cash collateral account is pledged to Agent, for the benefit of Lenders, and (B) over which cash collateral account Agent has control (pursuant to the terms of a control agreement satisfactory to Agent in its reasonable discretion). All insurance proceeds made available to any Credit Party that is not a Borrower to replace, repair, restore or rebuild Collateral shall be deposited in a cash collateral account under the conditions described in subclause (ii) of the immediately preceding sentence. Thereafter, such funds shall be made available to that Borrower or Credit Party to provide funds to replace, repair, restore or rebuild the Collateral as follows: (i) Borrower Representative shall request a Revolving Credit Advance or a release from the cash collateral account be made to such Borrower or Credit Party in the amount requested to be released; (ii) Revolving Lenders shall make such Revolving Credit Advance or Agent shall release funds from the cash collateral account; and (iii) in the case of insurance proceeds applied against the Revolving Loan, the reserve established with respect to such insurance proceeds shall be reduced by the amount of such Revolving Credit Advance. To the extent not used to replace, repair, restore or rebuild the Collateral, such insurance proceeds shall be applied in accordance with Section 1.3(d); provided, that in the case of insurance proceeds pertaining to any Credit Party that is not a Borrower, such insurance proceeds shall be applied ratably to all of the Loans owing by each Borrower.

5.5　　Compliance with Laws. Each Credit Party shall comply with all federal, state, local and foreign laws and regulations applicable to it, including those relating to ERISA, labor laws, and Environmental Laws and Environmental Permits, the Communications Laws and the rules and policies of the FCC, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.6　　Supplemental Disclosure. From time to time as may be reasonably requested by Agent (which request will not be made more frequently than once each year absent the

occurrence and continuance of an Event of Default) or at Credit Parties' election, the Credit Parties shall supplement each Disclosure Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify any Disclosure Schedule or representation, or be or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Agent and Requisite Lenders in writing, and (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date.

5.7    Intellectual Property.  Each Credit Party will conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its Licenses.

5.8    Environmental Matters.  Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply in all material respects with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate in all material respects; (c) notify Agent promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities in excess of $100,000; and (d) promptly forward to Agent a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $100,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter. If Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then each Credit Party shall, upon Agent's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrowers' expense, as Agent may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent, and (ii) permit Agent or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and testing as Agent deems appropriate,

including subsurface sampling of soil and groundwater. Borrowers shall reimburse Agent for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

5.9     Landlords' Agreements, Mortgagee Agreements, Bailee Letters and Real Estate Purchases. Concurrently with the execution or assumption by any Credit Party, as lessee, of any lease pertaining to real property, such Credit Party shall deliver to Agent (i) an executed copy thereof, (ii) if the real property that is the subject of such lease constitutes a transmitting tower site, at the option of Requisite Lenders, either a leasehold mortgage upon, or a collateral assignment of, such lease in favor of Agent, for the benefit of the Lenders, in either case in form and substance reasonably acceptable to Requisite Lenders, (iii) if the real property that is the subject of such lease does not constitute a transmitting tower site, a collateral assignment of such lease in favor of Agent, for the benefit of the Lenders, and a landlord waiver and consent from the landlord under such lease, each in form and substance reasonably acceptable to Requisite Lenders, (iv) with respect to any such required leasehold mortgage, at the option of Agent, a lender's policy of title insurance, in such form and amount and containing such endorsements as shall be reasonably satisfactory to Agent, insuring the Lien of such leasehold mortgage, together with a survey of such real property, which survey shall be of a recent enough date and in sufficient detail so as to permit the title company issuing such policy to eliminate any survey exceptions to such policy, and (v) such other documents and assurances with respect to such real property as Requisite Lenders may require. Each Credit Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located. To the extent otherwise permitted hereunder, if any Credit Party proposes to acquire a fee ownership interest in Real Estate after the Closing Date, it shall first provide to Agent a mortgage or deed of trust granting Agent a first priority Lien on such Real Estate, together with environmental audits, mortgage title insurance commitment, real property survey, local counsel opinion(s), and, if required by Agent, supplemental casualty insurance and flood insurance, and such other documents, instruments or agreements reasonably requested by Agent, in each case, in form and substance reasonably satisfactory to Agent.

5.10     [Intentionally Reserved.]

5.11     Further Assurances. Each Credit Party executing this Agreement agrees that it shall and shall cause each other Credit Party to, at such Credit Party's expense and upon the reasonable request of Agent, duly execute and deliver, or cause to be duly executed and delivered, to Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Agent to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

5.12     FCC Reports and Communications. In addition to and not in lieu of the requirements set forth in item (o) of Annex E, the Credit Parties shall provide Agent, promptly after the same becomes available, with copies of all (i) letters of inquiry, notices of apparent liability, hearing designation orders or any other orders, rulings or decisions of the FCC naming any of the Radio Stations and (ii) any material correspondence, pleading or other response from any Borrower or any of its respective Subsidiaries to the FCC with respect to the foregoing. Each Borrower and its respective Subsidiaries shall comply in all material respects with all FCC

filing requirements described in 47 C.F.R. §§73.3613 and 73.3615 and shall provide copies to Agent of all filings made pursuant to such requirements. Without limiting the generality of the foregoing, Borrower and its respective Subsidiaries shall file at the FCC the Loan Documents required to be filed under the Communications Laws within 30 days of the execution thereof and shall provide a copy to Agent of such filing.

     5.13   <u>FCC Licenses</u>. Subject to the second sentence of this <u>Section 5.13</u>, each Credit Party shall at all times maintain the Main Station Licenses in full force and effect. The License Sub of Station WLOR(AM) shall maintain the STA in full force and effect until the relocation of the Station's daytime and nighttime facilities to the tower site authorized in the Station's outstanding construction permit and any subsequent modifications thereof has been completed on or before the expiration date of such permit. In addition, the Credit Parties shall resolve all discrepancies in the tower site coordinates for the Radio Stations identified on <u>Disclosure Schedule (3.27(b)(i))</u> to the reasonable satisfaction of Agent by (a) filing with the FCC and/or the Federal Aviation Administration, as the case may be, within six (6) months of the Closing Date, all such applications, registrations or notifications as may be necessary or desirable to correct the tower site discrepancies in the records of the FCC and the Federal Aviation Administration; (b) completing all steps necessary or desirable to correct the tower site discrepancies within twelve (12) months of the Closing Date or such later date as may be mutually agreed upon by Agent and Borrowers; and (c) submitting a progress report to Agent on a bimonthly basis (i.e., every other month) commencing with the first business day of the first full month following the Closing Date and continuing on that basis until the deadline for completion set forth in subsection (b) of this <u>Section 5.13</u>.

## 6.    NEGATIVE COVENANTS

     Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof until the Termination Date, unless Agent's and Requisite Lenders' prior written consent thereto is first obtained:

     6.1   <u>Mergers, Subsidiaries, Etc.</u> No Credit Party shall directly or indirectly, by operation of law or otherwise, (a) form or acquire any Subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person, except that any Borrower may merge with another Borrower, <u>provided</u> that Borrower Representative shall be the survivor of any such merger to which it is a party. Nothing herein shall be deemed to prevent or restrict the members of Holdings from doing any of the foregoing as long as such actions occur through an entity other than Holdings, any other Borrower or any other Credit Party.

     6.2   <u>Investments; Loans and Advances</u>. Except as otherwise expressly permitted by this <u>Section 6</u>, no Credit Party shall make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that: (a) Borrowers may hold investments comprised of notes payable, or stock or other securities issued by Account Debtors to any Borrower pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business consistent with past practices; and (b) each Credit Party may maintain its existing investments in its Subsidiaries as of the Closing Date.

6.3     Indebtedness.

(a)      No Credit Party shall create, incur, assume or permit to exist any Indebtedness, except (without duplication) (i) Indebtedness secured by purchase money security interests and Capital Leases permitted in Section 6.7(c), (ii) the Loans and the other Obligations, (iii) unfunded pension fund and other employee benefit plan obligations and liabilities to the extent they are permitted to remain unfunded under applicable law, (iv) existing Indebtedness described in Disclosure Schedule (6.3) and refinancings thereof or amendments or modifications thereto that do not have the effect of increasing the principal amount thereof, changing the amortization thereof (other than to extend the same), or, in the case of the Subordinated Debt evidenced by the Spectrum Notes and the Holdings Investment Documents, permitting interest to be accrued or paid other than in kind (provided, also, that any refinancing of the Subordinated Debt evidenced by the Spectrum Notes and the Holdings Investment Documents shall include a joinder agreement executed by the party undertaking such refinancing with respect to the Spectrum Subordination Agreement) and that are otherwise on terms and conditions no less favorable to any Credit Party, Agent or any Lender, as determined by Agent, than the terms of the Indebtedness being refinanced, amended or modified, and (v) Indebtedness consisting of intercompany loans and advances made by any Borrower to any other Borrower; provided, that: (A) each Borrower shall have executed and delivered to each other Borrower, on the Closing Date, a demand note (collectively, the "Intercompany Notes") to evidence any such intercompany Indebtedness owing at any time by such Borrower to such other Borrowers which Intercompany Notes shall be in form and substance reasonably satisfactory to Agent and shall be pledged and delivered to Agent pursuant to the applicable Pledge Agreement or Security Agreement as additional collateral security for the Obligations; (B) each Borrower shall record all intercompany transactions on its books and records in a manner reasonably satisfactory to Agent; (C) the obligations of each Borrower under any such Intercompany Notes shall be subordinated to the Obligations of such Borrower hereunder in a manner reasonably satisfactory to Agent; (D) at the time any such intercompany loan or advance is made by any Borrower to any other Borrower and after giving effect thereto, each such Borrower shall be Solvent; and (E) no Default or Event of Default would occur and be continuing after giving effect to any such proposed intercompany loan.

(b)      No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations; (ii) Indebtedness secured by a Permitted Encumbrance if the asset securing such Indebtedness has been sold or otherwise disposed of in accordance with Sections 6.8(b) or (c); and (iii) Indebtedness permitted by Section 6.3(a)(iv) upon any refinancing thereof in accordance with Section 6.3(a)(iv).

6.4     Employee Loans and Affiliate Transactions.

(a)      Except as described on Disclosure Schedule (6.4(a)) or as otherwise expressly permitted in this Section 6 with respect to Affiliates, no Credit Party shall enter into or be a party to any transaction with any other Credit Party or any Affiliate thereof except in the ordinary course of and pursuant to the reasonable requirements of such Credit Party's business and upon fair and reasonable terms that are no less favorable to such Credit Party than would be

obtained in a comparable arm's length transaction with a Person not an Affiliate of such Credit Party. In addition, if any such transaction or series of related transactions involves payments in excess of $250,000 in the aggregate, the terms of these transactions must be disclosed in advance to Agent and Lenders. All such transactions existing as of the date hereof are described in Disclosure Schedule (6.4(a)).

(b)     Except as described in Disclosure Schedule (6.4)(a)), no Credit Party shall enter into any lending or borrowing transaction with any employees of any Credit Party, except loans to its respective employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes and stock option financing up to a maximum of $100,000 to any employee and up to a maximum of $100,000 in the aggregate at any one time outstanding.

6.5     Capital Structure and Business.  No Credit Party shall (a) make any change in its capital structure as described in Disclosure Schedule (3.8), including the issuance or sale of any shares of Stock, warrants or other securities convertible into Stock or any revision of the terms of its outstanding Stock; provided, however, Holdings may issue equity in respect of the Holdings Investment or otherwise, as long as (i) such new Stock is pledged to Agent, for the benefit of Lenders, as Collateral for the Obligations, and (ii) the proceeds of such issuance are applied in accordance with Section 1.3(b), or (b) amend its charter, bylaws or operating agreement, as the case may be, in a manner that would adversely affect Agent or Lenders or such Credit Party's duty or ability to repay the Obligations.  No Credit Party shall engage in any business other than the commercial radio broadcasting business.

6.6     Guaranteed Indebtedness.  No Credit Party shall create, incur, assume or permit to exist any Guaranteed Indebtedness except (a) by endorsement of instruments or items of payment for deposit to the general account of any Credit Party, and (b) for Guaranteed Indebtedness incurred for the benefit of any other Credit Party if the primary obligation is expressly permitted by this Agreement.

6.7     Liens.  No Credit Party shall create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties or assets (whether now owned or hereafter acquired) except for (a) Permitted Encumbrances;  (b) Liens in existence on the date hereof and summarized on Disclosure Schedule (6.7) securing the Indebtedness described on Disclosure Schedule (6.3) and permitted refinancings, extensions and renewals thereof, including extensions or renewals of any such Liens; provided that the principal amount of the Indebtedness so secured is not increased and the Lien does not attach to any other property; and (c) Liens created after the date hereof by conditional sale or other title retention agreements (including Capital Leases) or in connection with purchase money Indebtedness with respect to Equipment and Fixtures acquired by any Credit Party in the ordinary course of business, involving the incurrence of an aggregate amount of purchase money Indebtedness and Capital Lease Obligations of not more than $250,000 outstanding at any one time for all such Liens (provided that such Liens attach only to the assets subject to such purchase money debt and such Indebtedness is incurred within twenty (20) days following such purchase and does not exceed 100% of the purchase price of the subject assets).  In addition, no Credit Party shall become a party to any agreement, note, indenture or instrument, or take any other action, that would prohibit the creation of a Lien on any of its properties or other assets in favor of Agent, on behalf

of itself and Lenders, as additional collateral for the Obligations, except operating leases, Capital Leases or Licenses which prohibit Liens upon the assets that are subject thereto.

6.8     Sale of Stock and Assets. No Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) or any of its Accounts, other than (a) the sale of Inventory in the ordinary course of business, and (b) the sale other disposition by a Credit Party of Equipment, Fixtures or Real Estate that are obsolete or no longer used or useful in such Credit Party's business and having a book value not exceeding $250,000 in the aggregate in any Fiscal Year; and (c) the sale or other disposition of other Equipment and Fixtures having a book value not exceeding $250,000 in the aggregate in any Fiscal Year.

6.9     ERISA. No Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur (i) an event that could result in the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA or (ii) an ERISA Event to the extent such ERISA Event would reasonably be expected to result in taxes, penalties and other liabilities in an aggregate amount in excess of $250,000 in the aggregate.

6.10     Financial Covenants. Borrowers shall not breach or fail to comply with any of the Financial Covenants.

6.11     Hazardous Materials. No Credit Party shall cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the use or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities that would not reasonably be expected to have a Material Adverse Effect.

6.12     Sale-Leasebacks. No Credit Party shall engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets.

6.13     Restricted Payments. No Credit Party shall make any Restricted Payment, except (a) intercompany loans, accounts receivable, accounts payable and advances between Borrowers to the extent permitted by Section 6.3, (b) dividends and distributions by Subsidiaries of any Borrower paid to such Borrower, (c) employee loans permitted under Section 6.4(b), (d) payments of principal and interest of Intercompany Notes issued in accordance with Section 6.3, (e) Permitted Tax Distributions, and (f) the Permitted Equity Repurchase.

6.14     Change of Corporate Name, State of Incorporation or Location; Change of Fiscal Year. No Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization, (b) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization or incorporate or organize in any additional jurisdictions, in each case without at least thirty (30) days prior written notice to

Agent and after Agent's written acknowledgment that any reasonable action requested by Agent in connection therewith, including to continue the perfection of any Liens in favor of Agent, on behalf of Lenders, in any Collateral, has been completed or taken, and provided, that any such new location shall be in the continental United States. No Credit Party shall change its Fiscal Year.

6.15    No Impairment of Intercompany Transfers.    No Credit Party shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany loans by a Subsidiary of any Borrower to any Borrower or between Borrowers.

6.16    Real Estate Purchases.    No Credit Party shall purchase a fee simple ownership interest in Real Estate.

6.17    Changes Relating to Subordinated Debt; Material Contracts.

(a)    No Credit Party shall change or amend the terms of any Subordinated Debt evidenced by the Seller Notes (or any indenture or agreement executed in connection therewith) if the effect of such amendment is to: (a) increase the interest rate on such Subordinated Debt; (b) change the dates upon which payments of principal or interest are due on such Subordinated Debt other than to extend such dates; (c) change any default or event of default other than to delete or make less restrictive any default provision therein, or add any covenant with respect to such Subordinated Debt; (d) change the redemption or prepayment provisions of such Subordinated Debt other than to extend the dates therefor or to reduce the premiums payable in connection therewith; (e) grant any security or collateral to secure payment of such Subordinated Debt; or (f) change or amend any other term if such change or amendment would increase the obligations of the Credit Party thereunder or confer additional rights on the holder of such Subordinated Debt in a manner adverse to any Credit Party, Agent or any Lender.

(b)    No Credit Party shall change or amend the terms of any Subordinated Debt evidenced by the Spectrum Notes (or any indenture or agreement executed in connection therewith, including the Holdings Investment Documents) if the effect of such amendment is to: (a) increase the interest rate on such Subordinated Debt; (b) change the dates upon which payments of principal or interest are due on such Subordinated Debt, other than to extend such dates; (c) change any default or event of default, other than to delete or make less restrictive any default provision therein, or add any covenant with respect to such Subordinated Debt, (d) change the redemption or prepayment provisions of such Subordinated Debt, including, without limitation, the provisions related to the 5th Anniversary Redemption, the 5th Anniversary Put, any Mandatory Repurchase Event or any notice related to any of the foregoing (as each of the foregoing terms are defined in the Holdings Investment Documents); (e) grant any security or collateral to secure such Subordinated Debt; (f) cause any interest paid or accrued with respect to such Subordinated Debt to be paid or accrued other than in kind; (g) change or amend Section 10.1(c) of the Holdings Investment Documents in any manner whatsoever or change or modify the rights of the holder of such Subordinated Debt with respect thereto in any manner whatsoever, or (h) change or amend any other provision thereof if such change or amendment

would increase the obligations of any Credit Party thereunder or confer additional rights on the holder of such Subordinated Debt in a manner adverse to any Credit Party, Agent or any Lender.

(c)     No Credit Party shall change or amend the terms of any of the following material contracts: (i) that certain Lease Agreement dated June 3, 1998, by and between Ora Mae Luster and Wolfe Communication, Inc., as assigned to Thomas Media, Inc. by that certain Assignment of Lease and Amendment dated August 1, 2000; (ii) that certain Lease dated November 8, 2001, by and between Jerry Chesser and STG Media, L.L.C.; (iii) that certain Lease Agreement dated August 1, 2000, by and between Neal Smith and Wanda Smith and Thomas Media, Inc.; (iv) that certain Ground Lease Agreement dated October 28, 1999, by and between the City of DeLand and Green Broadcast Group, Inc., as assigned to Black Crow Broadcasting, Inc., by an Assignment and Assumption of Lease dated March 2, 2000, as assigned to Black Crow Media, L.L.C., by way of that certain Assignment and Assumption of Real Property Leases dated November 19, 2001; (v) that certain Lease Agreement dated March 22, 1995, by and between Audrey D. Jordan and M&M Broadcasting, Inc., as assigned to Southern Broadcast Group, L.L.C., by way of that certain Assignment of Transmitter Site Lease dated March 22, 1995, as assigned to RTG Media, LLC, by way of that certain Assignment, Assumption and Consent to Assignment and Assumption of Real Estate Lease; (vi) that certain Lease and Rent Contract dated July 10, 2000, by and between Ira T. Paulk and Robert F. Fain and M&M Broadcast Co., as assigned to Southern Broadcast Group, L.L.C., by way of that certain Agreement of Assignment dated July 10, 2000, as assigned to RTG Media, LLC, by way of that certain Assignment, Assumption and Consent to Assignment and Assumption of Real Estate Lease; (vii) that certain Lease Agreement dated April 15, 1999, by and between J. C. Hand and Assets, Inc., as assigned to Southern Broadcast Group, L.L.C. and Mr. Albert Brooks, Brooks Broadcasting Corporation, Inc. and Al Brooks Communications, Inc., by way of that certain undated Assignment, as assigned to RTG Media, LLC, by way of that certain Assignment and Assumption of Leases and Contracts dated February 15, 2001; and (viii) that certain lease agreement as referenced in that certain undated Purchase and Sales Agreement by and between Jerry Moore and STG Media, LLC (all such agreements, collectively, the "Tower Leases"), in a manner adverse to any Credit Party, Agent or any Lender.

6.18    [Intentionally Reserved.]

6.19    <u>License Subs</u>. No Borrower nor any Subsidiary thereof, other than a License Sub, shall hold any FCC Licenses. Borrowers shall not permit the License Subs to have any business activities, operations, indebtedness, guaranties or Liens (other than those in favor of Agent).

6.20    <u>Limitation on Sale or Discount of Receivables</u>. No Borrower nor any Subsidiary thereof, shall discount or sell with recourse, or sell for less than the greater of the face value or market value thereof, any of its notes receivable or accounts receivable, other than in the ordinary course of its business consistent with past practices; <u>provided, however</u>, that, regardless of Borrowers' ordinary course conduct or their respective past practices, no Borrower nor any Subsidiary thereof shall discount or sell with recourse, or sell for less than the greater of the face value or market value thereof, any note receivable or account receivable with a face amount in excess of $500,000 for a discount in excess of twenty-five percent (25%), without the prior written consent of Agent.

6.21    Marketing Agreements.  No Credit Party shall enter into or be bound by any Marketing Agreement.

6.22    FCC Licenses.  No Credit Party shall operate the Radio Stations other than in accordance with the Communications Laws and the Main Station Licenses in all material respects.  No Credit Party shall fail to file any report or application or pay any FCC regulatory or filing fee pertaining to the Radio Stations which is required to be filed with or paid to the FCC. No Credit Party shall take any action that would or could cause the FCC to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of the Main Station Licenses or take or permit to be taken any other action within its control that would reasonably be expected to result in non-compliance with the requirements of the Communications Laws in any material respect.

## 7.    TERM

7.1    Termination.  The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, or the Term Loan B Commitment Termination Date, as the case may be, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2    Survival of Obligations Upon Termination of Financing Arrangements.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of Agent and Lenders relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.  Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of Agent and each Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; provided, that the provisions of Section 11, the payment obligations under Sections 1.15 and 1.16, and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 8.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1    Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    Any Borrower (i) fails to make (A) any payment of principal of the Loans or any of the other Obligations within two (2) Business Days of when due and payable (other than with respect to principal due on the maturity date (whether by acceleration or otherwise) for such Obligation, for which no grace or cure period shall apply), or (B) any payment of interest on, or Fees owing in respect of, the Loans or any of the other Obligations within five (5) Business Days of when due and payable, or (ii) fails to pay or reimburse Agent or Lenders for