# EXHIBIT B

## BORROWERS' SECURITY AGREEMENT

This BORROWERS' SECURITY AGREEMENT (this "Security Agreement") is made and entered into as of October 3, 2003, by and among BLACK CROW MEDIA GROUP, LLC, a Delaware limited liability company ("Holdings"), BLACK CROW MEDIA, L.L.C., a Florida limited liability company ("Black Crow Media"), STG MEDIA, L.L.C., a Florida limited liability company ("STG Media"), RTG MEDIA, L.L.C., a Florida limited company ("RTG Media"), THOMAS MEDIA OPERATIONS, L.L.C., a Florida limited liability company ("Thomas Media"), BLACK CROW RADIO, L.L.C., a Florida limited liability company ("Black Crow Radio"), BCA RADIO, L.L.C., a Florida limited liability company ("BCA Radio"), RTG RADIO, L.L.C., a Florida limited liability company ("RTG Radio"), THOMAS RADIO, L.L.C., a Florida limited liability company ("Thomas Radio"), RAINBOW MEDIA, INC., a Tennessee corporation ("Rainbow") (Holdings, Black Crow Media, STG Media, RTG Media, Thomas Media, Black Crow Radio, BCA Radio, RTG Radio, Thomas Radio, and Rainbow are collectively referred to herein as the "Grantors" and individually as a "Grantor"), and GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, individually and in its capacity as Agent for Lenders.

## W I T N E S S E T H :

WHEREAS, pursuant to that certain Credit Agreement, dated as of the date hereof, by and among Grantors, the other Persons signatory thereto as Credit Parties, Agent and Lenders (as amended, modified or supplemented from time to time, the "Credit Agreement"), Lenders have agreed to make the Loans to Grantors;

WHEREAS, in order to induce Agent and Lenders to enter into the Credit Agreement and other Loan Documents and to induce Lenders to make the Loans as provided for in the Credit Agreement, Grantors have agreed to grant a continuing Lien on the Collateral (as hereinafter defined) to secure the Obligations;

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    DEFINED TERMS. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Credit Agreement or in Annex A thereto. All other terms contained in this Security Agreement, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein.

2.    GRANT OF LIEN.

(a)    To secure the prompt and complete payment, performance and observance of all of the Obligations (specifically including, without limitation, each Grantor's Obligations arising under the cross-guaranty provisions of Section 12 of the Credit Agreement), each Grantor hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to Agent, for itself and the benefit of Lenders, a Lien upon all of its right, title and interest in, to and under all personal property and other assets (including, without limitation, the Stock of its Subsidiaries), whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor

(including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Grantor, and regardless of where located (all of which being hereinafter collectively referred to as the "Collateral"), including:

> (i)      all Accounts;
>
> (ii)     all Chattel Paper;
>
> (iii)    all Documents;
>
> (iv)     all General Intangibles (including payment intangibles and Software);
>
> (v)      all Goods (including Inventory, Equipment and Fixtures);
>
> (vi)     all Instruments;
>
> (vii)    all Investment Property;
>
> (viii)   all Deposit Accounts, of any Grantor, including all Blocked Accounts, Disbursement Accounts, and all other bank accounts and all deposits therein;
>
> (ix)     all money, cash or cash equivalents of any Grantor;
>
> (x)      all Supporting Obligations of any Grantor;
>
> (xi)     all Commercial Tort Claims listed on Schedule VI hereto; and
>
> (xii)    to the extent not otherwise included, all Proceeds, commercial tort claims, insurance claims and other rights to payments not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

(b)      In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce Agent and Lenders as aforesaid, each Grantor hereby grants to Agent, for itself and the benefit of Lenders, a right of setoff against the property of such Grantor held by Agent or any Lender, consisting of property described above in Section 2(a) now or hereafter in the possession or custody of or in transit to Agent or any Lender, for any purpose, including safekeeping, collection or pledge, for the account of such Grantor, or as to which such Grantor may have any right or power.

3.      AGENT'S AND LENDERS' RIGHTS; LIMITATIONS ON AGENT'S AND LENDERS' OBLIGATIONS.

(a)      It is expressly agreed by Grantors that, anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of its Contracts and each of its Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Neither Agent nor any Lender shall have any obligation or liability under any

CORP/974272.6

Contract or License by reason of or arising out of this Security Agreement or the granting herein of a Lien thereon or the receipt by Agent or any Lender of any payment relating to any Contract or License pursuant hereto. Neither Agent nor any Lender shall be required or obligated in any manner to perform or fulfill any of the obligations of any Grantor under or pursuant to any Contract or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract or License, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)    Agent may at any time after an Event of Default has occurred and is continuing, without prior notice to any Grantor, notify Account Debtors and other Persons obligated on the Collateral that Agent has a security interest therein, and that payments shall be made directly to Agent. Furthermore, if Agent determines that Borrowing Availability is less than zero, Agent may notify Account Debtors that Agent has a security interest therein, and that payments shall be made directly to Agent. Upon the request of Agent, each Grantor shall so notify Account Debtors and other Persons obligated on Collateral. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, the affected Grantor shall not give any contrary instructions to such Account Debtor or other Person without Agent's prior written consent.

(c)    Agent may at any time in Agent's own name, in the name of a nominee of Agent or in the name of any Grantor, communicate (by mail, telephone, facsimile or otherwise) with Account Debtors, parties to Contracts and obligors in respect of Instruments to verify with such Persons, to Agent's satisfaction, the existence, amount terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper and/or payment intangibles. If an Event of Default occurring under Sections 8.1(a), 8.1(h) or 8.1(i) of the Credit Agreement shall have occurred and be continuing, each Grantor, at its own expense, shall cause the independent certified public accountants then engaged by such Grantor to prepare and deliver to Agent and each Lender at any time and from time to time promptly upon Agent's request the following reports with respect to each Grantor: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as Agent may request. Each Grantor, at its own expense, shall deliver to Agent the results of each physical verification, if any, which such Grantor may in its discretion have made, or caused any other Person to have made on its behalf, of all or any portion of the Collateral.

4.    REPRESENTATIONS AND WARRANTIES. Each Grantor represents and warrants to Agent and each Lender that:

(a)    Each Grantor has rights in and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder free and clear of any and all Liens, other than Permitted Encumbrances.

(b)    No effective security agreement, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is on file or of record in any public office, except such as may have been filed: (i) by any Grantor in favor of

3

Agent pursuant to this Security Agreement or the other Loan Documents, and (ii) in connection with any other Permitted Encumbrances.

(c)     This Security Agreement is effective to create a valid and continuing Lien on and, upon the filing of the appropriate financing statements in the jurisdictions listed on Schedule I hereto, a perfected Lien in favor of Agent, for itself and the benefit of Lenders, on the Collateral with respect to which a Lien may be perfected by filing pursuant to the Code. Such Lien is prior to all other Liens, except Permitted Encumbrances, that would be prior to Liens in favor of Agent for the benefit of Agent and Lenders as a matter of law, and is enforceable as such as against any and all creditors of and purchasers from any Grantor. All action by any Grantor requested by Agent to protect and perfect such Lien on each item of the Collateral has been duly taken.

(d)     Schedule II hereto lists all Instruments, Letter of Credit Rights and Chattel Paper of each Grantor. All action by any Grantor requested by Agent to protect and perfect the Lien of Agent on each item set forth on Schedule II (including the delivery of all originals thereof to Agent and the legending of all Chattel Paper as required by Section 5(b) hereof) has been duly taken. The Lien of Agent, for the benefit of Agent and Lenders, on the Collateral listed on Schedule II hereto is prior to all other Liens, except Permitted Encumbrances, that would be prior to the Liens in favor of Agent as a matter of law, and is enforceable as such against any and all creditors of and purchasers from any Grantor.

(e)     Each Grantor's name as it appears in official filings in the state of its incorporation, formation or other organization, the type of entity of each Grantor (including corporation, partnership, limited partnership or limited liability company), organizational identification number issued by each Grantor's state of incorporation or organization or a statement that no such number has been issued, each Grantor's state of organization, formation or incorporation, the location of each Grantor's chief executive office, principal place of business, offices, all warehouses and premises where Collateral is stored or located, and the locations of its books and records concerning the Collateral are set forth on Schedule III-A, Schedule III-B, Schedule III-C, Schedule III-D, Schedule III-E, Schedule III-F, Schedule III-G, Schedule III-H, Schedule III-I, and Schedule III-J, respectively, hereto. Each Grantor has only one state of incorporation, formation or organization.

(f)     With respect to the Accounts, except as specifically disclosed in the most recent Collateral Report delivered to Agent (i) they are valid and enforceable and are all fully collectible in the ordinary course of Grantors' business, after deducting Grantors' standard reserve for doubtful Accounts (with such reserve being calculated in the ordinary course of business consistent with past practices); and (ii) to each Grantor's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on any Grantor's books and records. Further, with respect to the Accounts no payments have been or shall be made thereon except payments immediately delivered to the applicable Blocked Accounts or the Agent as required pursuant to the terms of Annex C to the Credit Agreement.

(g)     With respect to any Inventory or Equipment scheduled or listed on the most recent Collateral Report delivered to Agent pursuant to the terms of this Security Agreement or

4

CORP:9742726

the Credit Agreement, (i) such Inventory and/or Equipment is located at one of the applicable Grantor's locations set forth on Schedule III-A, Schedule III-B, Schedule III-C, Schedule III-D, Schedule III-E, Schedule III-F, Schedule III-G, Schedule III-H, Schedule III-I, and Schedule III-J, hereto, as applicable, (ii) no Inventory nor Equipment is now, or shall at any time or times hereafter be stored at any other location without Agent's prior consent, and if Agent gives such consent, each applicable Grantor will concurrently therewith obtain, to the extent required by the Credit Agreement, bailee, landlord and mortgagee agreements, (iii) the applicable Grantor has good, indefeasible and merchantable title to such Inventory and Equipment, and such Inventory and Equipment is not subject to any Lien, security interest or document whatsoever except for the Lien granted to Agent, for the benefit of Agent and Lenders, and except for Permitted Encumbrances, (iv) except as specifically disclosed in the most recent Collateral Report delivered to Agent, such Inventory and Equipment is in good operating condition, ordinary wear and tear excepted, (v) such Inventory and Equipment is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements with any third parties which would require any consent of any third party upon sale or disposition of that Inventory or Equipment or the payment of any monies to any third party upon such sale or other disposition, and (vi) the completion of sale or other disposition of such Inventory or Equipment by Agent following an Event of Default shall not require the consent of any Person and shall not constitute a breach or default under any contract or agreement to which any Grantor is a party or to which such property is subject.

(h)    No Grantor has any interest in, or right or title to, any Patent, Trademark or Copyright except as set forth in Schedule IV hereto. This Security Agreement is effective to create a valid and continuing Lien on and, upon filing of the Copyright Security Agreements with the United States Copyright Office and filing of the Patent Security Agreements and the Trademark Security Agreements with the United States Patent and Trademark Office, perfected Liens in favor of Agent on each Grantor's Patents, Trademarks and Copyrights and such perfected Liens are enforceable as such as against any and all creditors of and purchasers from any Grantor. Upon filing of the Copyright Security Agreements with the United States Copyright Office and filing of the Patent Security Agreements and the Trademark Security Agreements with the United States Patent and Trademark Office and the filing of appropriate financing statements listed on Schedule I hereto, all action by any Grantor requested by Agent to protect and perfect Agent's Lien on each Grantor's Patents, Trademarks or Copyrights shall have been duly taken.

(i)    All motor vehicles owned by each Grantor are listed on Schedule V hereto, by model, model year and vehicle identification number ("VIN"). Immediately upon request by Agent following an Event of Default, each Grantor shall deliver to Agent a motor vehicle certificate of title for all motor vehicles from time to time owned by it and shall cause those title certificates to be filed (with Agent's lien noted thereon) in the appropriate state motor vehicle filing office.

5.    COVENANTS.  Each Grantor covenants and agrees with Agent, for the benefit of Agent and Lenders, that from and after the date of this Security Agreement and until the Termination Date:

(a)    Further Assurances; Pledge of Instruments; Chattel Paper.

CORP/974272 6

(i)     At any time and from time to time, upon the written request of Agent and at the sole expense of Grantors, each Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Agent may reasonably deem necessary and appropriate to obtain the full benefits of this Security Agreement, including, without limitation (A) after an Event of Default has occurred and is continuing, using its best efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of Agent of any License or Contract held by such Grantor and to enforce the security interests granted hereunder; and (B) filing any financing or continuation statements under the Code with respect to the Liens granted hereunder or under any other Loan Document.

(ii)     Unless Agent shall otherwise consent in writing (which consent may be revoked), each Grantor shall deliver to Agent all Collateral consisting of negotiable Documents, certificated securities, Chattel Paper and Instruments (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank) promptly after such Grantor receives the same.

(iii)     In accordance with Section 5.9 of the Credit Agreement, each Grantor shall obtain or use its best efforts to obtain waivers or subordinations of Liens from landlords and mortgagees. In addition, each Grantor shall in all instances obtain signed acknowledgements of Agent's Liens from bailees having possession of any Grantor's Goods that they hold for the benefit of Agent.

(iv)     Unless waived by Agent in writing (which waiver may be revoked), each Grantor shall obtain authenticated Control Letters from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any Grantor.

(v)     In accordance with Annex C to the Credit Agreement, each Grantor shall obtain a blocked account or similar agreement with each bank or financial institution holding a Deposit Account for such Grantor.

(vi)     Each Grantor that is or becomes the beneficiary of a letter of credit shall promptly, and in any event within two (2) Business Days after becoming a beneficiary, notify Agent thereof and enter into a tri-party agreement with Agent and the issuer and/or confirmation bank with respect to Letter-of-Credit Rights assigning such Letter-of-Credit Rights to Agent and directing all payments thereunder to the Collection Account, all in form and substance reasonably satisfactory to Agent.

(vii)     Each Grantor shall take all steps necessary to grant the Agent control of all electronic chattel paper in accordance with the Code and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(viii)     Each Grantor hereby irrevocably authorizes the Agent at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such

6

Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Code or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Each Grantor agrees to furnish any such information to the Agent promptly upon request. Each Grantor also ratifies its authorization for the Agent to have filed in any jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(ix)    Each Grantor shall promptly, and in any event within five (5) Business Days after the same is acquired by it, notify Agent of any Commercial Tort Claim acquired by it and unless otherwise consented by Agent, such Grantor shall enter into a supplement to this Security Agreement, granting to Agent a Lien in such Commercial Tort Claim.

(b)    Maintenance of Records.  Grantors shall keep and maintain, at their own cost and expense, complete records of the Collateral, including a record of any and all payments received and any and all credits granted with respect to the Collateral and all other dealings with the Collateral.  If any Grantor retains possession of any Chattel Paper or Instruments with Agent's consent, such Chattel Paper and Instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of General Electric Capital Corporation, as Agent, for the benefit of Agent and certain Lenders."

(c)    Covenants Regarding Patent, Trademark and Copyright Collateral.

(i)    Grantors shall notify Agent immediately if they know or have reason to know that any application or registration relating to any Patent, Trademark or Copyright (now or hereafter existing) may become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding any Grantor's ownership of any Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same.

(ii)    In no event shall any Grantor, either itself or through any agent, employee, licensee or designee, file an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Agent prior written notice thereof, and, upon request of Agent, Grantor shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements or Trademark Security Agreements as Agent may request to evidence Agent's Lien on such Patent, Trademark or Copyright, and the General Intangibles of such Grantor relating thereto or represented thereby.

7

CORP/974272 6

(iii)    Grantors shall take all actions necessary or requested by Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the Patents, Trademarks and Copyrights (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of non-contestability and opposition and interference and cancellation proceedings, unless the applicable Grantor shall determine that such Patent, Trademark or Copyright is not material to the conduct of its business.

(iv)    In the event that any of the Patent, Trademark or Copyright Collateral is infringed upon, or misappropriated or diluted by a third party, such Grantor shall comply with Section 5(a)(ix) of this Security Agreement.  Such Grantor shall, unless such Grantor shall reasonably determine that such Patent, Trademark or Copyright Collateral is in no way material to the conduct of its business or operations, promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as Agent shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright Collateral.

(d)    Indemnification.  In any suit, proceeding or action brought by Agent or any Lender relating to any Collateral for any sum owing with respect thereto or to enforce any rights or claims with respect thereto, each Grantor will save, indemnify and keep Agent and Lenders harmless from and against all expense (including reasonable attorneys' fees and expenses), loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of any Account Debtor or other Person obligated on the Collateral, arising out of a breach by any Grantor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from such Grantor, except in the case of Agent or any Lender, to the extent such expense, loss, or damage is attributable solely to the gross negligence or willful misconduct of Agent or such Lender as finally determined by a court of competent jurisdiction. All such obligations of Grantors shall be and remain enforceable against and only against Grantors and shall not be enforceable against Agent or any Lender.

(e)    Compliance with Terms of Accounts, etc.  In all material respects, each Grantor will perform and comply with all material obligations in respect of the Collateral and all material agreements to which it is a party relating to the Collateral.

(f)    Limitation on Liens on Collateral.  No Grantor will create, permit or suffer to exist, and each Grantor will defend the Collateral against, and take such other action as is necessary to remove, any Lien on the Collateral, except Permitted Encumbrances, and will defend the right, title and interest of Agent and Lenders in and to any of such Grantor's rights under the Collateral against the claims and demands of all Persons whomsoever.

(g)    Limitations on Disposition.  No Grantor will sell, license, lease, transfer or otherwise dispose of any of the Collateral, or attempt or contract to do so, except as expressly permitted by the Credit Agreement.

8

(h)   Further Identification of Collateral.  Grantors will, if so requested by Agent (which requests shall not occur more often than once in any twelve month period, unless an Event of Default shall have occurred and be continuing (at which time no such limit shall apply)), furnish to Agent, as often as Agent requests, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Agent may reasonably request, all in such detail as Agent may reasonably specify.

(i)   Notices.  Grantors will advise Agent promptly, in reasonable detail, (i) of any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral, and (ii) of the occurrence of any other event known to Grantors which would have a material adverse effect on the aggregate value of the Collateral or on the Liens created hereunder or under any other Loan Document.

(j)   Good Standing Certificates.  If requested by Agent (which requests shall not occur more often than once in any twelve month period, unless an Event of Default shall have occurred and be continuing (at which time no such limit shall apply)), each Grantor shall provide to Agent a certificate of good standing from its state of incorporation or organization.

(k)   No Reorganization.  Without limiting the prohibitions on mergers involving the Grantors contained in Section 6.1 of the Credit Agreement, no Grantor shall reincorporate, reform or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated, formed or organized as of the date hereof without the prior written consent of Agent.

(l)   Terminations; Amendments Not Authorized.  Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of Agent and agrees that it will not do so without the prior written consent of Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the Code.

(m)   Authorized Terminations.  Agent will promptly deliver to each Grantor for filing or authorize each Grantor to prepare and file termination statements and releases in accordance with Section 11.2(e) of the Credit Agreement.

6.   AGENT'S APPOINTMENT AS ATTORNEY-IN-FACT.

On the Closing Date, each Grantor shall execute and deliver to Agent a power of attorney (the "Power of Attorney") substantially in the form attached hereto as Exhibit A.  The power of attorney granted pursuant to the Power of Attorney is a power coupled with an interest and shall be irrevocable until the Termination Date.  The powers conferred on Agent, for the benefit of Agent and Lenders, under the Power of Attorney are solely to protect Agent's interests (for the benefit of Agent and Lenders) in the Collateral and shall not impose any duty upon Agent or any Lender to exercise any such powers.  Agent agrees that (a) except for the powers granted in clause (h) of the Power of Attorney, it shall not exercise any power or authority granted under the Power of Attorney unless an Event of Default has occurred and is continuing, and (b) Agent shall account for any moneys received by Agent in respect of any foreclosure on or disposition of Collateral pursuant to the Power of Attorney provided that neither Agent nor any Lender shall

9                                              CORP/974272.6

have any duty as to any Collateral, and Agent and Lenders shall be accountable only for amounts that they actually receive as a result of the exercise of such powers. NONE OF AGENT, LENDERS OR THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL BE RESPONSIBLE TO ANY GRANTOR FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE (EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION), NOR FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

### 7.    REMEDIES; RIGHTS UPON DEFAULT.

(a)    In addition to all other rights and remedies granted to Agent (for the benefit of Agent and the Lenders) under this Security Agreement, the Credit Agreement, the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Obligations, if any Event of Default shall have occurred and be continuing, Agent may exercise all rights and remedies of a secured party under the Code. Without limiting the generality of the foregoing, each Grantor expressly agrees that in any such Event of Default, Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon such Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code and other applicable law), may forthwith enter upon the premises of such Grantor where any Collateral is located through self-help, without judicial process, without first obtaining a final judgment or giving such Grantor or any other Person notice and opportunity for a hearing on Agent's claim or action and may collect, receive, assemble, process, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, license, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or sales. Agent or any Lender shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of Agent and Lenders, the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Grantor hereby releases. Such sales may be adjourned and continued from time to time with or without notice. Agent shall have the right to conduct such sales on any Grantor's premises or elsewhere and shall have the right to use any Grantor's premises without charge for such time or times as Agent deems necessary or advisable.

If any Event of Default shall have occurred and be continued, each Grantor further agrees, at Agent's request, to assemble the Collateral and make it available to Agent at such Grantor's premises. Until Agent is able to effect a sale, lease, or other disposition of Collateral, Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by Agent. Agent shall have no obligation to any Grantor to maintain or preserve the rights of such Grantor as against third parties with respect to Collateral while Collateral is in the possession of Agent. Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of Agent's remedies (for the benefit of Agent and Lenders), with respect to such appointment without prior notice or hearing as to such

CORP:974272 6

appointment. Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale to the Obligations as provided in the Credit Agreement, and only after so paying over such net proceeds, and after the payment by Agent of any other amount required by any provision of law, need Agent account for the surplus, if any, to any Grantor. To the maximum extent permitted by applicable law, each Grantor waives all claims, damages, and demands against Agent or any Lender arising out of the repossession, retention or sale of the Collateral except such as arise solely out of the gross negligence or willful misconduct of Agent or such Lender as finally determined by a court of competent jurisdiction. Each Grantor agrees that fifteen (15) days prior notice by Agent of the time and place of any public sale or of the time after which a private sale may take place is reasonable notification of such matters. Grantors shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations, including any attorneys' fees and other expenses incurred by Agent or any Lender to collect such deficiency.

      (b)    Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

      (c)    To the extent that applicable law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of assets in wholesale rather than retail markets, (ix) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (x) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xi) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this Section 7(c) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7(c). Without limitation upon the foregoing, nothing contained in this Section 7(c) shall be construed to grant any rights to any Grantor or to impose any duties on Agent that would not have been

granted or imposed by this Security Agreement or by applicable law in the absence of this Section 7(c).

(d) Neither Agent nor the Lenders shall be required to make any demand upon, or pursue or exhaust any of their rights or remedies against, any Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof. Neither Agent nor the Lenders shall be required to marshal the Collateral or any guarantee of the Obligations or to resort to the Collateral or any such guarantee in any particular order, and all of its and their rights hereunder or under any other Loan Document shall be cumulative.

8. GRANT OF LICENSE TO USE INTELLECTUAL PROPERTY COLLATERAL. For the purpose of enabling Agent to exercise rights and remedies under Section 7 hereof (including, without limiting the terms of Section 7 hereof, in order to take possession of, hold, preserve, process, assemble, prepare for sale, market for sale, sell or otherwise dispose of Collateral) at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Agent, for the benefit of Agent and Lenders, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, license or sublicense any Intellectual Property now owned (or licensed) or hereafter acquired (or licensed) by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

9. LIMITATION ON AGENT'S AND LENDERS' DUTY IN RESPECT OF COLLATERAL. Agent and each Lender shall use reasonable care with respect to the Collateral in its possession or under its control. Neither Agent nor any Lender shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Agent or such Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

10. REINSTATEMENT. This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11. NOTICES. Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication

CORP/974272 6

shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give and serve upon any other party any communication with respect to this Security Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be given in the manner, and deemed received, as provided for in the Credit Agreement.

12.  SEVERABILITY.  Whenever possible, each provision of this Security Agreement shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.  This Security Agreement is to be read, construed and applied together with the Credit Agreement and the other Loan Documents which, taken together, set forth the complete understanding and agreement of Agent, Lenders and Grantors with respect to the matters referred to herein and therein.

13.  NO WAIVER; CUMULATIVE REMEDIES.  Neither Agent nor any Lender shall by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, and no waiver shall be valid unless in writing, signed by Agent and then only to the extent therein set forth.  A waiver by Agent of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Agent would otherwise have had on any future occasion.  No failure to exercise nor any delay in exercising, on the part of Agent or any Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law or in equity.  None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by Agent and Grantors.

14.  LIMITATION BY LAW.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

15.  SPECIAL PROVISIONS RESPECTING FCC LICENSES.

(a)  If the consent of the FCC or other applicable regulatory authority is required in connection with any of the actions which may be taken by the Agent or any of the Lenders, as the case may be, in the exercise of their rights hereunder or under any of the other Loan Documents, then each Grantor, at its sole cost and expense, shall use its best efforts to secure such consent and to cooperate fully with the Agent, or the Lenders, as the case may be, in any action commenced by the Agent or the Lenders, as the case may be, to secure such consent. Upon the occurrence and during the continuation of (i) any Event of Default under Sections

CORP/974272.6

8.1(a), 8.1(h) or 8.1(i), (ii) any Event of Default arising as a result of the breach or failure of any Credit Party to comply with any of the Financial Covenants set forth in Annex G to the Credit Agreement, or (iii) any other Event of Default based upon which Agent and/or Lenders have elected to accelerate under the terms of the Loan Documents, each Grantor, subject to the provisions of applicable law, shall promptly execute and file and/or cause the execution and filing of all applications, certificates, instruments and other documents that the Agent or the Lenders reasonably deem necessary or advisable to file in order to obtain any governmental consent, approval, or authorization, and if any Grantor fails or refuses to execute or cause the filing of, or fails or refuses to cause another Person authorized under the Communications Laws and the appropriate charter, bylaws or other corporate instruments to execute documents on behalf of such Grantor to execute or file, such documents, the clerk or other authorized officer of any court with jurisdiction over the Loan Documents may execute and file the same on behalf of such Grantor as and to the extent permitted by the FCC. Each Grantor recognizes that the FCC Licenses held by such Grantor are unique assets which may have to be transferred in order for the Lenders adequately to realize the value of their security interest. Each Grantor further recognizes that a violation of this covenant would result in irreparable harm to the Lenders for which monetary damages are not readily ascertainable. Therefore, in addition to any other remedy which may be available to the Agent or the Lenders, as the case may be, at law or in equity including other remedies involving specific performance, the Agent or the Lenders, as the case may be, shall have the remedy of specific performance of the provisions of this Section 15. To enforce the provisions of this Section 15, the Agent is authorized to request the consent or approval of the FCC or other regulatory authority to a voluntary or an involuntary transfer of control of any FCC License.

(b)    Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, the Agent and the Lenders will not knowingly take any action pursuant to this Agreement or any such documents which would constitute or result in assignment of an FCC License or any transfer of control of the holder of an FCC License if such assignment of license or transfer of control would require under then existing law (including the written rules and regulations promulgated by the FCC), the prior approval of the FCC, without first obtaining such approval. In connection with this provision, the Agent and the Lenders shall be entitled to rely upon the advice of counsel of the Agent's choice whether or not the advice rendered is ultimately determined to have been accurate.

16.    TERMINATION OF THIS SECURITY AGREEMENT.    Subject to Section 10 hereof, this Security Agreement shall terminate upon the Termination Date.

17.    SUCCESSORS AND ASSIGNS.    This Security Agreement and all obligations of Grantors hereunder shall be binding upon the successors and assigns of each Grantor (including any debtor-in-possession to such Grantor) and shall, together with the rights and remedies of Agent, for the benefit of Agent and Lenders, hereunder, inure to the benefit of Agent and Lenders, all future holders of any instrument evidencing any of the Obligations and their respective successors and assigns. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to Agent, for the benefit of Agent and Lenders, hereunder. No Grantor may assign, sell, hypothecate or otherwise transfer any interest in or obligation under this Security Agreement.

CORP/974272 6

18. <u>COUNTERPARTS</u>. This Security Agreement may be authenticated in any number of separate counterparts, each of which shall collectively and separately constitute one agreement. This Security Agreement may be authenticated by manual signature, facsimile or, if approved in writing by Agent, electronic means, all of which shall be equally valid.

19. <u>GOVERNING LAW</u>.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. EACH GRANTOR HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN GRANTORS, AGENT AND LENDERS PERTAINING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, <u>PROVIDED</u>, THAT AGENT, LENDERS AND GRANTORS ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK COUNTY, AND, <u>PROVIDED, FURTHER</u>, NOTHING IN THIS SECURITY AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION IN WHICH COLLATERAL IS LOCATED TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT. EACH GRANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH GRANTOR HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u> AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH GRANTOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH GRANTOR AT THE ADDRESS SET FORTH ON <u>ANNEX I</u> TO THE CREDIT AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF ACTUAL RECEIPT THEREOF OR FIVE (5) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

20. <u>WAIVER OF JURY TRIAL</u>.    BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT DISPUTES ARISING HEREUNDER OR RELATING HERETO BE RESOLVED BY A JUDGE

CORP/974272 6

APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, AMONG AGENT, LENDERS, AND GRANTORS ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED IN CONNECTION WITH, THIS SECURITY AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO.

21. SECTION TITLES. The section titles contained in this Security Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

22. NO STRICT CONSTRUCTION. The parties hereto have participated jointly in the negotiation and drafting of this Security Agreement. In the event an ambiguity or question of intent or interpretation arises, this Security Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Security Agreement.

23. ADVICE OF COUNSEL. Each of the parties represents to each other party hereto that it has discussed this Security Agreement and, specifically, the provisions of Section 19 and Section 20, with its counsel.

24. BENEFIT OF LENDERS. All Liens granted or contemplated hereby shall be for the benefit of Agent, individually, and Lenders, and all proceeds or payments realized from Collateral in accordance herewith shall be applied to the Obligations in accordance with the terms of the Credit Agreement.

[signatures appear on the following pages]

CORP/974272 6

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

"Agent":

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____

Name:  Stephen W. Hipp
Title:  Duly Authorized Signatory

"Grantors":

**BLACK CROW MEDIA GROUP, LLC**

By: _____
Name:  J. Michael Linn
Title:  President

**BLACK CROW MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
         Manager

         By: _____
         Name:  J. Michael Linn
         Title:  President

**RTG MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
         Manager

         By: _____
         Name:  J. Michael Linn
         Title:  President

**STG MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
         Manager

         By: _____
         Name:  J. Michael Linn
         Title:  President

IN WITNESS WHEREOF, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

"Agent":

**GENERAL ELECTRIC CAPITAL CORPORATION**

By:_____
Name:  Stephen W. Hipp
Title:  Duly Authorized Signatory

"Grantors":

**BLACK CROW MEDIA GROUP, LLC**

By:_____
Name:  J. Michael Linn
Title:  President

**BLACK CROW MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
        Manager

        By:_____
        Name:  J. Michael Linn
        Title:  President

**RTG MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
        Manager

        By:_____
        Name:  J. Michael Linn
        Title:  President

**STG MEDIA, L.L.C.**

By:     BLACK CROW MEDIA GROUP, LLC
        Manager

        By:_____
        Name:  J. Michael Linn
        Title:  President

**THOMAS MEDIA OPERATIONS, L.L.C.**

By:    BLACK CROW MEDIA GROUP, LLC
Manager

    By: _____
    Name: J. Michael Linn
    Title: President

**BLACK CROW RADIO, L.L.C.**

By:    BLACK CROW MEDIA, L.L.C.,
Manager

    By:    BLACK CROW MEDIA GROUP,
LLC, Manager

        By: _____
        Name: J. Michael Linn
        Title: President

**RTG RADIO, L.L.C.**

By:    RTG MEDIA, L.L.C.,
Manager

    By:    BLACK CROW MEDIA GROUP,
LLC, Manager

        By: _____
        Name: J. Michael Linn
        Title: President

**BCA RADIO, L.L.C.**

By:    STG MEDIA, L.L.C.,
Manager

    By:    BLACK CROW MEDIA GROUP,
LLC, Manager

        By: _____
        Name: J. Michael Linn
        Title: President

THOMAS RADIO, L.L.C.

By:    THOMAS MEDIA OPERATIONS, L.L.C.
      Manager

      By:    BLACK CROW MEDIA GROUP,
            LLC, Manager

            By: _____
            Name: J. Michael Linn
            Title: President

**RAINBOW MEDIA, INC.**

By: _____
Name: J. Michael Linn
Title: Treasurer

SCHEDULE I
to
SECURITY AGREEMENT


FILING JURISDICTIONS


| Name of Grantor | Filing Jurisdiction(s) |
|---|---|
| Black Crow Media Group, LLC | Delaware Secretary of State |
| Black Crow Media, L.L.C. | Florida Department of State<br>Volusia County, FL (fixture filing) |
| STG Media, L.L.C. | Florida Department of State<br>Madison County, AL (fixture filing) |
| RTG Media, L.L.C. | Florida Department of State<br>Coffee County, Georgia (fixture filing)<br>Tift County, GA (fixture filing)<br>Irwin County, GA (fixture filing)<br>Ben Hill County, GA (fixture filing)<br>Lowndes County, GA (fixture filing)<br>Echols County, GA (fixture filing)<br>Berrien County, GA (fixture filing)<br>Suwannee County, FL (fixture filing)<br>Columbia County, FL (fixture filing) |
| Thomas Media Operations, L.L.C. | Florida Department of State<br>Madison County, TN (fixture filing)<br>Chester County, TN (fixture filing) |
| Black Crow Radio, L.L.C. | Florida Department of State |
| BCA Radio, L.L.C. | Florida Department of State |
| RTG Radio, L.L.C. | Florida Department of State |
| Thomas Radio, L.L.C. | Florida Department of State |
| Rainbow Media, Inc. | Tennessee Secretary of State |

SCHEDULE II
to
SECURITY AGREEMENT


INSTRUMENTS
CHATTEL PAPER
AND
LETTER OF CREDIT RIGHTS


The Intercompany Notes (as defined in the Credit Agreement)

Two promissory notes, each in the stated principal amounts of $280,000, between Thomas Media Operations, L.L.C. and Billy Thomas, Sr. and Billy Thomas, Jr.

Promissory note dated April 18, 2000 in the stated principal amount of $20,000 between Thomas Media Operations (assignee of Black Crow Broadcasting, Inc.) and Billy Thomas, Jr.

Promissory note dated February 28, 2003 in the stated principal amount of $360,000 between RTG Radio, L.L.C. and Bullie Broadcasting Corporation

Promissory note dated June 4, 2001, in the stated principal amount $6,100 from Doug Sargent to Black Crow Broadcasting, Inc. (current outstanding amount under the note is approximately $2,396.03)

SCHEDULE III-A
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING BLACK CROW MEDIA GROUP, LLC'S COLLATERAL

I.      Grantor's official name:  BLACK CROW MEDIA GROUP, LLC

II.     Type of entity:  limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a
        statement that no such number has been issued: 3697100

IV.     State or Formation of Grantor:  Delaware

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International
        Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  126 W. International Speedway Blvd., Daytona
        Beach, FL 32114

VII.    Warehouses:  None

VIII.   Other Premises at which Collateral is Stored or Located:  None

IX.     Locations of Records Concerning Collateral:   126 W. International Speedway Blvd.,
        Daytona Beach, FL 32114

SCHEDULE III-B
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL
AND RECORDS CONCERNING BLACK CROW MEDIA, L.L.C.'S COLLATERAL

I.  Grantor's official name: BLACK CROW MEDIA, L.L.C.

II.  Type of entity: limited liability company

III.  Organizational identification number issued by Grantor's state of formation or a statement that no such number has been issued: L01000017904

IV.  State or Formation of Grantor: Florida

V.  Chief Executive Office and Corporate Offices of Grantor: 126 W. International Speedway Blvd., Daytona Beach, FL 32114

VI.  Principal Place of Business of Grantor: 126 W. International Speedway Blvd., Daytona Beach, FL 32114

VII.  Warehouses: None

VIII.  Other Premises at which Collateral is Stored or Located:
- 126-132 W. International Speedway Blvd., Daytona Beach, Volusia County, FL 32114
- 115 N. Palmetto Avenue, Daytona Beach, Volusia County, FL
- 1432 LPGA Blvd., Daytona Beach, Volusia County, FL
- 1290 Deharo Road, Edgewater, Volusia County, FL
- 220 E. Hubbard Avenue, Deland, Volusia County, FL

IX.  Locations of Records Concerning Collateral: 126 W. International Speedway Blvd., Daytona Beach, FL 32114

SCHEDULE III-C
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING STG MEDIA, L.L.C'S. COLLATERAL

I.      Grantor's official name:  STG MEDIA, L.L.C.

II.     Type of entity:  limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a statement that no such number has been issued: L01000002376

IV.     State or Formation of Grantor:  Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  1900 S. Memorial Parkway, Huntsville, AL 35801

VII.    Warehouses:  None

VIII.   Other Premises at which Collateral is Stored or Located:
        - 9991 Juniper Drive, Drake Mountain, Huntsville, Madison County, AL
        - 7970 Pulaski Pike, Huntsville, Madison County, AL
        - Dan Tibbs Road, Huntsville, Madison County, AL

IX.     Locations of Records Concerning Collateral:
        - 126 W. International Speedway Blvd., Daytona Beach, FL 32114
        - 1900 S. Memorial Parkway, Huntsville, AL 35801

SCHEDULE III-D
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING RTG MEDIA, L.L.C.'S COLLATERAL

I.    Grantor's official name:  RTG MEDIA, L.L.C.

II.   Type of entity:  limited liability company

III.  Organizational identification number issued by Grantor's state of formation or a
      statement that no such number has been issued:  L00000011453

IV.   State or Formation of Grantor:  Florida

V.    Chief Executive Office and Corporate Offices of Grantor:    126 W. International
      Speedway Blvd., Daytona Beach, FL 32114

VI.   Principal Place of Business of Grantor:  1001 W. Gordon Street, Valdosta, GA 31601

VII.  Warehouses:  None

VIII. Other Premises at which Collateral is Stored or Located:
      -    232 N. Central Avenue, Tifton, Tift County, GA
      -    620 E. Ward Street, Douglas, Coffee County, GA
      -    Lot 236, 6th Land District, Douglas, Coffee County, GA
      -    Roanoke Road, Fitzgerald, Ben Hill County, GA
      -    S.R. 376 & Jennings-Naylor Road, Lake Park, Echols County, GA
      -    Hwy. 319, 6.2 miles SW of Ocilla city limits, Ocilla, Irwin County, GA
      -    Hwy. 129 North, Fitzgerald, Ben Hill County, GA
      -    2.2 miles SW of Ray City, Berrien County, GA
      -    224 N. Central Avenue, Tifton, Tift County, GA
      -    Boone Road, Cook County, GA
      -    1305 Helvenston Street, Live Oak, Suwannee County, FL
      -    Hwy. 41 & David Street, Lake City, Columbia County, FL

IX.   Locations of Records Concerning Collateral:
      -    126 W. International Speedway Blvd., Daytona Beach, FL 32114
      -    1001 W. Gordon Street, Valdosta, GA 31601
      -    232 N. Central Avenue, Tifton, GA
      -    1305 Helvenston Street, Live Oak, FL

SCHEDULE III-E
to
SECURITY AGREEMENT


SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING THOMAS MEDIA OPERATIONS, L.L.C.'S COLLATERAL


I.      Grantor's official name: THOMAS MEDIA OPERATIONS, L.L.C.

II.     Type of entity: limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a
        statement that no such number has been issued: L01000017907

IV.     State or Formation of Grantor: Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International
        Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor: 111 W. Main Street, Jackson, TN 38301

VII.    Warehouses: None

VIII.   Other Premises at which Collateral is Stored or Located:
        -    288 Sanders Bluff Road, Humboldt, Madison County, TN
        -    160 Ozier Road, Pinson, Madison County, TN
        -    570 N. Steed Street, Henderson, Chester County, TN
        -    Highway 79 South (Humboldt Highway), Milan, Madison County, TN

IX.     Locations of Records Concerning Collateral:
        -    126 W. International Speedway Blvd., Daytona Beach, FL 32114
        -    111 W. Main Street, Jackson, TN 38301

SCHEDULE III-F
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING BLACK CROW RADIO, L.L.C.'S COLLATERAL

I.      Grantor's official name: BLACK CROW RADIO, L.L.C.

II.     Type of entity: limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a
statement that no such number has been issued: L01000012732

IV.     State or Formation of Grantor: Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International
Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  126 W. International Speedway Blvd., Daytona
Beach, FL 32114

VII.    Warehouses: None

VIII.   Other Premises at which Collateral is Stored or Located:  None

IX.     Locations of Records Concerning Collateral:   126 W. International Speedway Blvd.,
Daytona Beach, FL 32114

SCHEDULE III-G
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING BCA RADIO, L.L.C.'S COLLATERAL

I.      Grantor's official name:  BCA RADIO, L.L.C.

II.     Type of entity:  limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a
        statement that no such number has been issued: L01000018125

IV.     State or Formation of Grantor: Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International
        Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  1900 S. Memorial Parkway, Huntsville, AL
        35801

VII.    Warehouses: None

VIII.   Other Premises at which Collateral is Stored or Located:  None

IX.     Locations of Records Concerning Collateral:
            -   126 W. International Speedway Blvd., Daytona Beach, FL 32114
            -   1900 S. Memorial Parkway, Huntsville, AL 35801

SCHEDULE III-H
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING RTG RADIO, L.L.C.'S COLLATERAL

I.      Grantor's official name:  RTG RADIO, L.L.C.

II.     Type of entity:  limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a
        statement that no such number has been issued:  L01000017909

IV.     State or Formation of Grantor:  Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International
        Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  1001 W. Gordon Street, Valdosta, GA 31601

VII.    Warehouses:  None

VIII.   Other Premises at which Collateral is Stored or Located:  None

IX.     Locations of Records Concerning Collateral:
        -   126 W. International Speedway Blvd., Daytona Beach, FL 32114
        -   1001 W. Gordon Street, Valdosta, GA 31601

SCHEDULE III-I
to
SECURITY AGREEMENT


SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING THOMAS RADIO, L.L.C.'S COLLATERAL


I.      Grantor's official name:  THOMAS RADIO, L.L.C.

II.     Type of entity:  limited liability company

III.    Organizational identification number issued by Grantor's state of formation or a statement that no such number has been issued: L01000017905

IV.     State or Formation of Grantor:  Florida

V.      Chief Executive Office and Corporate Offices of Grantor:   126 W. International Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor:  111 W. Main Street, Jackson, TN 38301

VII.    Warehouses: None

VIII.   Other Premises at which Collateral is Stored or Located:  None

IX.     Locations of Records Concerning Collateral:
        -   126 W. International Speedway Blvd., Daytona Beach, FL 32114
        -   111 W. Main Street, Jackson, TN 38301

SCHEDULE III-J
to
SECURITY AGREEMENT

SCHEDULE OF OFFICES, LOCATIONS OF COLLATERAL AND RECORDS
CONCERNING RAINBOW MEDIA, INC.'S COLLATERAL

I.      Grantor's official name: RAINBOW MEDIA, INC.

II.     Type of entity: corporation

III.    Organizational identification number issued by Grantor's state of formation or a
        statement that no such number has been issued: 0175686

IV.     State or Formation of Grantor: Tennessee

V.      Chief Executive Office and Corporate Offices of Grantor:    126 W. International
        Speedway Blvd., Daytona Beach, FL 32114

VI.     Principal Place of Business of Grantor: 111 W. Main Street, Jackson, TN 38301

VII.    Warehouses: None

VIII.   Other Premises at which Collateral is Stored or Located: None

IX.     Locations of Records Concerning Collateral:
            -    126 W. International Speedway Blvd., Daytona Beach, FL 32114
            -    111 W. Main Street, Jackson, TN 38301

SCHEDULE IV
to
SECURITY AGREEMENT

PATENTS, TRADEMARKS AND COPYRIGHTS

**STG Media, L.L.C.:**

| Mark | Country | Status | Serial No. | Registration No. | Registration Date |
|------|---------|--------|-----------|------------------|-------------------|
| BIG TOYS FOR BIG BOYS | U.S. | Registered | | 2475669 | August 7, 2001 |
| A99 DESIGN | U.S. | Registered | | 2472861 | July 31, 2001 |
| YOUR RIDE IS HERE | U.S. | Registered | | 2485202 | September 4, 2001 |
| ROCKET 95.FM | U.S. | Pending | 76/178715 | | |
| R ROCKET 95.1 DESIGN | U.S. | Registered | | 2623168 | September 24, 2002 |
| ROCKET 95.1 | U.S. | Registered | | 2529302 | January 15, 2002 |
| WRTT 95.1 THE ROCKET | U.S. | Registered | | 2494142 | October 2, 2001 |
| STARLIGHT CAFÉ | U.S. | Registered | | 2539067 | February 19, 2002 |
| WAHR STAR 99 | U.S. | Registered | | 2526591 | January 8, 2002 |
| STAR 99.FM | U.S. | Pending | 76/179046 | | |
| WAHR | U.S. | Registered | | 1475333 | February 2, 1988 |
| FAMILY FEST (and design) | U.S. | Pending | 78/160907 | | |
| FAMILY FEST | U.S. | Pending | 78/151240 | | |
| www.ROCKET951.FM | U.S. | Pending | 76/190167 | | |
| WRTT 95.1 The Rocket | State of Alabama | Registered | AL007356 | 107985 | May 8, 2000 |
| Rocket 95.1 | State of Alabama | Registered | AL007355 | 107984 | May 8, 2000 |
| WAHR Star 99 | State of Alabama | Registered | AL007160 | 107791 | October 8, 1999 |
| Design only (outline of a star with 99) | State of Alabama | Registered | AL007141 | 107772 | August 23, 1999 |

SCHEDULE V
to
SECURITY AGREEMENT

Owned Vehicles:*

| Name of Grantor | Motor Vehicle Make/Model | Model Year | VIN |
|---|---|---|---|
| Black Crow Media, L.L.C. | Dodge Ram P/U | 2001 | 3B7HF13Z41M536157 |
| | Chevrolet Astro | 1984 | 1GBEG25H5E7210110 |
| | Workhorse Truck | 1999 | 5B4HP32W3X3309574 |
| | HD Road King | 1996 | 1HD1FDL13TY606248 |
| | Lincoln Navigator | 2002 | 5LMEU27R62LJ04206 |
| STG Media, L.L.C. | Toyota Tundra | 2003 | 5TBRN34183S425599 |
| | Workhorse Step Van | 1999 | 5B4HP32R1X3308126 |
| | Chevy Silverado | 1999 | 2GCEC19T9X1227637 |
| | Ford Bronco | 1988 | 1FMEU15N0JLA34598 |
| RTG Media, L.L.C. | Ford Windstar | 2000 | 2FTZA5447YBB42547 |
| | Ford Aerostar | 1989 | 1FTCA14U1KZB21308 |
| | Chevy Astro | 1998 | 1GNDM19W0WB142260 |
| | Chevy Tahoe | 2001 | 1GNEC13T71R208924 |
| | GMC Safari | 1987 | 1GTCM15E4HB533979 |
| | GEO Tracker | 1992 | 2CNBE18U8N6916152 |
| | GMC Safari | 1998 | 1GKDM19WXWB505726 |
| | Ford Aerostar | 1991 | 1FTCA14U1MZA85915 |
| | Toyota Forerunner | 1997 | JT3GN86R1V0048672 |
| | Ford Windstar | 1998 | 2FM2A51U9WBD32010 |
| | Ford Ranger | 1991 | 1FTCR10A5MUC63939 |
| | Chevy Astro | 1999 | 1GCDM19W2XB160060 |
| | Chevy Astro | 1994 | 1GNDM19ZXRB133810 |
| | Chevy Lumina | 1997 | 2G1WL52M2V1121227 |
| Thomas Media Operations, L.L.C. | Chevrolet Astro | 1990 | 1GNDM15ZXLB120178 |
| | GMC Safari | 1996 | 1G7DM19W37B519533 |
| | Dodge Van | 1998 | 2B4FT2531BR326419 |
| | Mitsubishi Van | 1995 | JW6AKF1H55L003158 |
| | Chevrolet Ventura | 1998 | 1GNDV03E4WD235474 |

* This chart does not include vehicles leased by or subject to trade arrangements with any of the Grantors.

<u>SCHEDULE VI</u>
to
<u>SECURITY AGREEMENT</u>

<u>COMMERCIAL TORT CLAIMS</u>

*STG Media, L.L.C.:*

- STG Media filed suit against Duralast and Lewis & Sons Roofing related to warranty claims on a new roof on the Huntsville facility installed by Lewis and Sons.

EXHIBIT A

POWER OF ATTORNEY

This Power of Attorney is executed and delivered by each of the undersigned (each, a "Grantor" and collectively, the "Grantors"), to General Electric Capital Corporation, a Delaware corporation (hereinafter referred to as "Attorney"), as Agent for the benefit of Agent and Lenders, under a Credit Agreement (the "Credit Agreement") and a Security Agreement, both dated as of _____, 2003, and other related documents (collectively, the "Loan Documents"). No person to whom this Power of Attorney, as authority for Attorney to take any action or actions contemplated hereby, is presented shall be required to inquire into or seek confirmation from Grantors as to the authority of Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Attorney unconditionally the authority to take and perform the actions contemplated herein, and each Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity which acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The power of attorney granted hereby is coupled with an interest, and may not be revoked or canceled by any Grantor without Attorney's written consent. All capitalized terms that are used but not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement or Annex A thereto.

Each Grantor hereby irrevocably constitutes and appoints Attorney (and all officers, employees or agents designated by Attorney), with full power of substitution, as such Grantor's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, from time to time in Attorney's discretion, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Security Agreement and, without limiting the generality of the foregoing, each Grantor hereby grants to Attorney the power and right, to such Grantor, without notice to or assent by such Grantor, and at any time, to do the following: (a) with appropriate notice to the FCC, change the mailing address of such Grantor, open a post office box to such Grantor, open mail for such Grantor, and ask, demand, collect, give acquittances and receipts for, take possession of, endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, and notices in connection with any property of such Grantor; (b) effect any repairs to any asset of such Grantor, or continue or obtain any insurance and pay all or any part of the premiums therefor and costs thereof, and make, settle and adjust all claims under such policies of insurance, and make all determinations and decisions with respect to such policies; (c) pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against such Grantor or its property; (d) defend any suit, action or proceeding brought against such Grantor if such Grantor does not defend such suit, action or proceeding or if Attorney believes that such Grantor is not pursuing such defense in a manner that will maximize the recovery to Attorney, and settle, compromise or adjust any suit, action, or proceeding described above and, in connection therewith, give such discharges or releases as Attorney may deem appropriate; (e) file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other

Exhibit A-1

action otherwise deemed appropriate by Attorney for the purpose of collecting any and all such moneys due to such Grantor whenever payable and to enforce any other right in respect of such Grantor's property; (f) request the certified public accountants then engaged by such Grantor to prepare and deliver to Attorney at any time and from time to time, promptly upon Attorney's request, the following reports: (1) a reconciliation of all accounts, (2) an aging of all accounts, (3) trial balances, (4) test verifications of such accounts as Attorney may request, and (5) the results of each physical verification of inventory; (g) communicate in its own name with any party to any Contract with regard to the assignment of the right, title and interest of such Grantor in and under the Contracts and other matters relating thereto; (h) file such financing statements with respect to the Security Agreement, with or without such Grantor's signature, or to file a photocopy of the Security Agreement in substitution for a financing statement, as the Agent may deem appropriate and to execute in such Grantor's name such financing statements and amendments thereto and continuation statements which may require such Grantor's signature; and (i) execute, in connection with any sale provided for in any Loan Document, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral and to otherwise direct such sale or resale, all as though Attorney were the absolute owner of the property of such Grantor for all purposes, and to do, at Attorney's option and such Grantor's expense, at any time or from time to time, all acts and other things that Attorney reasonably deems necessary to perfect, preserve, or realize upon such Grantor's property or assets and Attorney's Liens thereon, all as fully and effectively as such Grantor might do. Each Grantor hereby ratifies, to the extent permitted by law, all that said Attorney shall lawfully do or cause to be done by virtue hereof.

[signatures appear on the following pages]

STG MEDIA, L.L.C.

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President


## NOTARY PUBLIC CERTIFICATE

      On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of STG MEDIA, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.


_____
Notary Public


RTG MEDIA, L.L.C.

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President


## NOTARY PUBLIC CERTIFICATE

      On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of RTG MEDIA, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.


_____
Notary Public


Exhibit A-4                                                    CORP/974272.6

THOMAS MEDIA OPERATIONS, L.L.C.

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President


NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of THOMAS MEDIA OPERATIONS, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.


_____
Notary Public


BLACK CROW RADIO, L.L.C.

By:    BLACK CROW MEDIA, L.L.C.
       Manager

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President


NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of BLACK CROW MEDIA, L.L.C., Manager of BLACK CROW RADIO, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.


_____
Notary Public


Exhibit A-5                                    CORP/974272.6

BCA RADIO, L.L.C.

By:    STG MEDIA, L.L.C.
       Manager

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President


## NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of STG MEDIA, L.L.C., Manager of BCA RADIO, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.

_____
Notary Public

RTG RADIO, L.L.C.

By:    RTG MEDIA, L.L.C., Manager

By:    BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President

## NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as Manager BLACK CROW MEDIA GROUP, LLC, Manager of RTG MEDIA, L.L.C., Manager of RTG RADIO, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.

_____
Notary Public


Exhibit A-6                              CORP/9742726

THOMAS RADIO, L.L.C.

By:   THOMAS MEDIA OPERATIONS, L.L.C.
       Manager

By:   BLACK CROW MEDIA GROUP, LLC
       Manager

By:_____
       Name:  J. Michael Linn
       Title:  President

## NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as President of BLACK CROW MEDIA GROUP, LLC, Manager of THOMAS MEDIA OPERATIONS, L.L.C., Manager of THOMAS RADIO, L.L.C., a Florida limited liability company ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.

_____
Notary Public

RAINBOW MEDIA, INC.

By:_____
       Name:  J. Michael Linn
       Title:  Treasurer

## NOTARY PUBLIC CERTIFICATE

On this _____ day of October, 2003, J. Michael Linn who is personally known to me appeared before me in his capacity as Treasurer of RAINBOW MEDIA, INC., a Tennessee corporation ("Grantor"), and executed on behalf of Grantor the Power of Attorney in favor of General Electric Capital Corporation to which this Certificate is attached.

_____
Notary Public

Exhibit A-7                    CORP/974272.6

# EXHIBIT C

**GENERAL ELECTRIC CAPITAL CORPORATION**
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009

January 8, 2009

<u>VIA FACSIMILE (386) 271-0141</u>
<u>AND OVERNIGHT COURIER</u>

Black Crow Media Group, LLC,
    as Borrower Representative
126 W. International Speedway Blvd.
Daytona Beach, Florida 32114
Attn: Mr. Mike Linn

      Re:    Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights

Ladies and Gentlemen:

      Reference is hereby made to (i) that certain Credit Agreement (as the same has been amended from time to time, the "Credit Agreement"), dated as of October 3, 2003, among Black Crow Media Group, LLC ("Borrower Representative"), the other Borrowers party thereto from time to time (collectively with the Borrower Representative, the "Borrowers"), the other Credit Parties signatory thereto from time to time, General Electric Capital Corporation, as agent (the "Agent") and lender, and the other lenders signatory thereto from time to time, (ii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of March 6, 2008 (the "March Default Letter"), (iii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of June 13, 2008 (the "June Default Letter") and (iv) that certain Notice of Events of Default, Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated October 20, 2008 (the "October Default Letter"; together with the March Default Letter and the June Default Letter, collectively, the "Default Letters"). The Credit Agreement and all other agreements entered in conjunction with the Credit Agreement, relating or pertaining thereto, as the same may have been amended from time to time, are referred to collectively herein as, the "Loan Documents." All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the applicable Loan Document(s).

      This letter shall serve as formal notice (this "Notice") of Borrowers' failure to satisfy (i) Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement with respect to Borrowers' failure to pay the required Term Loan A and Term Loan B quarterly principal installments due on December 31, 2008 (such failures, collectively, the "Payment Default") and (ii) Section 6.10 of the Credit Agreement for the Fiscal Quarter ending September 30, 2008, with respect to each of the Financial Covenants set forth in Annex G to the Credit Agreement, including Borrowers' failure to satisfy each of (a) the minimum Fixed Charge Coverage Ratio, (b) the minimum Interest Coverage Ratio, (c) the maximum Total Secured Leverage Ratio and (d) the maximum

Black Crow Media Group, LLC
January 8, 2009
Page 2

_____

Total Leverage Ratio (such failures, collectively, the "Financial Covenants Default").    The Payment Default constitutes an Event of Default under Section 8.1(a) of the Credit Agreement and the Financial Covenants Default constitutes an Event of Default under Section 8.1(b) of the Credit Agreement and, therefore, each of the Loan Documents is in default (such Events of Default, collectively, the "Existing Event of Default").    Agent and Lenders consider the Existing Event of Default to be serious and material.

This letter shall also serve as formal notice that the application of the Default Rate to the Obligations, as provided in the October Default Letter, shall continue and be payable in accordance with the Credit Agreement and the October Default Letter.

While it is not currently the intention of Agent and Lenders to, at this time, demand payment in full of the Obligations under the Loan Documents (although Agent and Lenders retain the right to do so at any time, and without any further notice, except for such notice, if any, as may be required under the Credit Agreement), Agent and Lenders do not, and do not intend to, waive the Existing Event of Default, the "Existing Events of Default" (as defined in the Default Letters) or any other Event of Default of which Agent and/or any Lender becomes aware.

Please be advised nothing contained in or implied by this Notice shall be construed as a commitment of any kind by Agent or any Lender to continue funding under the Credit Agreement, whether in accordance with the formulae set forth therein or otherwise, and Lenders have, and shall have, no obligation of any kind to (i) fund any future Revolving Credit Advances, or (ii) incur any future Letter of Credit Obligations, as the same may be requested by Borrowers following the date hereof.    Notwithstanding the foregoing, Lenders' agreement (if any) to (i) fund any future Revolving Credit Advance or (ii) incur any future Letter of Credit Obligations will not and shall not create (nor shall Borrowers rely upon the existence of or claim or assert that there exists) any obligation of Lenders to consider or agree to (a) fund any other request(s) for Revolving Credit Advances by Borrowers or (b) incur any other Letter of Credit Obligations on behalf of Borrowers and no funding by Lenders or issuance by any L/C Issuer of any such additional Revolving Credit Advances or Letters of Credit, as the case may be, nor any other conduct of Agent or any Lender shall be of any force or effect on Agent's and/or any Lender's consideration or decision with respect to any requested Revolving Credit Advance or any requested Letter of Credit, as applicable, and Lenders shall have no obligation whatsoever to consider or agree to further Revolving Credit Advances or Letters of Credit.

Please be further advised that it is the intention of Agent and Lenders to strictly enforce the covenants, conditions, provisions and terms of the Loan Documents and Agent and Lenders hereby demand Borrowers' and the other Credit Parties' strict compliance with said covenants, conditions, provisions and terms including, without limitation, delivery of the additional "cash reports", "account receivable statements", "account payable statements" and "pacing reports" as set forth in the March Default Letter, together with any other such financial or other information regarding the Borrowers, their assets and the Radio Stations requested by the Agent and Lenders. Agent retains and reserves all of its rights to exercise any and all other remedies as provided for in the Loan Documents or as otherwise available pursuant to applicable law, including, without

Black Crow Media Group, LLC
January 8, 2009
Page 3

limitation, its right to accelerate the Obligations under the Loan Documents at any time by exercising the powers enumerated therein, the right to terminate the Credit Agreement and all Loan Documents, the right to demand payment of all of the Obligations, the right to commence legal action to enforce the collection thereof and the right to realize upon the Collateral pledged to Agent under or in connection with the Loan Documents. Furthermore, this letter is not a waiver of any of Agent's or Lenders' rights under the Loan Documents, including, without limitation, the right to accelerate after default without notice. Nothing herein should be construed or interpreted as being a waiver of any rights or remedies which Agent or any Lender has pursuant to the Loan Documents by virtue of any voluntary, temporary forbearance or extension with respect thereto.

[Signatures Appear on Following Page]

Black Crow Media Group, LLC
January 8, 2009
Page 4

_____

Sincerely,
GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent

By:_____
Name: Nirmal B. Bivek
Title:   Duly Authorized Signatory

cc:    Wiley Rein LLP
       1776 K. Street N.W.
       Washington, D.C. 20006
       Attention:  Brian A. Johnson, Esq.
       Facsimile No.: (202) 719-7049

       Cobb & Cole
       150 Magnolia Avenue
       Daytona Beach, Florida 32115
       Attention:  Larry Marsh, Esq.
       Facsimile No.: (386) 238-7003

# EXHIBIT D

GENERAL ELECTRIC CAPITAL CORPORATION
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009

April 13, 2009

<u>VIA FACSIMILE (386) 271-0141</u>
<u>AND OVERNIGHT COURIER</u>

Black Crow Media Group, LLC,
     as Borrower Representative
126 W. International Speedway Blvd.
Daytona Beach, Florida 32114
Attn: Mr. Mike Linn

     Re:    Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights

Ladies and Gentlemen:

     Reference is hereby made to (i) that certain Credit Agreement (as the same has been amended from time to time, the "Credit Agreement"), dated as of October 3, 2003, among Black Crow Media Group, LLC ("Borrower Representative"), the other Borrowers party thereto from time to time (collectively with the Borrower Representative, the "Borrowers"), the other Credit Parties signatory thereto from time to time, General Electric Capital Corporation, as agent (the "Agent") and lender, and the other lenders signatory thereto from time to time, (ii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of March 6, 2008 (the "March 2008 Default Letter"), (iii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of June 13, 2008 (the "June 2008 Default Letter"), (iv) that certain Notice of Events of Default, Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated October 20, 2008 (the "October 2008 Default Letter") and (v) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated January 8, 2009 (the "January 2009 Default Letter"; together with the March 2008 Default Letter, the June 2008 Default Letter and the October 2008 Default Letter, collectively, the "Default Letters"). The Credit Agreement and all other agreements entered in conjunction with the Credit Agreement, relating or pertaining thereto, as the same may have been amended from time to time, are referred to collectively herein as, the "Loan Documents." All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the applicable Loan Document(s).

     This letter shall serve as formal notice (this "Notice") of Borrowers' failure to satisfy (i) Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement with respect to Borrowers' failure to pay the required Term Loan A and Term Loan B quarterly principal installments due on March 31, 2009 (such failures, collectively, the "Principal Payment Default"), (ii) Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter with respect to Borrowers' failure to pay that portion of interest equal to the Default Rate with respect to the interest

Black Crow Media Group, LLC
April 13, 2009
Page 2

---

payments due on April 1, 2009 (the "Interest Payment Default"; together with the Principal Payment Default, the "Payment Defaults"), and (iii) Section 6.10 of the Credit Agreement for the Fiscal Quarters ending December 31, 2008 with respect to each of the Financial Covenants set forth in Annex G to the Credit Agreement, including Borrowers' failure to satisfy each of (a) the minimum Fixed Charge Coverage Ratio, (b) the minimum Interest Coverage Ratio, (c) the maximum Total Secured Leverage Ratio and (d) the maximum Total Leverage Ratio (such failures, collectively, the "Financial Covenants Default"). The Payment Defaults constitute Events of Default under Section 8.1(a) of the Credit Agreement and the Financial Covenants Default constitutes an Event of Default under Section 8.1(b) of the Credit Agreement and, therefore, each of the Loan Documents is in default (such Events of Default, collectively, the "Existing Event of Default"). Agent and Lenders consider the Existing Event of Default to be serious and material.

This letter shall also serve as formal notice that the application of the Default Rate to the Obligations, as provided in the October 2008 Default Letter, shall continue and be payable in accordance with the Credit Agreement and the October 2008 Default Letter.

While it is not currently the intention of Agent and Lenders to, at this time, demand payment in full of the Obligations under the Loan Documents (although Agent and Lenders retain the right to do so at any time, and without any further notice, except for such notice, if any, as may be required under the Credit Agreement), Agent and Lenders do not, and do not intend to, waive the Existing Event of Default, the "Existing Events of Default" (as defined in the Default Letters) or any other Event of Default of which Agent and/or any Lender becomes aware.

Please be advised nothing contained in or implied by this Notice shall be construed as a commitment of any kind by Agent or any Lender to continue funding under the Credit Agreement, whether in accordance with the formulae set forth therein or otherwise, and Lenders have, and shall have, no obligation of any kind to (i) fund any future Revolving Credit Advances, or (ii) incur any future Letter of Credit Obligations, as the same may be requested by Borrowers following the date hereof. Notwithstanding the foregoing, Lenders' agreement (if any) to (i) fund any future Revolving Credit Advance or (ii) incur any future Letter of Credit Obligations will not and shall not create (nor shall Borrowers rely upon the existence of or claim or assert that there exists) any obligation of Lenders to consider or agree to (a) fund any other request(s) for Revolving Credit Advances by Borrowers or (b) incur any other Letter of Credit Obligations on behalf of Borrowers and no funding by Lenders or issuance by any L/C Issuer of any such additional Revolving Credit Advances or Letters of Credit, as the case may be, nor any other conduct of Agent or any Lender shall be of any force or effect on Agent's and/or any Lender's consideration or decision with respect to any requested Revolving Credit Advance or any requested Letter of Credit, as applicable, and Lenders shall have no obligation whatsoever to consider or agree to further Revolving Credit Advances or Letters of Credit.

Please be further advised that it is the intention of Agent and Lenders to strictly enforce the covenants, conditions, provisions and terms of the Loan Documents and Agent and Lenders hereby demand Borrowers' and the other Credit Parties' strict compliance with said covenants,

Black Crow Media Group, LLC
April 13, 2009
Page 3

conditions, provisions and terms including, without limitation, delivery of the additional "cash reports", "account receivable statements", "account payable statements" and "pacing reports" as set forth in the March 2008 Default Letter, together with any other such financial or other information regarding the Borrowers, their assets and the Radio Stations requested by the Agent and Lenders.  Agent retains and reserves all of its rights to exercise any and all other remedies as provided for in the Loan Documents or as otherwise available pursuant to applicable law, including, without limitation, its right to accelerate the Obligations under the Loan Documents at any time by exercising the powers enumerated therein, the right to terminate the Credit Agreement and all Loan Documents, the right to demand payment of all of the Obligations, the right to commence legal action to enforce the collection thereof and the right to realize upon the Collateral pledged to Agent under or in connection with the Loan Documents.  Furthermore, this letter is not a waiver of any of Agent's or Lenders' rights under the Loan Documents, including, without limitation, the right to accelerate after default without notice.  Nothing herein should be construed or interpreted as being a waiver of any rights or remedies which Agent or any Lender has pursuant to the Loan Documents by virtue of any voluntary, temporary forbearance or extension with respect thereto.

[Signatures Appear on Following Page]

Black Crow Media Group, LLC
April 13, 2009
Page 4

_____

Sincerely,
GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent

By: _____
Name: Nirmal B. Bivek
Title:   Duly Authorized Signatory


cc:    Wiley Rein LLP
       1776 K. Street N.W.
       Washington, D.C. 20006
       Attention:  Brian A. Johnson, Esq.
       Facsimile No.: (202) 719-7049

       Cobb & Cole
       150 Magnolia Avenue
       Daytona Beach, Florida 32115
       Attention:  Larry Marsh, Esq.
       Facsimile No.: (386) 238-7003

# EXHIBIT E

**GENERAL ELECTRIC CAPITAL CORPORATION**
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009

September 2, 2009

<u>**VIA FACSIMILE (386) 271-0141**</u>
<u>**AND OVERNIGHT COURIER**</u>

Black Crow Media Group, LLC,
     as Borrower Representative
126 W. International Speedway Blvd.
Daytona Beach, Florida 32114
Attn: Mr. Mike Linn

      Re:    Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights

Ladies and Gentlemen:

     Reference is hereby made to (i) that certain Credit Agreement (as the same has been amended from time to time, the "Credit Agreement"), dated as of October 3, 2003, among Black Crow Media Group, LLC ("Borrower Representative"), the other Borrowers party thereto from time to time (collectively with the Borrower Representative, the "Borrowers"), the other Credit Parties signatory thereto from time to time, General Electric Capital Corporation, as agent (the "Agent") and lender, and the other lenders signatory thereto from time to time, (ii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of March 6, 2008 (the "March 2008 Default Letter"), (iii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of June 13, 2008 (the "June 2008 Default Letter"), (iv) that certain Notice of Events of Default, Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated October 20, 2008 (the "October 2008 Default Letter"), (v) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated January 8, 2009 (the "January 2009 Default Letter") and (vi) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated April 13, 2009 (the "April 2009 Default Letter"; together with the March 2008 Default Letter, the June 2008 Default Letter, the October 2008 Default Letter and the January 2009 Default Letter, collectively, the "Default Letters"). The Credit Agreement and all other agreements entered in conjunction with the Credit Agreement, relating or pertaining thereto, as the same may have been amended from time to time, are referred to collectively herein as, the "Loan Documents." All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the applicable Loan Document(s).

     This letter shall serve as formal notice (this "Notice") that the Defaults and Events of Default listed on Exhibit A hereto have occurred and are continuing (the "Specific Defaults"). Agent and the Lenders consider the Specific Defaults to be serious and material.

Black Crow Media Group, LLC
September 2, 2009
Page 2

---

This letter shall also serve as formal notice that the application of the Default Rate to the Obligations, as provided in the October 2008 Default Letter, shall continue and be payable in accordance with the Credit Agreement and the October 2008 Default Letter.

Accordingly, as a result of the Specific Defaults, as well as any other Defaults or Events or Default that may exist, the Agent and the Lenders are entitled to exercise any and all default-related rights and remedies under the Credit Agreement, other Loan Documents and/or applicable law. While it is not currently the intention of Agent and the Lenders to, at this time, demand payment in full of the Obligations under the Loan Documents (although Agent and the Lenders retain the right to do so at any time, and without any further notice, except for such notice, if any, as may be required under the Credit Agreement), the Agent and the Lenders do not, and do not intend to, waive the Specific Defaults, the "Existing Events of Default" (as defined in the Default Letters) or any other Default or Event of Default of which Agent and/or any Lender becomes aware.

Please be advised that it is the intention of the Agent and the Lenders to strictly enforce the covenants, conditions, provisions and terms of the Loan Documents and the Agent and the Lenders hereby demand Borrowers' and the other Credit Parties' strict compliance with said covenants, conditions, provisions and terms including, without limitation, delivery of the additional "cash reports", "account receivable statements", "account payable statements" and "pacing reports" as set forth in the March 2008 Default Letter, together with any other such financial or other information regarding the Borrowers, their assets and the Radio Stations requested by the Agent and the Lenders.

In addition to the foregoing, the Agent and the Lenders will also continue to monitor the default situation very carefully and will decide in their sole discretion on a "day-by-day" basis whether or not to exercise their rights and remedies. We remind you, however, that neither any "day-by-day" discretionary extensions of credit by the Agent and the Lenders nor anything in this letter or in any ongoing discussions or negotiations between the Agent and/or any one or more of the Lenders, on the one hand, and the Borrower Representative and the other Credit Parties and the Credit Parties' Affiliates, on the other hand, nor any delay on the part of the Agent or the Lenders in exercising any of their respective rights and remedies under the Credit Agreement, the other Loan Documents and/or applicable law, shall directly or indirectly: (i) create any obligation to forbear from taking any enforcement action, or to make any further extensions of credit, (ii) constitute a consent to or waiver of any past, present or future Default or Event of Default or other violation of any provisions of the Credit Agreement or any other Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power, privilege or remedy of the Agent or any one or more of the Lenders thereunder or under applicable law or constitute an agreement to forbear or to restructure the Obligations in any respect or otherwise modify the capital structure of any or all of the Loan Parties, or (iv) constitute a course of dealing or other basis for altering any rights or obligations of the Agent or the Lenders under the Loan Documents or any Obligations of any Borrower or any other Credit Party under the Credit Agreement, other Loan Documents or any

Black Crow Media Group, LLC
September 2, 2009
Page 3

---

other contract or instrument. Nothing contained in this letter shall confer on any Borrower or any other Credit Party or Person any right to notice or cure periods with respect to any Event of Default.

This letter confirms that the Agent and the Lenders have not waived the Specific Defaults and each of the Agent and the Lenders expressly reserves all of its rights, powers, privileges and remedies under the Credit Agreement, other Loan Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to determine not to make further Loans or incur further Letter of Credit Obligations under the Credit Agreement as a result of the Specific Defaults and/or to terminate their Commitments to make Loans and incur Letter of Credit Obligations, (ii) to accelerate the Obligations,, (iii) to commence any legal or other action to collect any or all of the Obligations from any or all of the Borrower, the other Credit Parties, and any other person liable therefor and/or any Collateral, (iv) to foreclose or otherwise realize on any or all of the Collateral and/or as appropriate, set-off or apply to the payment of any or all of the Obligations, any or all of the Collateral, (v) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, other Loan Documents or applicable law, and (vii) to reject any forbearance, financial restructuring or other proposal made by or on behalf of the Borrowers, any other Credit Party or any creditor or equity holder. Each of the Agent and the Lenders may exercise their respective rights, powers, privileges and remedies, including those set forth in (i) through (v) above at any time in its sole and absolute discretion without further notice. No oral representations or course of dealing on the part of the Agent, any Lender or any of its officers, employees or agents, and no failure or delay by the Agent or any Lender with respect to the exercise of any right, power, privilege or remedy under any of the Credit Agreement, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

[Signatures Appear on Following Page]

Black Crow Media Group, LLC
September 2, 2009
Page 4

_____

Sincerely,
GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent

By: _____
Name: Nirmal B. Bivek
Title:   Duly Authorized Signatory

cc:   Wiley Rein LLP
      1776 K. Street N.W.
      Washington, D.C. 20006
      Attention:  Brian A. Johnson, Esq.
      Facsimile No.: (202) 719-7049

      Cobb & Cole
      150 Magnolia Avenue
      Daytona Beach, Florida 32115
      Attention:  Larry Marsh, Esq.
      Facsimile No.: (386) 238-7003

<u>Exhibit A</u>

*Specific Defaults*

(i)      The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on June 30, 2009 as required pursuant to <u>Sections 1.1(b)(i)(B)</u> and <u>1.1(b)(ii)(B)</u> of the Credit Agreement, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(ii)      The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on March 31, 2009 as required pursuant to <u>Sections 1.1(b)(i)(B)</u> and <u>1.1(b)(ii)(B)</u> of the Credit Agreement, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(iii)      The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on April 1, 2009 as required pursuant to <u>Section 1.5(d)</u> of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(iv)      The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on May 1, 2009 as required pursuant to <u>Section 1.5(d)</u> of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(v)      The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on June 1, 2009 as required pursuant to <u>Section 1.5(d)</u> of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(vi)      The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on July 1, 2009 as required pursuant to <u>Section 1.5(d)</u> of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(vii)      The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on August 1, 2009 as required pursuant to <u>Section 1.5(d)</u> of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(viii)      The Borrowers failed to pay the interest payment due on July 1, 2009 as required pursuant to <u>Section 1.5(a)</u> of the Credit Agreement, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

(ix)      The Borrowers failed to pay the interest payment due on August 1, 2009 as required pursuant to <u>Section 1.5(a)</u> of the Credit Agreement, and as a result an Event of Default has arisen under <u>Section 8.1(a)</u> of the Credit Agreement;

Black Crow Media Group, LLC
September 2, 2009
Page 6

---

(x)     The Borrowers failed to pay the unused revolver fee due on July 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xi)     The Borrowers failed to pay the unused revolver fee due on August 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xii)     The Borrowers failed to pay the unused revolver fee due on September 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result a Default has arisen under the Credit Agreement and an Event of Default is anticipated to occur under Section 8.1(a) of the Credit Agreement on September 8, 2009;

(xiii)     The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xiv)     The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xv)     The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xvi)     The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xvii)     The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xviii)     The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xix)     The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

Black Crow Media Group, LLC
September 2, 2009
Page 7

---

(xx)    The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to <u>Section 6.10</u> of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under <u>Section 8.1(b)</u> of the Credit Agreement;

(xxi)    The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to <u>Section 6.10</u> of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under <u>Section 8.1(b)</u> of the Credit Agreement;

(xxii)    The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to <u>Section 6.10</u> of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under <u>Section 8.1(b)</u> of the Credit Agreement;

(xxiii)    The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to <u>Section 6.10</u> of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under <u>Section 8.1(b)</u> of the Credit Agreement; and

(xxiv)    The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to <u>Section 6.10</u> of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under <u>Section 8.1(b)</u> of the Credit Agreement.

# EXHIBIT F

GENERAL ELECTRIC CAPITAL CORPORATION
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009

October 8, 2009

<u>VIA FACSIMILE (386) 271-0141</u>
<u>AND OVERNIGHT COURIER</u>

Black Crow Media Group, LLC,
      as Borrower Representative
126 W. International Speedway Blvd.
Daytona Beach, Florida 32114
Attn: Mr. Mike Linn

      Re:    Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate, Demand for Payment of Certain Interest Payable with respect to Swap Related Reimbursement Obligations, and Reservation of Rights

Ladies and Gentlemen:

      Reference is hereby made to (i) that certain Credit Agreement (as the same has been amended from time to time, the "Credit Agreement"), dated as of October 3, 2003, among Black Crow Media Group, LLC ("Borrower Representative"), the other Borrowers party thereto from time to time (collectively with the Borrower Representative, the "Borrowers"), the other Credit Parties signatory thereto from time to time, General Electric Capital Corporation, as agent (the "Agent") and lender, and the other lenders signatory thereto from time to time, (ii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of March 6, 2008 (the "March 2008 Default Letter"), (iii) that certain Notice of Events of Default, Request for Information and Reservation of Rights, dated as of June 13, 2008 (the "June 2008 Default Letter"), (iv) that certain Notice of Events of Default, Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated October 20, 2008 (the "October 2008 Default Letter"), (v) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated January 8, 2009 (the "January 2009 Default Letter"), (vi) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated April 13, 2009 (the "April 2009 Default Letter") and (vii) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate and Reservation of Rights, dated as of September 2, 2009 (the "September 2009 Default Letter"; together with the March 2008 Default Letter, the June 2008 Default Letter, the October 2008 Default Letter, the January 2009 Default Letter, the April 2009 Default Letter and the September 2009 Default Letter, collectively, the "Default Letters"). The Credit Agreement and all other agreements entered in conjunction with the Credit Agreement, relating or pertaining thereto, as the same may have been amended from time to time, are referred to collectively herein as, the "Loan Documents." All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the applicable Loan Document(s).

Black Crow Media Group, LLC
October 8, 2009
Page 2

---

This letter shall serve as formal notice (this "Notice") that the Defaults and Events of Default listed on <u>Exhibit A</u> hereto have occurred and are continuing (the "<u>Specific Defaults</u>"). Agent and the Lenders consider the Specific Defaults to be serious and material.

This letter shall also serve as formal notice that the application of the Default Rate to the Obligations, as provided in the October 2008 Default Letter, shall continue and be payable in accordance with the Credit Agreement and the October 2008 Default Letter.

This letter shall further serve as formal notice of Agent's demand, as of the date of this letter, of payment in full in cash of all Swap Related Reimbursement Obligations in the amount of $303,719.35 and all interest payable with respect thereto as of the date of this letter in the aggregate amount of $317.32 pursuant to <u>Section 1.2</u> of the Credit Agreement, which such Swap Related Reimbursement Obligations and interest payable with respect thereto remain due and payable and continues to accrue in accordance with the Credit Agreement.

Accordingly, as a result of the Specific Defaults, as well as any other Defaults or Events or Default that may exist, the Agent and the Lenders are entitled to exercise any and all default-related rights and remedies under the Credit Agreement, other Loan Documents and/or applicable law. While it is not currently the intention of Agent and the Lenders to, at this time, demand payment in full of the Obligations under the Loan Documents (except for the Swap Related Reimbursement Obligations and interest payable with respect thereto as set forth in the immediately preceding paragraph, and although Agent and the Lenders retain the right to do so at any time, and without any further notice, except for such notice, if any, as may be required under the Credit Agreement), the Agent and the Lenders do not, and do not intend to, waive the Specific Defaults, the "Existing Events of Default" (as defined in the Default Letters) or any other Default or Event of Default of which Agent and/or any Lender becomes aware.

Please be advised that it is the intention of the Agent and the Lenders to strictly enforce the covenants, conditions, provisions and terms of the Loan Documents and the Agent and the Lenders hereby demand Borrowers' and the other Credit Parties' strict compliance with said covenants, conditions, provisions and terms including, without limitation, delivery of the additional "cash reports", "account receivable statements", "account payable statements" and "pacing reports" as set forth in the March 2008 Default Letter, together with any other such financial or other information regarding the Borrowers, their assets and the Radio Stations requested by the Agent and the Lenders.

In addition to the foregoing, the Agent and the Lenders will also continue to monitor the default situation very carefully and will decide in their sole discretion on a "day-by-day" basis whether or not to exercise their rights and remedies. We remind you, however, that neither any "day-by-day" discretionary extensions of credit by the Agent and the Lenders nor anything in this letter or in any ongoing discussions or negotiations between the Agent and/or any one or more of the Lenders, on the one hand, and the Borrower Representative and the other Credit Parties and the Credit Parties' Affiliates, on the other hand, nor any delay on the part of the Agent or the Lenders in exercising any of their respective rights and remedies under the Credit

Black Crow Media Group, LLC
October 8, 2009
Page 3

---

Agreement, the other Loan Documents and/or applicable law, shall directly or indirectly: (i) create any obligation to forbear from taking any enforcement action, or to make any further extensions of credit, (ii) constitute a consent to or waiver of any past, present or future Default or Event of Default or other violation of any provisions of the Credit Agreement or any other Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power, privilege or remedy of the Agent or any one or more of the Lenders thereunder or under applicable law or constitute an agreement to forbear or to restructure the Obligations in any respect or otherwise modify the capital structure of any or all of the Loan Parties, or (iv) constitute a course of dealing or other basis for altering any rights or obligations of the Agent or the Lenders under the Loan Documents or any Obligations of any Borrower or any other Credit Party under the Credit Agreement, other Loan Documents or any other contract or instrument. Nothing contained in this letter shall confer on any Borrower or any other Credit Party or Person any right to notice or cure periods with respect to any Event of Default.

This letter confirms that the Agent and the Lenders have not waived the Specific Defaults and each of the Agent and the Lenders expressly reserves all of its rights, powers, privileges and remedies under the Credit Agreement, other Loan Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to determine not to make further Loans or incur further Letter of Credit Obligations under the Credit Agreement as a result of the Specific Defaults and/or to terminate their Commitments to make Loans and incur Letter of Credit Obligations, (ii) to accelerate the Obligations,, (iii) to commence any legal or other action to collect any or all of the Obligations from any or all of the Borrower, the other Credit Parties, and any other person liable therefor and/or any Collateral, (iv) to foreclose or otherwise realize on any or all of the Collateral and/or as appropriate, set-off or apply to the payment of any or all of the Obligations, any or all of the Collateral, (v) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, other Loan Documents or applicable law, and (vii) to reject any forbearance, financial restructuring or other proposal made by or on behalf of the Borrowers, any other Credit Party or any creditor or equity holder. Each of the Agent and the Lenders may exercise their respective rights, powers, privileges and remedies, including those set forth in (i) through (v) above at any time in its sole and absolute discretion without further notice. No oral representations or course of dealing on the part of the Agent, any Lender or any of its officers, employees or agents, and no failure or delay by the Agent or any Lender with respect to the exercise of any right, power, privilege or remedy under any of the Credit Agreement, other Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

[Signatures Appear on Following Page]

Black Crow Media Group, LLC
October 8, 2009
Page 4

_____

Sincerely,
GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent

By:_____
Name: Nirmal B. Bivek
Title:   Duly Authorized Signatory


cc:     Wiley Rein LLP
        1776 K. Street N.W.
        Washington, D.C. 20006
        Attention:  Brian A. Johnson, Esq.
        Facsimile No.: (202) 719-7049

        Cobb & Cole
        150 Magnolia Avenue
        Daytona Beach, Florida 32115
        Attention:  Larry Marsh, Esq.
        Facsimile No.: (386) 238-7003

## Exhibit A

*Specific Defaults*

(i)    The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on September 30, 2009 as required pursuant to Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(ii)    The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on October 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(iii)    The Borrowers failed to pay the interest payment due on October 1, 2009 as required pursuant to Section 1.5(a) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(iv)    The Borrowers failed to pay the unused revolver fee due on October 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(v)    The Borrowers failed to pay the Swap Related Reimbursement Obligation within one (1) Business Day after September 8, 2009 as required pursuant to Section 1.2(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(vi)    The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on June 30, 2009 as required pursuant to Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(vii)    The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on March 31, 2009 as required pursuant to Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(viii)    The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on April 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(ix)    The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on May 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

Black Crow Media Group, LLC
October 8, 2009
Page 6

---

(x)     The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on June 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xi)     The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on July 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xii)     The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on August 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and the October 2008 Default Letter, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xiii)     The Borrowers failed to pay the interest payment due on July 1, 2009 as required pursuant to Section 1.5(a) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xiv)     The Borrowers failed to pay the interest payment due on August 1, 2009 as required pursuant to Section 1.5(a) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xv)     The Borrowers failed to pay the unused revolver fee due on July 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xvi)     The Borrowers failed to pay the unused revolver fee due on August 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

(xvii)     The Borrowers failed to pay the unused revolver fee due on September 1, 2009 as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result a Default has arisen under the Credit Agreement and an Event of Default is anticipated to occur under Section 8.1(a) of the Credit Agreement on September 8, 2009;

(xviii) The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xix)     The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

Black Crow Media Group, LLC
October 8, 2009
Page 7

(xx)    The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxi)   The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxii)  The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxiii) The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxiv)  The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxv)   The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxvi)  The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxvii) The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending December 31, 2008, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement;

(xxviii)The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending March 31, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement; and

(xxix)  The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarter ending June 30, 2009, and as a result an Event of Default has arisen under Section 8.1(b) of the Credit Agreement.

# EXHIBIT G

<u>**VIA UPS OVERNIGHT DELIVERY AND FACSIMILE:**</u>

January 4, 2010

Black Crow Media Group, LLC
126 W. International Speedway Blvd.
Daytona Beach, Florida 32114
Attention: Mr. Mike Linn
Telecopier No.: (386) 271-0141

Re:    Credit Agreement dated as of October 3, 2003 (as amended to date, the "<u>Credit Agreement</u>") among Black Crow Media Group, LLC ("Holdings"), Black Crow Media, LLC, a Florida limited liability company ("Black Crow Media"), Rocket City Broadcasting LLC (f/k/a STG Media, L.L.C.) ("Rocket City"), RTG Media, LLC ("RTG Media"), Thomas Media Operations, LLC ("Thomas Media"), Black Crow Radio, LLC ("Black Crow Radio"), BCA Radio, LLC ("BCA Radio"), RTG Radio, LLC ("RTG Radio"), Thomas Radio, LLC ("Thomas Radio"), Rainbow Media, Inc. ("Rainbow" and, together with Holdings, Black Crow Media, Rocket City, RTG Media, Thomas Media, Black Crow Radio, BCA Radio, RTG Radio and Thomas Radio, collectively, the "<u>Borrowers</u>"), the lenders party thereto from time to time ("<u>Lenders</u>") and General Electric Capital Corporation, as agent for the Lenders (the "<u>Agent</u>").    Capitalized terms used herein but not defined herein shall have the meanings set forth in the Credit Agreement.

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement and each of the other Loan Documents. Reference is further made to (i) that certain Notice of Events of Default, Continued Demand for Payment of Certain Interest at Default Rate, Demand for Payment of Certain Interest Payable with respect to Swap Related Reimbursement Obligations, and Reservation of Rights Letter, dated October 8, 2009 (the "<u>October 2009 Default Letter</u>") and (ii) each of the Default Letters (as defined in the October 2009 Default Letter). As described in the October 2009 Default Letter and the Default Letters, numerous Events of Default have occurred including, without limitation, the Events of Default set forth on Exhibit A hereto (the "<u>Specified Defaults</u>"). Such Specified Defaults have occurred and are continuing on the date hereof.

Pursuant to the Loan Documents, the Agent hereby provides notice that (i) the principal of and any accrued interest on the Loans, and all other amounts due under the Loan Documents are immediately due and payable and (ii) the obligation, if any, of the Lenders to advance amounts under the Loan Agreement is terminated pursuant to <u>Section 8.2(b)</u> of the Credit

Black Crow Media Group, LLC
Page 2

Agreement. Because of the existence of the Specified Defaults, the Agent is entitled to exercise all of its other remedies under the Loan Documents and all other remedies available at law or in equity.

The exercise by the Agent, of any of its rights and remedies under any of the Loan Documents shall not be deemed a waiver of or preclude the exercise of any of its or any other Lenders' other rights or remedies under any of the Loan Documents or any rights or remedies which the Agent or any other Lender may have at law or in equity. The Agent and the other Lenders expressly reserve all such rights and remedies.

Sincerely,

GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent

By: _____
Name: Nirmal Bivek
Title: Duly Authorized Signatory

cc:

Wiley Rein & Fielding LLP
1776 K. Street, N.W.
Washington, D.C. 20006
Attention: Brian A. Johnson, Esq.
Telecopier No.(202) 719-7049

Cobb & Cole
150 Magnolia Avenue
Daytona Beach, Florida 32115
Attention: Larry Marsh, Esq.
Telecopier No.: (386) 238-7003

Black Crow Media Group, LLC
Page 3

# EXHIBIT A

## SPECIFIED DEFAULTS

1. The Borrowers failed to pay the required Term Loan A and Term Loan B quarterly principal installments due on December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009 as required pursuant to Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement, and as a result Events of Default have arisen under Section 8.1(a) of the Credit Agreement;

2. The Borrowers failed to pay the outstanding principal balance of the Term Loan A and Term Loan B due on December 28, 2009 as required pursuant to Sections 1.1(b)(i)(B) and 1.1(b)(ii)(B) of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement;

3. The Borrowers failed to pay that portion of interest equal to the Default Rate with respect to the interest payments due on April 1, 2009, May 1, 2009, June 1, 2009, July 1, 2009, August 1, 2009 and October 1, 2009 as required pursuant to Section 1.5(d) of the Credit Agreement and that certain Notice of Events of Default, Demand for Payment of Certain Interest at Default Rate and Reservation of Rights letter, dated October 20, 2009 (the "October 2008 Default Letter"), and as a result Events of Default have arisen under Section 8.1(a) of the Credit Agreement;

4. The Borrowers failed to pay the interest payments due on July 1, 2009, August 1, 2009 and October 1, 2009 as required pursuant to Section 1.5(a) of the Credit Agreement, and as a result Events of Default have arisen under Section 8.1(a) of the Credit Agreement;

5. The Borrowers failed to pay the unused revolver fee due on July 1, 2009, August 1, 2009, September 1, 2009, October 1, 2009, November 1, 2009, December 1, 2009 and on the Commitment Termination Date, as required pursuant to Section 1.9(b) of the Credit Agreement, and as a result Events of Default have arisen under Section 8.1(a) of the Credit Agreement;

6. The Borrowers failed to pay the Swap Related Reimbursement Obligation within one (1) Business Day after September 8, 2009 and November 18, 2009 as required pursuant to Section 1.2(b) of the Credit Agreement, and as a result Events of Default have arisen under Section 8.1(a) of the Credit Agreement;

7. The Borrowers failed to satisfy the minimum Fixed Charge Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarters ending December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009, and as a result Events of Default have arisen under Section 8.1(b) of the Credit Agreement;

8. The Borrowers failed to satisfy the minimum Interest Coverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarters ending December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009, and as a result Events of Default have arisen under Section 8.1(b) of the Credit Agreement;

Black Crow Media Group, LLC
Page 4

9. The Borrowers failed to satisfy the maximum Total Secured Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarters ending December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009, and as a result Events of Default have arisen under Section 8.1(b) of the Credit Agreement;

10. The Borrowers failed to satisfy the maximum Total Leverage Ratio as required pursuant to Section 6.10 of the Credit Agreement for the Fiscal Quarters ending December 31, 2007, March 31, 2008, June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009, and as a result Events of Default have arisen under Section 8.1(b) of the Credit Agreement; and

11. The Borrowers failed to pay the Agent for its fees, costs and expenses following the Agent's demand therefor as required pursuant to Section 11.3 of the Credit Agreement, and as a result an Event of Default has arisen under Section 8.1(a) of the Credit Agreement.

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENERAL ELECTRIC CAPITAL CORPORATION,

PLAINTIFF,

- AGAINST -

BLACK CROW MEDIA, L.L.C., ROCKET CITY
BROADCASTING LLC, BLACK CROW MEDIA OF
VALDOSTA LLC (F/K/A RTG MEDIA, L.L.C.),
THOMAS MEDIA OPERATIONS, L.L.C., BLACK
CROW RADIO, L.L.C, BCA RADIO, L.L.C., RTG
RADIO, L.L.C., THOMAS RADIO, L.L.C., AND
RAINBOW MEDIA, INC.,

DEFANDANTS.

Civil Action No. _____
ECF Case

### AFFIDAVIT

Personally appeared before me, the undersigned officer duly authorized to administer oaths, W. Lawrence Patrick, who being duly sworn, deposes and says:

1.    My name is W. Lawrence Patrick.  I am over the age of 18 and am competent in all respects to give this affidavit.

2.    I am familiar with the particular facts at issue in the above-captioned matter.  I am duly qualified to serve as the receiver in the above-captioned matter, as I (i) currently own and operate 14 stations (1998 to present) and own a part of 26 other stations (2007 to present); (ii) previously operated 12 radio stations of my own from 1986 through 1992; (iii) have been appointed as a federal or state court receiver or bankruptcy trustee in six cases involving 19 broadcast stations; and (iii)  have served as a trustee or consultant on over 125 voluntary workouts of broadcast stations.  A copy of my resume is attached hereto as Exhibit 1.  Also attached hereto as Exhibit 2, is a copy of my firm's resume.

NYC_IMANAGE-1100094.1

3.    I am ready, willing, and able to act, upon the Court's approval of my appointment, as the receiver of the Defendants and their property.

Further Affiant sayeth not.

_W. Lawrence Patrick_
W. Lawrence Patrick

Sworn to and subscribed before
me this 30 day of December, 2009.

Notary Public

My Commission Expires: 7/27/10

NYC_IMANAGE-1100094.1

## EXHIBIT 1

NYC_IMANAGE-1100094.1

# Biography of W. Lawrence Patrick

Larry Patrick serves as Managing Partner of Patrick Communications, LLC, a media investment banking and brokerage firm. Patrick Communications was established by Mr. Patrick in 1984 and is based in Elkridge, Maryland. Mr. Patrick also owns 14 small market radio stations in Wyoming and is an investor in another 26 stations in Missouri and Iowa.

Mr. Patrick has handled over 500 radio and 150 television broadcasting deals worth over $6.5 billion in his career. He has also consulted dozens of broadcast and cable companies as well as 50 financial institutions, including Bank of America, Goldman Sachs, Citicorp, Wells Fargo, Silver Point Capital, Vestar Partners, Fortress Investments, Canyon Partners, Barclays Capital, Merrill-Lynch, BlackRock Investments, Fleet Bank, Canyon Partners, Q Investments, TPG Partners, Corporate Partners, C.I.T. and D. B. Zwirn among others.

The company also regular provides detailed station valuation reports to broadcasters and financial institutions. Mr. Patrick has produced appraisals of two of the largest broadcast-related estate appraisals ever. These appraisals were the basis for successful litigation against the Internal Revenue Service with a value of over $500 million. As a result, the I.R.S. now regularly uses the firm on broadcast station valuations.

Mr. Patrick has served as a federal or state court receiver or bankruptcy trustee in six cases involving 19 broadcast stations. In addition, Mr. Patrick served as a Trustee or consultant on over 125 voluntary workouts of broadcast stations and has represented Bank of America, Fleet Bank, AMRESCO, Fortress Investments, RECOLL Management, D. B. Zwirn, Goldman Sachs, Compass Bank, National Westminster Bank and other firms in these distressed property situations. Overall, Mr. Patrick posted an outstanding recovery rate for secured creditors in these bankruptcies and workouts. All senior creditor claims were paid in full in these cases.

Mr. Patrick has testified in 25 federal and state court cases as an expert witness on station valuations, contract damage claims, libel damages and station management and operations. He has always been on the winning side of these cases. He also has testified before committees of the U.S. Senate and the House of Representatives, the Federal Communications Commission, the Federal Trade Commission, the Copyright Royalty Tribunal and the Australian Communications Department. Most recently, he testified in March, 2009 before the House Judiciary Committee in opposition to the radio performance tax.

Mr. Patrick also served as Chairman of the Board and Chairman of the Committee of Independent Directors of ION Media Networks from 2005 to 2008. ION is a national television broadcasting network serving over 91 million households daily with a core of 60 owned and operated television stations. Mr. Patrick oversaw the refinancing of that company, an exchange offer with the public bondholders and eventually sold the company in a going-private transaction in 2008 to Citadel Investment Group for $2.6 billion. This was the largest single broadcast restructuring to date in the history of the broadcasting industry.

On the cable side, Mr. Patrick has managed cable systems, provided appraisal and brokerage services to several dozen cable companies and advised numerous financial institutions on the value of cable their credits and investments.

Mr. Patrick previously operated 12 radio stations of his own from 1986 through 1992. Mr. Patrick also served as Chief Operating Officer of Gilmore Broadcasting of Kalamazoo, Michigan. Gilmore owned four radio and three television stations as well as 18 cable television systems. Prior to this, Mr. Patrick served as Senior Vice President of the National Association of Broadcasters in Washington, D.C. from 1979 through 1983. His direct station operating experience has included stations in Miami, Dallas, Salt Lake City, Dayton, Jacksonville, Greenville-Spartanburg, San Antonio, Austin, Modesto, Fresno, Allentown, Savannah, Quad Cities, Evansville, Rockford, Jackson, Baton Rouge, Reading, Youngtown-Canton, Sioux City, Morristown, Harrisonburg, Joplin, McAllen-Harlingen, Laredo and several dozen smaller markets.

Mr. Patrick also served as a professor of communications at both the University of Tulsa and the University of Maryland for four years fulltime prior to joining NAB and continued to teach at Maryland for an additional 12 years as an adjunct professor. Mr. Patrick also previously held operations and management positions with Nationwide Communications' WATE-AM/TV in Knoxville, Tennessee, Bluegrass Broadcasting's WKYT-TV in Lexington, Kentucky and at Kentucky Educational Television also in Lexington.

Mr. Patrick also has lectured in the International Training Program for the Voice of America and has traveled to a number of foreign countries, including Russia, Ukraine, Spain, Great Britain, Barbados, Australia, Hungry, Bahamas, Czech Republic, Jamaica, Italy, Lithuania, Canada and Mexico to teach and consult with broadcasters there.

Mr. Patrick holds a B.A. in telecommunications from the University of Kentucky (1972); a M.S. in communications from the University of Tennessee (1973); a Ph.D. in communications and management from Ohio University (1975); and a J.D. from the Georgetown University Law Center (1979). He was admitted as a member of the Maryland bar in 1980. Mr. Patrick has co-authored three books on broadcast station management and finance as well as several journal articles. He is a regular speaker at both corporate meetings and state media association conventions. He was named the outstanding alumnus at both the University of Tennessee (1996) and Ohio University (1995). He is also currently an adjunct professor at both Georgetown University Law Center and Central Michigan University.

He currently serves as Chairman of the National Association of Broadcasters Political Action Committee (NABPAC) and serves on the Boards of the NAB's Educational Foundation; the Bayliss Foundation; GoodRadio.TV; the Library of American Broadcasting; TTBG, LCC, a television group; the University of Tennessee; and the Yellowstone Park Foundation. Mr. Patrick is a past President of the Broadcast Education Association as well as the National Association of Media Brokers. He was awarded the Distinguished Education Service Award by BEA in 2005.

2

# EXHIBIT 2

# Patrick Communications

Patrick Communications, LLC is a media brokerage and investment banking firm established in 1984 with offices in Elkridge, Maryland. The firm is owned and managed by W. Lawrence and Susan K. Patrick. The two partners and the three other brokers working at the firm have over 75 years of media brokerage and investment banking experience. SNL Kagan ranks the firm as the top media brokerage firm in 2009.

The firm has sold over 500 radio and 150 television stations to date with a value of over $6.5 billion. In addition, Larry Patrick has served as a Trustee or Receiver on numerous workout and restructuring assignments. The firm is also active in the negotiation and sale of towers and spectrum for cellular and other wireless purposes. The firm also offers valuation services and management consulting. Finally, the firm has placed several hundred million worth of debt and equity for its clients.

Larry Patrick has a long history of station ownership, corporate executive positions in broadcasting, service on Boards of several broadcasting companies and as a broadcast trade association executive. He also served as Chairman of a television network and handled the largest television workout to date. He regularly serves as an expert witness and has testified before Congress and regulatory agencies. He holds a B.A. in telecommunications, a M.S. in communications, a Ph.D. in communications and management as well as a J.D. degree.

Susan Patrick was a media broker for 10 years with Blackburn & Company before joining the firm in 1994. She has produced hundreds of station valuations, testified in court and brokered dozen of station transactions. She holds a B.A. in communications and a M.B.A in finance.

Greg Guy is a broker with the firm and has over 11 years of experience as a broker. He is the leading broker for non-commercial stations in the nation and has completed almost one hundred deals. He holds a B.A. and M.A. in communications.

John Cunney is a broker with over 15 years of experience on Wall Street with a specialty in wireless spectrum and tower brokerage. He holds a B.A. in business and a M.B.A. in finance.

Jason James is a broker with the firm with three years of experience. He holds a B.A. and a M.A. in communication.

The firm also employs a CFO who holds a B.A. and is a C.P.A., one other C.P.A. and two financial accountants as well as three other support personnel.

A representative list of clients of the firm includes:

<u>Broadcasting Companies</u>

Meredith

Nexstar

Raycom Media

Evening Post Publishing

LIN Television

Cumulus Media

Paxson Communications (ION)

Mapleton Communications

Morgan Murphy Media

Lockwood Broadcasting

Equity Broadcasting

Eagle Communications

Littick Broadcasting

Dittman Broadcasting

WLEX-TV

KTEN-TV

Saga Communications

Jewell Television

Close Communications

Gannett Television

Bahakel Communications

<u>Financial Firms</u>

Goldman Sachs

Citicorp

Fortress Investments

Bank of America

Fleet Bank

Wells Fargo

Canyon Partners

VestarPartners

Corporate Partners

BlackRock Investments

D. B. Zwirn

ABRY Partners

AMRESCO

Barclay's Capital

RECOLL Management

Perella Weinberg

Silver Point Finance

Lazard

Fifth Third Bank

Q Investments

TPG Group

For more details, please visit www.patcomm.com